UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KENNETH F. WYMAN, JR. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18-cv-00095-JAW |
| | ) | |
| UNITED STATES SURGICAL | ) | |
| CORPORATION et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

A lobster and crab fisherman brings claims against the successor to the corporation that disposed of tons of mercury into the Penobscot River based on harm he and his business suffered allegedly as a result of shellfish contamination caused by the continued presence of mercury in the Penobscot River. The fisherman seeks partial summary judgment on his nuisance and strict liability causes of action, arguing that past findings in a related Resource Conservation and Recovery Act (RCRA) case should be applied to preclude the defense arguments on liability and causation and, in the alternative, that he has established liability and causation even without application of issue preclusion. Because the Court finds that issue preclusion is not proper and that the successor entity has successfully raised genuine disputes of material fact as to liability and causation, the Court denies the fisherman's motion.

## I.   PROCEDURAL HISTORY

On March 5, 2018, Kenneth F. Wyman, Jr. and F/V Megan K II LLC (collectively Mr. Wyman) filed a complaint against United States Surgical

Corporation (U.S. Surgical) and its wholly owned subsidiary Mallinckrodt US LLC (Mallinckrodt). *Compl.* (ECF No. 1); *Mallinckrodt US LLC's Corporate Disclosure Statement* (ECF No. 13). On May 14, 2018, Mallinckrodt and U.S. Surgical filed a partial motion to dismiss for failure to state a claim. *Defs.' Partial Mot. to Dismiss* (ECF No. 9). On May 30, 2018, Mr. Wyman filed a response to Mallinckrodt and U.S. Surgical's motion to dismiss. *Pls.' Obj. to Defs.' Partial Mot. to Dismiss* (ECF No. 16). On June 13, 2018, Mallinckrodt and U.S. Surgical filed a reply to Mr. Wyman's objection. *Defs.' Reply in Supp. of Partial Mot. to Dismiss* (ECF No. 22).

On June 15, 2018, Mallinckrodt and U.S. Surgical answered the Complaint, *Defs.' Joint Answer and Affirmative Defenses* (ECF No. 23), and on June 27, 2018, Mr. Wyman moved to amend the Complaint. *Pls.' Mot. to Amend Compl. (Corrected)* (ECF No. 25). On July 23, 2018, a Magistrate Judge granted Mr. Wyman's motion to amend without objection, *Order Granting Without Obj. Mot. to Amend* (ECF No. 30), and Mr. Wyman filed his amended complaint that same day. *First Am. Compl.* (ECF No. 31). On August 6, 2018, Mallinckrodt and U.S. Surgical answered the First Amended Complaint. *Defs.' Joint Answer to First Am. Compl. and Affirmative Defenses* (ECF No. 37) (*Answer*). On March 6, 2019, the Court denied Mallinckrodt and U.S. Surgical's Partial Motion to Dismiss. *Order Denying Defs.' Partial Mot. to Dismiss* (ECF No. 50).

On March 7, 2019, Mr. Wyman filed a motion for partial summary judgment, *Pls.' Mot. in Supp. of Mot. for Partial Summ. J. on Liability and Causation for Counts I-II and III-IV* (ECF No. 52) (*Pls.' Mot.*), and a statement of material facts. *Pls.'*

*Statement of Material Facts as to Which There Is No Genuine Dispute* (ECF No. 54)
(PSMF). On April 26, 2019, Mallinckrodt and U.S. Surgical filed a response to Mr.
Wyman's motion for partial summary judgment, *Defs.' Opp'n to Pls.' Mot. for Partial
Summ. J.* (ECF No. 66) (*Defs.' Opp'n*), a response to Mr. Wyman's statement of
material facts, and a statement of additional material facts. *Defs.' Opposing
Statement of Material Facts and Statement of Additional Material Facts* (ECF No. 67)
(for Mallinckrodt and U.S. Surgical's opposing statement of material facts, DRPSMF;
for Mallinckrodt and U.S. Surgical's statement of additional material facts, DSAMF).
On June 7, 2019, Mr. Wyman filed a reply to Mallinckrodt and U.S. Surgical's
response, *Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for Partial Summ. J.* (ECF No. 74)
(*Pls.' Reply*), and a response to Mallinckrodt and U.S. Surgical's statement of
additional material facts. *Pls.' Resp. to Defs.' Statement of Additional Material Facts*
(ECF No. 75). On October 16, 2019, Mr. Wyman filed an amended reply to
Mallinckrodt and U.S. Surgical's statement of additional material facts. *Pls.' Am.
Resps. to Defs.' Statement of Additional Material Facts* (ECF No. 89) (PRDSAMF).

Also, on April 26, 2019, Mallinckrodt and U.S. Surgical filed three additional
documents: a motion pursuant to Federal Rule of Civil Procedure 56(d) to defer or
deny summary judgment, *Defs.' Rule 56(d) Mot. to Deny or Defer Pls.' Mot. for Partial
Summ. J.* (ECF No. 63); a cross-motion for partial summary judgment, *Defs.' Cross-
Mot. for Partial Summ. J.* (ECF No. 64); and a statement of material facts in support
of its cross-motion for partial summary judgment. *Statement of Material Facts in
Supp. of Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 65) (DSMF). On June 7,

2019, Mr. Wyman filed three documents: an opposition to Mallinckrodt and U.S. Surgical's Rule 56(d) motion, *Pls.' Opp'n to Defs.' Rule 56(d) Mot.* (ECF No. 70); an opposition to Mallinckrodt and U.S. Surgical's cross-motion for partial summary judgment, *Pls.' Opp'n to Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 71); and a response to Mallinckrodt and U.S. Surgical's statement of material facts with additional material facts. *Pls.' Opposing Statement of Material Facts and Statement of Additional Material Facts in Opp'n to Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 72) (for Mr. Wyman's opposing statement of material facts, PRDSMF; for Mr. Wyman's statement of additional material facts, PSAMF).

On July 12, 2019, Mallinckrodt and U.S. Surgical filed a reply to Mr. Wyman's response to its Rule 56(d) motion. *Reply in Supp. of Defs.' Rule 56(d) Mot.* (ECF No. 83). Also, on that date, Mallinckrodt and U.S. Surgical filed a reply to Mr. Wyman's response to its cross-motion for partial summary judgment, *Reply in Supp. of Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 81), and a reply to Mr. Wyman's statement of additional material facts. *Defs.' Reply Statement of Material Facts in Supp. of Cross-Mot. for Partial Summ. J.* (ECF No. 82) (DRPSAMF).

On July 21, 2019, Mr. Wyman filed an unopposed motion for oral argument on the pending motions, *Pls. Mot. for Oral Arg. on Pending Mots.* (ECF No. 84); *Defs.' Resp. to Pls.' Mot. for Oral Arg. On Pending Mots.* (ECF No. 86), which the Court granted on July 24, 2019. *Order Granting Mot. for Oral Arg./Hr'g* (ECF No. 87). The Court held oral argument on February 19, 2019. *Min. Entry for Proceedings Held Before Judge John A. Woodcock, Jr.* (ECF No. 94).

## II.   FACTUAL BACKGROUND[1]

Since 1987, Mr. Wyman has held a Class III commercial fishing license.  PSMF ¶ 1; DRPSMF ¶ 1.  Prior to 1997, when Maine established Lobster Management Zones, there were no limitations on the number or location of the traps Mr. Wyman could set; since 1997, his license has authorized him to harvest lobster and crab from Lobster Management Zones C and D.[2]  PSMF ¶ 1; DRPSMF ¶ 1; DSAMF ¶¶ 2-4; PRDSAMF ¶¶ 2-4.  Using his commercial fishing vessel, the Megan K II, Mr. Wyman harvests lobster and crab from the maximum 800 traps allowed him.  PSMF ¶¶ 2-3; DRPSMF ¶¶ 2-3.  Mr. Wyman has an owner-operated license and must therefore personally be on board his boat when fishing.  PSMF ¶ 4; DRPSMF ¶ 4.  Mr. Wyman was fifty-four at the time of his deposition in this matter on December 7, 2018.  DSAMF ¶ 1; PRDSAMF ¶ 1.  F/V Megan K II LLC is a limited liability company formed by Mr. Wyman and his wife in January of 2015 for the purpose of engaging in maritime and waterfront activities such as fishing for lobsters and crabs.  PSMF ¶ 5; DRPSMF ¶ 5.  In addition to lobster and crab fishing, F/V Megan K II LLC also has a mooring service and a bait sales business and Mr. Wyman has a business

---

[1]    The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . . ."  *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[2]    Mallinckrodt and U.S. Surgical qualify paragraph 1 of Mr. Wyman's statement of material facts by pointing out that Mr. Wyman's restriction to Zones C and D was not put in place until 1997.  DRPSMF ¶ 1.  The Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical, and altered paragraph 1 of Mr. Wyman's statement of material facts to reflect the record more accurately.

transporting lobster to a wholesaler for other fishermen.[3]  DSAMF ¶ 10; PRDSAMF ¶ 10.

U.S. Surgical is a Delaware corporation that is the successor through multiple mergers to International Minerals and Chemical Corporation (IMC) and Sobin Chemicals Inc. (Sobin) (collectively Mallinckrodt's Predecessor), which entities owned and operated the Orrington, Maine, chlor-alkali chemical plant (the Orrington Plant) from when it was built in 1967 until 1982.[4]  PSMF ¶¶ 6, 8-9; DRPSMF ¶¶ 6, 8-9.  The Orrington Plant sits on a 240-acre site located on the banks of the Penobscot River. PSMF ¶ 9; DRPSMF ¶ 9.  Mallinckrodt is a Delaware limited liability company and is a wholly-owned subsidiary of U.S. Surgical.  PSMF ¶ 7; DRPSMF ¶ 7.  As a result of mergers and by operation of law, U.S. Surgical has assumed all liabilities associated with ownership and operation of the Orrington Plant from December of 1967 until April of 1982.  PSMF ¶¶ 10, 12; DRPSMF ¶¶ 10, 12.  Pursuant to a contribution and assumption agreement dated March 1, 2007, Mallinckrodt assumed liabilities of U.S. Surgical associated with the ownership and operation of the

---

[3]    The second sentence of paragraph 10 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "Mr. Wyman also has a business transporting lobster to a wholesaler for other fishermen."  DSAMF ¶ 10.  Mr. Wyman denies this sentence, saying that this transportation is not a business, but rather he is "paid to transport lobsters to the wholesaler for just three other fishermen at the same time [his] lobsters are transported."  PRDSAMF ¶ 10.  The Court does not see a distinction between a "business" and the activity being undertaken by Mr. Wyman in exchange for pay.  The Court rejects Mr. Wyman's denial.

[4]    Mallinckrodt and U.S. Surgical qualify that portion of paragraph 6 of Mr. Wyman's statement of material facts which states that U.S. Surgical "is the legal successor" to IMC and Sobin, which Mallinckrodt and U.S. Surgical say states a legal conclusion unsupported by the record citation. DRPSMF ¶ 6.  On this motion for summary judgment, the Court is obligated to view the facts in the light most favorable to Mallinckrodt and U.S. Surgical as supported by the record.  The Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical, and altered the statement to remove the adjective "legal."

Orrington Plant that is the subject of this suit.[5]  PSMF ¶ 11; DRPSMF ¶ 11.  During

Mallinckrodt's Predecessor's ownership of the Orrington Plant, it supplied chlorine

to a major part of the paper industry in the state of Maine.  DSAMF ¶ 141; PRDSAMF

¶ 141.  As of August of 1972, the Orrington Plant employed fifty-five people and was

of great importance to the area of its operation and to the economy of the state of

Maine.[6]  DSAMF ¶ 142; PRDSAMF ¶ 142.

## A.   The Mercury Discharges

Between December 9, 1967, and April 30, 1982, Mallinckrodt's Predecessor

manufactured chlorine and caustic soda at the Orrington Plant under the supervision

of plant manager and supervisor to the plant manager Peter DeAngelis.  PSMF ¶ 13;

DRPSMF ¶ 13.  One byproduct of the chemical production process of manufacturing

---

[5]     Mallinckrodt and U.S. Surgical deny Mr. Wyman's statement that Mallinckrodt assumed "liabilities that are the subject of this suit" on the grounds that it is unsupported by the record citation and object to it as stating a legal conclusion.  DRPSMF ¶ 11.  The Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical's denial, and altered the statement to reflect the record more accurately.  In their answer to the Amended Complaint, Mallinckrodt and U.S. Surgical state that Mallinckrodt assumed "liabilities from the operation of the Orrington, Maine chemical plant that is the subject of this suit."  *Answer* ¶ 5.  The Court reads the phrase "that is the subject of this suit" in the Answer as referring to the Orrington Plant, rather than "liabilities."

Mr. Wyman additionally states that he will refer to Mallinckrodt, U.S. Surgical, and their predecessors collectively as "Mallinckrodt."  PSMF ¶ 11.  Mallinckrodt and U.S. Surgical object "on the grounds that it is inaccurate, vague, and prejudicial to refer to each entity by a term used as a designation by some, but not all, of those entities."  DRPSMF ¶ 11.  Because Mallinckrodt and U.S. Surgical are the non-movants on this motion for summary judgment, the Court will refer to Mallinckrodt and U.S. Surgical as distinct from their predecessors.

[6]     Mr. Wyman qualifies paragraph 142 of Mallinckrodt and U.S. Surgical's statement of additional material facts, arguing that Peter DeAngelis, the former plant manager of the Orrington Plant, testified to this statement "but did not provide any evidence of its truth and, even if true, [this fact] does not justify the contamination of the Penobscot River estuary from the operation of the plant."  PRDSAMF ¶ 142.  On this motion for summary judgment where Mallinckrodt and U.S. Surgical are the non-movants, the Court must take all reasonable inferences in their favor.  The Court regards Mr. DeAngelis' testimony as sufficient record support to include Mallinckrodt and U.S. Surgical's paragraph in its recitation of the undisputed facts.  Additionally, because paragraph 142 does not state that the economic importance of the Orrington Plant is sufficient justification for the pollution of the Penobscot River estuary and because the Court does not interpret this paragraph as an attempted economic justification for mercury pollution, the Court disregards the remainder of Mr. Wyman's qualification.

chlorine and caustic soda is brine sludge, a chemical product that contains mercury and other contaminants.  PSMF ¶ 14; DRPSMF ¶ 14.  Mr. DeAngelis testified that, to his understanding, before opening the Orrington Plant, Mallinckrodt's Predecessor had to fill out a wastewater discharge permit application to comply with Maine law.[7] PSMF ¶ 15; DRPSMF ¶ 15.  Mallinckrodt's Predecessor's March 7, 1967, permit application, which it filed with the Maine Water Improvement Commission (MWIC), did not state that Mallinckrodt's Predecessor would be discharging mercury into the Penobscot River.[8]  PSMF ¶ 16; DRPSMF ¶ 16.  When Mallinckrodt's Predecessor

---

[7]     Mr. Wyman's paragraph 15 states "[b]efore Mallinckrodt['s Predecessor] could begin operations, it was required by 38 M.R.S.A. § 413 to obtain a permit for the discharge of pollutants from the then existing Maine Water Improvement Commission," citing Mr. DeAngelis' deposition.  PSMF ¶ 15.  The Court first notes that the cited portion of the record does not contain reference to 38 M.R.S. § 413, the discharge of pollutants, or the Maine Water Improvement Commission, and so the Court removed these references from Mr. Wyman's statement.

Mallinckrodt and U.S. Surgical deny the statement on the grounds that Mr. DeAngelis "was not competent to testify regarding the Maine legal requirements concerning the discharge of pollutants in 1967" and that "[t]o the extent [Mr. Wyman] rel[ies] on Mr. DeAngelis' description of what his attorney told him, that is inadmissible hearsay."  DRPSMF ¶ 15.  Additionally, Mallinckrodt and U.S. Surgical state that "[b]ecause the record citations vaguely allude to legal requirements without competent evidence as to the details of those requirements, the probative value of the evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the Court," and that Mr. Wyman has "offered no competent evidence to support [his] assertion for what Maine law required with respect to discharge of pollutants in 1967."  DRPSMF ¶ 15.  The Court reviewed the cited portion of Mr. DeAngelis' deposition and agrees that alterations to Mr. Wyman's statement are necessary but does not agree that Mallinckrodt and U.S. Surgical have presented sufficient grounds for denial.  Mr. DeAngelis testified to his personal understanding of the reason for filing a permit application.  *Additional Attachs.*, Attach. 1, *Ex. 7: Excerpts from the Dep. of Peter DeAngelis on July 24, 2001* at 12:25-13:07 (ECF No. 56) (*DeAngelis Dep.*).  That his understanding may have been influenced by the advice of counsel does not of itself render that personal understanding inadmissible hearsay.  As Plant Manager, Mr. DeAngelis is competent to testify about regulatory matters affecting the plant and furthermore, as people do not learn things in a vacuum, the fact that Mr. DeAngelis was aware of this regulatory requirement from what he read or from what he was told does not render his personal knowledge hearsay.

Additionally, the Court does not view Mr. DeAngelis' testimony as unduly prejudicial or confusing.  The Court altered Mr. Wyman's statement to reflect that Mr. DeAngelis was testifying to his personal understanding that a permit was required and Mallinckrodt's Predecessor applied for it.

[8]     Mallinckrodt and U.S. Surgical's qualification of this statement constitutes argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 16, and the Court disregards it as violative of District of Maine Local Rule 56(c).  *See Michaud v. Calais Reg'l Hosp.*, No. 15-cv-00359-NT, 2017 WL 902133, at *1 n.1 (D. Me. Mar. 7, 2017) (noting that "qualifications" that exceed the scope of the original statement are appropriately presented as additional facts rather than qualifications).

completed its application for a wastewater discharge permit for the Orrington Plant in March of 1967—before the plant began operations in December of 1967—it was unaware that the plant would be discharging mercury.[9]  DSAMF ¶ 121; PRDSAMF ¶ 121.  At the time, Mallinckrodt's Predecessor's understanding of what waste would be discharged from the plant was based on discussions with the firm that constructed the Orrington Plant.   DSAMF ¶ 122; PRDSAMF ¶ 122.   The MWIC issued Mallinckrodt's Predecessor a wastewater discharge permit on April 24, 1967.[10]  PSMF ¶ 17; DRPSMF ¶ 17.

Mallinckrodt's Predecessor's discharge permit required it to have a satisfactory measuring and sampling device installed in its discharge outflow line or lines.[11]

---

[9]      Mr. Wyman qualifies Mallinckrodt and U.S. Surgical's additional paragraph 121, arguing that Mr. DeAngelis "testified that his only source of knowledge about wastewater discharge came from the Leonard Construction Company and no other effort was made to determine whether mercury would be part of the discharge of wastewater."  PRDSAMF ¶ 121.  The Court does not regard this qualification as inconsistent with Mallinckrodt and U.S. Surgical's paragraph 121 and disregards Mr. Wyman's qualification.  If Mr. Wyman wished to put in the record the facts he alleges in paragraph 121 of his response to Mallinckrodt and U.S. Surgical's statement of additional material facts, he was free to do so in his own statement of material facts.

[10]     Mr. Wyman's paragraph 18 states, "[a]fter the wastewater discharge permit was issued, Mallinckrodt['s Predecessor] did not report to the M[WIC] that it was discharging mercury into the Penobscot River at variance with its permit, as required by the permit," citing Mr. DeAngelis' deposition transcript.  PSMF ¶ 18.  Mallinckrodt and U.S. Surgical deny this paragraph for several reasons, including that "[w]hen it realized it was discharging mercury into the Penobscot River, IMC communicated that to the M[WIC]."  DRPSMF ¶ 18.  The Court reviewed the portion of Mr. DeAngelis' deposition transcript cited by Mallinckrodt and U.S. Surgical and agrees that it provides a proper basis for their denial, taking all inferences in their favor.  In response to the question, "Do you remember reporting to the state of Maine . . . that the plant was discharging mercury into the Penobscot River prior to commencement of the federal suit under the Rivers and Harbors Act," Mr. DeAngelis testified that he was almost sure that this was discussed with the state.  *DeAngelis Dep.* at 24:22-25:19.  The Court did not include Mr. Wyman's paragraph 18.

[11]     Mallinckrodt and U.S. Surgical qualify paragraph 19 of Mr. Wyman's statement of material facts by stating that, "[g]iven the lack of competent evidence that the referenced permit required IMC to install a device to measure and sample mercury," paragraph 19 is "irrelevant, prejudicial, and risks confusing the issues."  DRPSMF ¶ 19.  The Court regards Mallinckrodt and U.S. Surgical's qualification of this statement as argument outside the scope of the facts asserted in the statement and rejects the qualification for the reasons expressed in footnote 8, supra.

Paragraph 20 of Mr. Wyman's statement of material facts states, "Mallinckrodt['s Predecessor] did not install a measuring and sampling device in its discharge outflow line sufficiently satisfactory

PSMF ¶ 19; DRPSMF ¶ 19.  From the time the plant began operations, Mallinckrodt's Predecessor had chemists in its on-site laboratory analyze the plant outfall for mercury, but the analyses did not reveal the presence of mercury.[12]  DSAMF ¶ 123; PRDSAMF ¶ 123.  Every day from December 9, 1967, until June 1970, the Orrington Plant sent mercury-contaminated brine sludge into the facility's sewer, through the facility's outfall, and directly into the Penobscot River.  PSMF ¶ 21; DRPSMF ¶ 21. In addition, the Orrington plant discharged mercury through air emissions.[13]  PSMF ¶ 22; DRPSMF ¶ 22.  More mercury was discharged through air emissions than through the facility outfall.[14]  PSMF ¶ 23; DRPSMF ¶ 23.  Mallinckrodt's Predecessor

---

[12] to detect mercury discharges from its plant."  PSMF ¶ 20.  Mallinckrodt and U.S. Surgical deny this paragraph, arguing that the portion of Mr. DeAngelis' deposition relied on by Mr. Wyman makes clear that Mallinckrodt's Predecessor did indeed install a device capable of detecting mercury.  DRPSMF ¶ 20.  The Court reviewed the cited portion of the record and, viewing the record in the light most favorable to the non-moving parties, agrees with Mallinckrodt and U.S. Surgical.  The Court therefore did not include Mr. Wyman's paragraph 20 in its recitation of undisputed facts.

[12] Mr. Wyman qualifies Mallinckrodt and U.S. Surgical's additional paragraph 123, arguing that "[i]n violation of the conditions of its wastewater license from the State of Maine, Mallinckrodt['s Predecessor] did not install a satisfactory measuring and sampling device in its discharge outflow line."  PRDSAMF ¶ 123.  For his qualification, Mr. Wyman cites paragraphs 19 and 20 of his statement of material facts.  PRDSAMF ¶¶ 19-20.  The Court already discussed Mr. Wyman's paragraphs 19 and 20 and rejects Mr. Wyman's qualification of Mallinckrodt and U.S. Surgical's additional paragraph 123 for the reasons expressed in footnote 11, supra.

[13] Mr. Wyman's paragraph 22 states that "mercury from the Orrington plant was discharged into the Penobscot River from air emissions and groundwater."  PSMF ¶ 22.  Mallinckrodt and U.S. Surgical qualify this statement on the grounds that "there is no record evidence of whether mercury from air emissions ended up in the Penobscot River or, if so, how much."  DRPSMF ¶ 22.  Furthermore, they deny "that portion of the statement" which says mercury was discharged through groundwater because Mr. Wyman "cite[s] no record evidence supporting the statement . . . ."  DRPSMF ¶ 22.  The Court reviewed the cited portions of the record and agrees with Mallinckrodt and U.S. Surgical that, viewing the record in the light most favorable to the non-movants, they do not support the portions of paragraph 22 that suggest mercury discharged through air emissions entered the Penobscot River or that mercury was discharged through groundwater.  The Court left these portions of Mr. Wyman's paragraph 22 out of its recitation of undisputed facts.

[14] Mallinckrodt and U.S. Surgical qualify Mr. Wyman's paragraph 23 on the grounds that "there is no evidence of whether mercury from air emissions ended up in the Penobscot River or, if so, how much," and therefore the statement is irrelevant and its probative value is outweighed by the danger of unfair prejudice and confusion.  DRPSMF ¶ 23.  The Court regards Mallinckrodt and U.S. Surgical's qualification of this statement as argument outside the scope of the facts asserted in the statement and rejects the qualification for the reasons expressed in footnote 8, supra.  The Court does not agree

knew from the beginning of operations that it was losing mercury through the hydrogen gas stream and that it was losing significant amounts of mercury from other sources.[15]  PSMF ¶¶ 24-25; DRPSMF ¶¶ 24-25.  Mr. DeAngelis stated that when the Orrington Plant was designed, Mallinckrodt's Predecessor and the prime design contractor considered all the latest technology on safe handling of mercury.[16]  PSMF ¶ 26; DRPSMF ¶ 26.

Mallinckrodt's Predecessor made extensive efforts to determine what was causing the loss of mercury but was not successful until early 1970.  PSMF ¶ 26; DRPSMF ¶ 26.  Mallinckrodt's Predecessor did not request that the off-site research laboratory in Libertyville test the wastewater produced by the Orrington Plant for mercury discharges until December of 1969, when it sent outfall samples to the Libertyville facility.[17]  PSMF ¶ 27; DRPSMF ¶ 27; DSAMF ¶ 124; PRDSAMF ¶ 124.

---

with Mallinckrodt and U.S. Surgical's arguments about the danger of unfair prejudice or issue confusion.

[15]   The Court regards Mallinckrodt and U.S. Surgical's qualifications of Mr. Wyman's paragraphs 24 and 25 as argument outside the scope of the facts asserted in the statements, DRPSMF ¶¶ 24-25, and rejects the qualifications for the reasons expressed in footnote 8, supra.  The Court does not agree with Mallinckrodt and U.S. Surgical's arguments about the danger of unfair prejudice or issue confusion.  DRPSMF ¶¶ 24-25.

[16]   Mallinckrodt and U.S. Surgical qualify a portion of paragraph 26 of Mr. Wyman's statement of material facts, which reads, in relevant part, "Mallinckrodt's [Predecessor's] plant manager claimed that the Orrington plant was state of the art at the time of its construction . . .."  PSMF ¶ 26.  Mallinckrodt and U.S. Surgical point out that the portions of the record cited by Mr. Wyman for this proposition are not quite so broad, reflecting only that Mallinckrodt's Predecessor and the prime design contractor considered the latest technology on safe handling of mercury.  DRPSMF ¶ 26.  The Court reviewed the cited portions of the record, agrees with the non-movants, Mallinckrodt and U.S. Surgical, and altered Mr. Wyman's paragraph 26 to more accurately reflect the record.  The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification of paragraph 26 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 26, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

[17]   The introductory clause used by Mr. Wyman in his paragraph 27 reads, "Notwithstanding the continuous and unaccounted for loss of massive amounts of mercury from the start of operations . . .."  PSMF ¶ 27.  Mallinckrodt and U.S. Surgical object to this clause, arguing that this language is "vague, subjective, and prejudicial" and "is not supported by the record citation."  DRPSMF ¶ 27.  The Court

In April of 1970, the Libertyville research lab sent the Orrington Plant a report showing mercury in the plant's outfall using a different analytical method from the on-site lab.[18]  PSMF ¶ 28; DRPSMF ¶ 28; DSAMF ¶ 124; PRDSAMF ¶ 124.  By at least March 18, 1970, Mallinckrodt's Predecessor was aware of the possibility that it was losing mercury in its wastewater discharge of brine sludge because it was in possession of an article published in May of 1969 which reported that mercury used in chlorine plants is discharged through wastewater brine into aquatic systems, where it converts into highly toxic methylmercury and also because Les MacMillan— Mallinckrodt's Predecessor's "technical guy"—used this article in drafting a memorandum regarding mercury loss from the Orrington Plant.[19]  PSMF ¶ 29;

---

reviewed the portion of the record cited by Mr. Wyman, agrees with the non-movants, Mallinckrodt and U.S. Surgical, and omits the objected-to language.

[18]     Mallinckrodt and U.S. Surgical qualify Mr. Wyman's paragraph 28 to note that the Libertyville research lab was not a Mallinckrodt facility.  DRPSMF ¶ 28.  The Court reviewed the portions of the record cited by Mr. Wyman, notes that they do not provide support for the proposition that the Libertyville research lab was a Mallinckrodt facility, and omits the language that was the subject of Mallinckrodt and U.S. Surgical's qualification.

[19]     Mr. Wyman's paragraph 29 reads:

> At least by March 18, 1970, Mallinckrodt['s Predecessor] was aware that it was losing mercury in its wastewater discharge of brine sludge . . . because it was in possession of an article written by Swedish scientists published in May 1969, reporting that mercury used in chlorine plants is discharged through wastewater brine into aquatic systems, where it converts into highly toxic methylmercury . . . and because Les MacMillan (Mallinckrodt's [Predecessor's] "technical guy" . . .), was actually using the Swedish Paper to assess the amount of mercury being discharged by Mallinckrodt['s Predecessor] through the plant's brine in March 1970.

PSMF ¶ 29.  Mallinckrodt and U.S. Surgical qualify this paragraph, arguing that "[t]he record citations reflect only that Mr. MacMillan reported to Mr. DeAngelis the theoretical possibility of mercury losses in brine sludge."  DRPSMF ¶ 29.  The Court reviewed the cited portions of the record and agrees that the fact Mallinckrodt's Predecessor possessed the May 1969 article does not establish that it knew of mercury loss from wastewater discharge, only that it knew such losses were possible.  Supporting this view, Mr. MacMillan's memorandum refers to hypothetical mercury losses through brine sludge and does not refer to this scenario as a certainty.  *Additional Attachments*, Attach. 1, *Ex. 12: Memo from A. L. MacMillan to Peter DeAngelis, Dated March 18, 1970* (ECF No. 57).  Taking the record in the light most favorable to the non-movants, the Court altered Mr. Wyman's paragraph 29 to reflect that Mallinckrodt's Predecessor were aware by March 18, 1970, only of the possibility that mercury was being lost in wastewater discharge of brine sludge.  The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification as argument outside the scope of the facts asserted in the statement,

DRPSMF ¶ 29.  Mallinckrodt's Predecessor had also read about the problems posed by a chemical plant in Minamata, Japan that was discharging methyl mercury and learned about high levels of mercury in fish in the Saint Clair River in Detroit due to a nearby chlor-alkali plant.[20]  PSMF ¶ 31; DRPSMF ¶ 31.  However, prior to receiving the results of the Libertyville lab's analysis in April of 1970, Mallinckrodt's Predecessor was unaware that mercury was being discharged from the plant's outfall or any other waste stream.[21]  DSAMF ¶ 125; PRDSAMF ¶ 125.

---

DRPSMF ¶ 29, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

    Mallinckrodt and U.S. Surgical also admit in part and deny in part Mr. Wyman's paragraph 30, which reads:

> Mallinckrodt['s Predecessor] knew or should have known about the Swedish Paper at least by early May 6, 1969 because it was published as part of an industrial waste conference on that date, because the article was also published by the Chlorine Institute in 1969 as Pamphlet Number R-10 (request for a copy pending) and because since 1967 [Mr.] DeAngelis was a member of the Chlorine Institute and its Mercury Abatement Task Force.

PSMF ¶ 30.  Mallinckrodt and U.S. Surgical respond that while they "admit that beginning in 1967 Mr. DeAngelis was a member of the Chlorine Institute and its Mercury Abatement Task Force," the remainder of paragraph 30 of Mr. Wyman's statement of material facts is not supported by record citations and they deny the remainder of the paragraph on that ground.  DRPSMF ¶ 30.

    The Court reviewed the cited portions of the record and agrees with Mallinckrodt and U.S. Surgical.  The cited portions of Mr. DeAngelis' deposition do not support the proposition that he should have known about a particular publication put out by an organization simply because he was a member of that organization.  Once this portion of Mr. Wyman's paragraph 30 is excised, the Court views Mr. DeAngelis' membership in the Chlorine Institute as irrelevant.  The Court therefore did not include paragraph 30 in its recitation of undisputed facts.

[20]    Mr. Wyman cites a New York Times article for the proposition that mercury from the Detroit chlor-alkali plant "resulted in the closing of the [Saint Clair R]iver for commercial fishing . . .."  PSMF ¶ 31.  Mallinckrodt and U.S. Surgical object to citation of the New York Times article, arguing that it is "inadmissible hearsay not subject to any exception."  DRPSMF ¶ 31.  The Court agrees.  Mr. Wyman cites the article for its truth—that mercury released from a chlor-alkali facility resulted in the closure of the Saint Clair River for commercial fishing.  He cannot be citing it for its effect on the reader because the article does not of itself establish that anyone at Mallinckrodt's Predecessor read it.  This is impermissible hearsay, and the Court excluded that portion of Mr. Wyman's paragraph 31 which relies on the New York Times article.

    The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 31, and rejects the remainder of the qualification for the reasons expressed in footnote 8 supra.

[21]    Mr. Wyman denies Mallinckrodt and U.S. Surgical's paragraph 125, arguing that Mallinckrodt's Predecessor "knew or should have known that its plant was discharging mercury since May 1969" and citing paragraphs 29 and 30 of his statement of material facts.  The Court already

## B.    Mitigation Measures

To reduce mercury discharge, Mallinckrodt's Predecessor constructed Mac's Pond, the first landfill on the site, around June 15, 1970.[22]  PSMF ¶ 32; DRPSMF ¶ 32.  Upon learning that there was mercury in the Orrington Plant's outfall, Mallinckrodt's Predecessor took this action promptly to divert the contaminated brine sludge from the effluent stream and contain it.[23]  DSAMF ¶ 126; PRDSAMF ¶ 126.  Mac's Pond, located on a downgradient between the facility and the Penobscot River, was open and unlined.  PSMF ¶ 33; DRPSMF ¶ 33.  In his deposition, Mr. DeAngelis did not remember whether any consideration was given to the potential environmental impact of Mac's Pond's location on a downgradient.[24]  PSMF ¶ 34;

---

reviewed Mr. Wyman's paragraphs 29 and 30 and rejects Mr. Wyman's denial for the reasons expressed in footnote 19, supra.  Mr. Wyman may present evidence about what knowledge Mallinckrodt's Predecessor had or should have had at different times, but the non-movants are denying these assertions and the proper forum for him to make such arguments is at trial, not a motion for summary judgment in which he is the movant.

[22]    Mallinckrodt and U.S. Surgical qualify paragraph 32 of Mr. Wyman's statement of material facts, which reads, "The first measure by Mallinckrodt to reduce mercury discharge occurred when the company constructed Mac's Pond, the first landfill on the site, around June 15, 1970."  PSMF ¶ 32. Mallinckrodt and U.S. Surgical "admit that IMC constructed Mac's Pond, the first landfill on the site, around June 15, 1970," and further state that "[o]nce Mac's Pond was constructed, IMC also ceased all direct discharges of brine sludge through the sewer and the outfall."  DRPSMF ¶ 32.  The Court reviewed the cited portions of the record and agrees with Mallinckrodt and U.S. Surgical that the cited portions do not provide support for the statement that this was the first measure taken to reduce mercury discharge.  The Court therefore excised that portion of paragraph 32.

The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 32, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

[23]    Mr. Wyman denies Mallinckrodt and U.S. Surgical's additional paragraph 126, arguing that construction of Mac's Pond "was not 'prompt' because mercury continued to be discharged from the plant unabated, directly into the river until June 15, 1970" and "the action was not effective as Mac Pond was open and unlined and on a downgradient to the Penobscot River, and no consideration was given to the potential environmental impact of the downgradient."  PRDSAMF ¶ 126.  The Court views these denials as arguments about the success of Mac's Pond as a remedial measure.  But whether Mac's Pond was successful in diverting mercury has no bearing on whether the decision to construct Mac's Pond was prompt.  The Court rejects Mr. Wyman's denial of additional paragraph 126.

[24]    Paragraph 34 of Mr. Wyman's statement of material facts reads, "No consideration was given to the potential environmental impact of the downgrade."  PSMF ¶ 34.  Mallinckrodt and U.S. Surgical deny this paragraph, arguing that this statement is not supported by the record citation, as Mr.

DRPSMF ¶ 34. Mallinckrodt's Predecessor never obtained a permit from the United States Army Corps of Engineers to discharge waste into the Penobscot River.[25] PSMF ¶ 35; DRPSMF ¶ 35.

On July 27, 1970, the United States brought an action against Mallinckrodt's Predecessor, which was amended on August 21, 1970.[26] PSMF ¶ 36; DRPSMF ¶ 36. The complaint alleged that Mallinckrodt's Predecessor's effluent waste discharged daily and continuously into the Penobscot River contained significant quantities of mercury or mercury compounds suspended in solution. PSMF ¶ 37; DRPSMF ¶ 37. At his deposition, Mr. DeAngelis had no information with which to dispute these allegations.[27] PSMF ¶ 38; DRPSMF ¶ 38.

---

DeAngelis testified only that he did not recall whether environmental impact was considered. DRPSMF ¶ 34. The Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical that it does not provide sufficient support for the statement at issue, and altered paragraph 34 to more accurately reflect the record.

[25]    Mr. Wyman's paragraph 35 states that "Mallinckrodt['s Predecessor] never obtained a permit from the U. S. Army Corp of Engineers to discharge waste into the Penobscot River as required by the Rivers and Harbors Act of 1899, 33 U.S.C. §407." PSMF ¶ 35. Mallinckrodt and U.S. Surgical deny this statement, arguing that it "assumes a legal requirement for which there is no record evidence." DRPSMF ¶ 35. The Court reviewed the cited portion of the record, which does not mention the Rivers and Harbors Act. *See DeAngelis Dep.* at 58:02-13. The Court concludes that the cited portion of the record does not support the portion of the statement that refers to the Rivers and Harbors Act and excised that portion of the statement.

[26]    Mr. Wyman's paragraph 36 states, "As a consequence, on July 27, 1970, the United States brought an action against Mallinckrodt['s Predecessor], which was amended on August 21, 1970." PSMF ¶ 36. Mallinckrodt and U.S. Surgical argue that the prefatory phrase "[a]s a consequence" is not supported by the record citation. DRPSMF ¶ 36. The Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical for the reasons stated in footnote 25, *supra*, and excised that prefatory phrase from paragraph 36.

[27]    Paragraph 38 of Mr. Wyman's statement of material facts states that "Mallinckrodt had no information with which to dispute those allegations." PSMF ¶ 38. Mallinckrodt and U.S. Surgical deny this paragraph on the ground that the given record citation showed only that Mr. DeAngelis, and not Mallinckrodt or Mallinckrodt's Predecessor, had no information with which to dispute the allegations in the 1970 federal lawsuit. DRPSMF ¶ 38. The Court reviewed the cited portion of the record and agrees with Mallinckrodt and U.S. Surgical. There is no allegation in the record that Mr. DeAngelis was a designee of Mallinckrodt or Mallinckrodt's Predecessor under Federal Rule of Civil Procedure 30(b)(6) in the Federal RCRA case nor does the record reflect that he was otherwise authorized to make representations about Mallinckrodt or its Predecessor's scope of knowledge more

In response to this federal suit, in July of 1970, Mallinckrodt's Predecessor constructed another containment area named Hickel's Pond, plugged all effluent lines from the main cell building, and diverted them into Hickel's Pond.[28]  PSMF ¶ 39; DRPSMF ¶ 39; DSAMF ¶ 128; PRDSAMF ¶ 128.  Hickel's Pond, located close to the Penobscot River and on a downslope from the Orrington Plant buildings, was eventually lined due to concerns about leaching contaminates.  PSMF ¶ 40; DRPSMF ¶ 40.  Mallinckrodt's Predecessor instituted a program of "total environmental control" which included, among other things, efforts to recycle or recover all mercury; over the next approximately five years, Mallinckrodt's Predecessor reduced mercury in the effluent to 0.085 pounds per day.[29]  DSAMF ¶ 129; PRDSAMF ¶ 129.

Mallinckrodt's Predecessor developed and patented a borohydride system— installed in early 1972—designed to permanently curb all mercury in its effluent.[30]

---

generally, and so his deposition cannot be read as testimony on behalf of Mallinckrodt or its Predecessor.  The Court altered paragraph 38 accordingly.

[28]     Mallinckrodt and U.S. Surgical admit the contents of Mr. Wyman's paragraph 39 and then interpose additional facts outside the scope of the facts asserted in the statement.  DRPSMF ¶ 39.  The Court rejects Mallinckrodt and U.S. Surgical's qualification for the reasons expressed in footnote 8, supra.

Paragraph 127 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "[Mallinckrodt's Predecessor] ceased all direct discharge of brine sludge through the sewer and the outfall before July 27, 1970, when the federal government sued [Mallinckrodt's Predecessor]."  DSAMF ¶ 127.  Mr. Wyman denies additional paragraph 127, arguing that it is not supported by the record evidence.  PRDSAMF ¶ 127.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and did not include additional paragraph 127 in its recitation of undisputed facts.

The Court regards Mr. Wyman's qualification of paragraph 128 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 128, and rejects the qualification for the reasons expressed in footnote 8, supra.

[29]     The Court regards Mr. Wyman's qualification of paragraph 129 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 129, and rejects the qualification for the reasons expressed in footnote 8, supra.

[30]     Mr. Wyman qualifies paragraph 130 of Mallinckrodt and U.S. Surgical's statement of additional material facts.  PRDSAMF ¶ 130.  First, he argues that "[t]he testimony cited shows uncertainty by Mr. DeAngelis about the borohydride system . . .."  PRDSAMF ¶ 130.  The Court

16

DSAMF ¶ 130; PRDSAMF ¶ 130.  The total environmental control program also included measures to eliminate mercury air emissions, which included but were not limited to installation of heat exchangers to cool hydrogen and keep mercury contained in cells, a brink mist eliminator to remove mercury particulates prior to emission, and a state-of-the-art molecular sieve.[31]  DSAMF ¶ 131; PRDSAMF ¶ 131. The molecular sieve was installed in 1972 and reduced mercury air emissions.[32] DSAMF ¶ 132; PRDSAMF ¶ 132.  Mallinckrodt's Predecessor replaced all wooden walkways with fiberglass walkways because it was easier to clean and remove mercury from the fiberglass walkways.  DSAMF ¶ 133; PRDSAMF ¶ 133.  These measures were among many taken in the early 1970s to contain or eliminate mercury discharges; they were not implemented earlier because the plant operators had been unaware of the need for them.[33]  DSAMF ¶ 134; PRDSAMF ¶ 134.

---

reviewed the cited portions of the record and rejects this portion of Mr. Wyman's qualification.  The testimony cited supports an inference in favor of non-movants Mallinckrodt and U.S. Surgical that the system Mr. Wyman was referring to was indeed the borohydride system.  *See DeAngelis Dep.* at 101:18-102:02.  Second, Mr. Wyman contends that "Mr. DeAngelis admitted that there were sources of mercury in the effluent that was not addressed by the system."  PRDSAMF ¶ 130.  The Court does not view this qualification as inconsistent with additional paragraph 130, which states only that the system was designed to curb all mercury in its effluent.  The Court rejects this portion of Mr. Wyman's qualification.

[31]     The Court regards Mr. Wyman's qualification of paragraph 131 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 131, and rejects the qualification for the reasons expressed in footnote 8, supra.

[32]     Paragraph 132 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "The molecular sieve was installed in 1972 and effectively reduced mercury air emissions." DSAMF ¶ 132.  Mr. Wyman qualifies this paragraph as to the word "effectively" because "Mr. DeAngelis could not compare mercury emissions before the sieve was installed with after it was installed."  PRDSAMF ¶ 132.  The Court did not include the word "effectively," but notes that exclusion of that word does not change the meaning of the paragraph.

[33]     Mr. Wyman denies paragraph 134 of Mallinckrodt and U.S. Surgical's statement of additional material facts, contending that "Mr. DeAngelis testified that the measures were not undertaken 'in the beginning' . . ., not that they could not have been implemented earlier."  PRDSAMF ¶ 134.  The Court does not read additional paragraph 134 as saying that these measures could not have been taken earlier and disregards Mr. Wyman's denial as moot.

In 1980, Mallinckrodt's Predecessor capped landfills with impervious materials to prevent pollution.[34]  PSMF ¶ 42; DRPSMF ¶ 42.  While Mallinckrodt's Predecessor owned and operated the Orrington Plant, there were mercury spills and releases at the facility.[35]  PSMF ¶ 43; DRPSMF ¶ 43.  Beginning in 1972, the federal government authorized Mallinckrodt's Predecessor—through issuance of a National Pollutant Discharge Elimination System (NPDES) permit from the Army Corps of Engineers and a consent decree—to discharge small amounts of mercury in the plant's outfall; though there were violations of the discharge limits of the permit between August of 1973 and April of 1982, these violations were extremely infrequent and were promptly reported and corrected when they occurred.[36]  PSMF ¶ 44;

---

[34]     Mr. Wyman's paragraph 41 states, "It was more difficult for Mallinckrodt['s Predecessor] to control mercury releases through air emissions, which was a long-term project for Mallinckrodt['s Predecessor] that did not begin until 1973."  PSMF ¶ 41.  Mallinckrodt and U.S. Surgical deny this statement on two grounds; the first is that Mr. DeAngelis' statement makes clear that Mallinckrodt's Predecessor did indeed take steps to curb air emissions of mercury prior to 1973.  DRPSMF ¶ 41.  The Court reviewed the portions of the record put forth by both parties and agrees with the non-movants Mallinckrodt and U.S. Surgical that efforts to curb air emission did take place before 1973.  Additionally, based on the cited portions of the record, the Court concludes that whether curbing air emissions was "more difficult" for Mallinckrodt's Predecessor is a disputed issue of fact.  For these reasons, the Court did not include paragraph 41 in its recitation of undisputed facts.
         The Court regards Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 42 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 42, and rejects the qualification for the reasons expressed in footnote 8, supra.
[35]     The Court regards Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 43 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 43, and rejects the qualification for the reasons expressed in footnote 8, supra.
[36]     Mallinckrodt and U.S. Surgical qualify Mr. Wyman's paragraph 44, which reads, "After Mallinckrodt['s Predecessor] was issued a NPDES permit from the Army Corp of Engineers in August 1973 until April 1982, there were violations of the discharge limits of the permit."  PSMF ¶ 44.  Mallinckrodt and U.S. Surgical argue that these violations occurred "between August 1973 and April 1982, not until April 1982."  DRPSMF ¶ 44 (emphasis omitted).  The Court reviewed the cited portion of the record and agrees with the non-movants Mallinckrodt and U.S. Surgical.  Accordingly, the Court altered paragraph 44 to more accurately reflect the record.
         The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 44 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 44, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.
         Mr. Wyman qualifies paragraph 135 of Mallinckrodt and U.S. Surgical's statement of additional material facts, asserting that "[t]he First Amended Complaint alleged the permit was issued

DRPSMF ¶ 44; DSAMF ¶¶ 135-36; PRDSAMF ¶¶ 135-36. Discharges of mercury from the Orrington Plant under the ownership and operation of Mallinckrodt's Predecessor continued until it sold the facility in 1982.[37] PSMF ¶ 45; DRPSMF ¶ 45. It was not practicable for Mallinckrodt's Predecessor to operate the Orrington Plant without discharging some mercury into the Penobscot River.[38] PSMF ¶ 46; DRPSMF ¶ 46.

The Maine Department of Environmental Protection (Maine DEP) began identifying and regulating hazardous wastes in 1980, at which time industrial wastewater discharges subject to regulation under the Clean Water Act were excluded from its definition of hazardous wastes.[39] DSAMF ¶ 137; PRDSAMF ¶ 137. Mallinckrodt's Predecessor's discharges were subject to regulation under the Clean

---

in August 1973" and "[t]he record cited by [Mallinckrodt and U.S. Surgical] refers to a permit that was issued 'in 1972 or so.'" PRDSAMF ¶ 135. Though the Court expects that there is a definitive answer to when the permit was issued, and furthermore does not view the answer to this question as dispositive of the underlying issues relevant to this motion for summary judgment, the Court takes the inference, reasonably supported by the record and in favor of the non-movants, that the permit was issued in 1972.

[37] The Court regards Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 45 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 45, and rejects the qualification for the reasons expressed in footnote 8, supra.

[38] The Court regards Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 46 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 46, and rejects the qualification for the reasons expressed in footnote 8, supra. However, the Court reviewed the portions of the record cited by Mr. Wyman and replaced the word "possible," used in paragraph 46, with the word "practicable" to more accurately reflect the record. *See Additional Attachs.*, Attach. 1, *Ex. 20: Letter from Peter DeAngelis to EPA, Dated August 16, 1972* at 4 (ECF No. 58).

[39] Mr. Wyman qualifies this paragraph, stating that "[t]he exclusion does not apply to hazardous waste discharged from December 1967 until the enactment of regulations under the 1972 amendments to the Clean Water Act" and that "[l]ater amendments to the DEP regulations clarified that the exemption only applies to discharges 'in fact' regulated by the Clean Water Act." PRDSAMF ¶ 137. In light of paragraph 138 of Mallinckrodt and U.S. Surgical's statement of additional material facts, which states that Mallinckrodt's Predecessor's discharges prior to 1973 were not exempt from the definition of hazardous wastes, DSAMF ¶ 138, and which Mr. Wyman admits, PRDSAMF ¶ 138, the Court regards Mr. Wyman's qualification as moot.

Water Act from at least 1973 onward.[40]  DSAMF ¶ 138; PRDSAMF ¶ 138.  The human health expert for the plaintiffs in the case Natural Resources Defense Council, Inc. and the Maine People's Alliance filed against Mallinckrodt Inc. in the United States District Court for the District of Maine with docket number 1:00-cv-00069-JAW (Federal RCRA Case) testified that, prior to research conducted in the 1980s, no one knew that low levels of exposure to methylmercury could cause human health problems.[41]  DSAMF ¶ 140; PRDSAMF ¶ 140.

---

[40]  Paragraph 139 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "[Mallinckrodt's Predecessor] was unaware in the early 1970s of any impact of mercury contaminated sediments on marine life in the Penobscot River and Bay."  DSAMF ¶ 139.  Mr. Wyman denies this paragraph, pointing out that the cited portion of the record "states that Mr. DeAngelis claimed that he personally was not aware of the impact of mercury contaminated sediments on marine life."  PRDSAMF ¶ 139.  It is not the Court's understanding that Mr. DeAngelis was a Rule 30(b)(6) designee testifying on behalf of Mallinckrodt's Predecessor.  Even if he were, his personal lack of awareness is not sufficient for the Court to draw an inference that the entire company was unaware.  The Court did not include paragraph 139 of Mallinckrodt and U.S. Surgical's statement of additional material facts in its recitation of the undisputed facts; in light of this, the Court views the remainder of Mr. Wyman's denial as moot.

[41]  Mr. Wyman qualifies Mallinckrodt and U.S. Surgical's additional paragraph 140, arguing as follows:

> Dr. [Phillpe] Grandjean testified in the cited transcript that when he was researching in the 1980s "we were very much aware that methylmercury was extremely toxic to the developing brain."  He testified that he conducted research to understand the effects of small doses, but he did not testify that "no one knew prior to his research about smaller doses and he did not define what he considered to be "smaller doses."  In fact, Mallinckrodt's [Predecessor's] own consultant (T.W. Beak Consultants) issued a report to Mallinckrodt['s Predecessor] in 1972 that stated that the "toxicity of mercury and its compounds has been known since antiquity, but the realization that mercury discharged to the environment in small traces could be hazardous is recent."  Reference was made in the Beak report to a Swedish study published in 1969 by Jensen and Jernelov describing the methylation in sediments that "is one of the most hazardous pathways for mercury pollution."

PRDSAMF ¶ 140.  The Court reviewed the cited portions of the record and disregards Mr. Wyman's qualification.  In the portion of the record cited by Mallinckrodt and U.S. Surgical, Dr. Grandjean testifies that while scientists knew that small doses of lead could do subtle damage to the brain, "we did not know about methyl mercury . . . ." DSAMF, Attach. 3, *Ex. 3: Phase I Trial Tr. Excerpts* at March 07 Part 1 14:05-19.  On this motion for summary judgment where Mallinckrodt and U.S. Surgical are the non-movants, the Court views this testimony as sufficient to draw the reasonable inference for purposes of this motion only that scientists did not know about the risks posed by small doses of methylmercury prior to the early 1980s.

Hanlin Group, Inc. (Hanlin), the company which purchased the Orrington Plant from Mallinckrodt's Predecessor in 1982, allowed the plant to fall into mechanical and environmental disrepair, including cracks in the concrete floors around the plant's cells and collection system, cell supports giving way, worn out cell switches, problems with the anode adjusting system, poor maintenance on the pollution control systems, and piping leaks in the brine field.[42]  DSAMF ¶ 143; PRDSAMF ¶ 143.  Some of this disrepair caused mercury releases to the environment beyond the Orrington Plant.  DSAMF ¶ 143; PRDSAMF ¶ 143.  Toward the end of its ownership, Hanlin had financial troubles that caused it to deviate from a consent decree with the federal government.  DSAMF ¶ 144; PRDSAMF ¶ 144.  Hanlin sold the plant to HoltraChem Manufacturing, which had a rash of spill events—some related to equipment failure and some to operator error.  DSAMF ¶ 145; PRDSAMF ¶ 145.  Hanlin was responsible for sixty-one known spills or releases during the period it owned the Orrington Plant.  DSAMF ¶ 146; PRDSAMF ¶ 146.

---

[42]    Mr. Wyman requests that the Court strike paragraph 143 of Mallinckrodt and U.S. Surgical's statement of additional material facts:

> Its only relevance is to challenge the ruling by Judge Carter in *Maine People's Alliance* that that "[t]he evidence was clear that Mallinckrodt has been a dominant source of mercury in the Penobscot River."  This ruling was affirmed on appeal and Mallinckrodt had the opportunity to challenge it again in the Phase II proceedings but failed to do so.  At this point [Mallinckrodt and U.S. Surgical] are precluded from challenging this ruling.  In any event, there is no quantification of any mercury discharges by Hanlin.

PRDSAMF ¶ 143 (some alternations in original).  Mr. Wyman makes the same request to strike additional paragraphs 144 through 153.  PRDSAMF ¶¶ 144-153.  The Court responds to all these qualifications here.

    For reasons the Court discusses in the body of its opinion, *see* Section V.A.1.a, *infra*, the Court considers Judge Carter's "dominant source" language to be dicta which has not previously been litigated.  Mallinckrodt and U.S. Surgical are thus not precluded from challenging this language.  The Court therefore denied Mr. Wyman's request to strike additional paragraphs 143 through 153.

In the Federal RCRA Case, Dr. Kenneth Finkelstein, an environmental scientist with the National Oceanic and Atmospheric Administration, testified that all New England—including the Penobscot River—has an issue with mercury coming from the atmosphere.  DSAMF ¶ 147; PRDSAMF ¶ 147.  Stacy Ladner, then-head of the Maine DEP's licensing unit for the hazardous waste program, testified it is "very hard to attribute mercury to different entities because Holtrachem isn't the only party that[] discharged mercury into its estuary;" for example, the paper mills on the Penobscot used mercury and disposed of consumer products that contained mercury. DSAMF ¶ 148; PRDSAMF ¶ 148.  Ms. Ladner agreed with Dr. Finkelstein that there is a region-wide mercury issue due to atmospheric deposition, stating "we have a mercury problem in the whole Northeast, including in Maine," and noting that "we have fish advisories across the state, not just on [the Penobscot] [R]iver."  DSAMF ¶ 149 (alterations in original); PRDSAMF ¶ 149.  It was Ms. Ladner's understanding that the background mercury concentration in the Penobscot River was 290 nanograms per gram.  DSAMF ¶ 150; PRDSAMF ¶ 150.  John Sowles, then-director of ecology for the Maine Department of Marine Resources (Maine DMR), testified that mercury sources to the Penobscot River included atmospheric deposition, much of which came from sources outside of New England, and discharges from paper mills and publicly-owned treatment works.  DSAMF ¶ 151; PRDSAMF ¶ 151.  He testified that there were "large sources of mercury coming down the Penobscot River from above Bangor."  DSAMF ¶ 151; PRDSAMF ¶ 151.

The trial testimony Judge Carter cited when he referred to Mallinckrodt as "a dominant source of mercury in the Penobscot River" referred to operations of the plant over its lifetime and was not limited to pre-1982 operations under Mallinckrodt's Predecessor's ownership.  DSAMF ¶ 152; PRDSAMF ¶ 152.  The witness Judge Carter relied on for this statement also testified that he could not determine whether the Orrington Plant was a significantly greater source of mercury to the river before 1971 than it was in later years.  DSAMF ¶ 153; PRDSAMF ¶ 153.

## C.    The Federal RCRA Suit Study Panel

In the Federal RCRA Case, Judge Carter created a study panel (Study Panel) and directed the implementation of the Penobscot River Mercury Study (PRMS).  PSMF ¶ 47; DRPSMF ¶ 47.  Samples of lobster meat taken just prior to Phase I of the Federal RCRA Case suggested that mercury concentrations in the meat of Penobscot Bay lobsters were low relative to lobster in other areas of the state.[43]  DSAMF ¶ 112; PRDSAMF ¶ 112.  During Phase I of the Federal RCRA Case, several individuals testified that they do not eat fish or shellfish from the Penobscot River or Bay because they are concerned that the fish have dangerous levels of mercury that may harm their health.  DSAMF ¶ 38; PRDSAMF ¶ 38.  The implementing order

---

[43]    Paragraph 112 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "At the time of Phase I of the federal RCRA case, mercury concentrations in the meat of Penobscot lobsters were low relative to lobster in other areas of the state."  DSAMF ¶ 112.  Mr. Wyman qualifies this additional paragraph, asserting that the portion of the record cited by Mallinckrodt and U.S. Surgical "refers to what data from 1995 and 1996 tests 'suggested' and was later contradicted by sampling by the PRMS Study Panel."  PRDSAMF ¶ 112.  The Court reviewed the cited portions of the record and agrees that the record citation provided by Mallinckrodt and U.S. Surgical refers only to what samplings in 1995 and 1996 suggested.  In light of this, the Court does not view the statement that the mercury concentrations of lobster in the Penobscot Bay were definitively lower than lobster in other areas of the state as a reasonable inference to draw and altered paragraph 112 of Mallinckrodt and U.S. Surgical's statement of additional material facts to more accurately reflect the record.

directed that the Study Panel create a study plan for a two-phase study to address the extent of the harm resulting from mercury contamination of the Penobscot River estuary, including whether the mercury posed an unacceptable risk to human health and the need for and feasibility of a remediation plan.  PSMF ¶ 48; DRPSMF ¶ 48. The Study Panel submitted its PRMS Phase I Report (Phase I Report) to the Court in the Federal RCRA Case on January 25, 2008, concluding that:

1.   the Penobscot River and estuary are contaminated with mercury to an extent that poses some limited risk to human consumers of fish and shellfish, with some lobsters found to contain mercury levels in excess of Maine DEP and United States Environmental Protection Agency criterion for protection of human health;

2.   the pattern of contamination of the sediments of the Penobscot River and estuary is not consistent with contamination from paper mills on the river or from regional atmospheric deposition of mercury but is consistent with a large source such as the Orrington Plant; and

3.   the spatial pattern of contamination of various species of biota, such as lobsters, is also consistent with elevated inputs of mercury to the lower Penobscot River below the Veazie Dam.[44]

---

[44]     Mallinckrodt and U.S. Surgical object to Mr. Wyman's paragraph 49 on the grounds that "the Study Panel was not charged with determining the source of mercury contamination, and this issue was not litigated in the Phase II trial" and that Mallinckrodt and U.S. Surgical dispute certain of the Study Panel's findings.  DRPSMF ¶ 49.  Mallinckrodt and U.S. Surgical do not, however, appear to deny that the conclusions of the study panel as laid out in paragraph 49 of Mr. Wyman's statement of material facts were not, in fact, the conclusions of the Study Panel.  Therefore, and after reviewing the cited portions of the record, the Court regards Mallinckrodt and U.S. Surgical's qualification of paragraph 49 as argument outside the scope of the facts asserted in the statement and rejects the qualification for the reasons expressed in footnote 8, supra.

PSMF ¶ 49; DRPSMF ¶ 49.  Judge Carter approved and adopted the Phase I Report,

with some emendations, on March 7, 2008, ordering the Study Panel to proceed to

Phase II of the PRMS.[45]  PSMF ¶ 50; DRPSMF ¶ 50.  In doing so, he ruled:

> It is now established in the record that mercury (Hg) deposited in the
> Penobscot River in significant quantities and to substantial negative
> effect from the [Orrington Plant] has and is now in the process of
> methylation posing a danger to the health of the wildlife in the River
> and risks of a substantial nature to the well-being of human beings who
> ingest the products of the River.  That is the distillation of the factual
> predicate on which this case is to proceed.

PSMF ¶ 50; DRPSMF ¶ 50.

On July 27, 2009, the Study Panel filed an update to the Phase I Report, which

concluded that "[a]t some locations two species of shell fish, lobster and rock crab,

approached or exceeded Maine DEP guidelines for human consumption," that the

geographic pattern of mercury concentrations in several species revealed higher

concentrations at locations closer to the Orrington Plant (which is consistent with the

Orrington Plant being the major source of mercury to the river), and that added data

and analysis supported the original conclusions of the Phase I Report that the

Penobscot River estuary continues to be significantly contaminated with mercury.[46]

---

[45]     Mallinckrodt and U.S. Surgical qualify paragraph 50 of Mr. Wyman's statement of material
facts, noting that Judge Carter accepted the Phase I Report "with emendations."  DRPSMF ¶ 50.  The
Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical, and altered
Mr. Wyman's paragraph 50 to more accurately reflect the record.

[46]     Mr. Wyman's paragraph 51 states that the update to the Phase I Report suggested that one of the
original conclusions of the Phase I Report was that "the [Orrington Plant] was the dominant source
of th[e] mercury contamination" in the Penobscot River estuary.  PSMF ¶ 51.  Mallinckrodt and U.S.
Surgical qualify paragraph 51 by noting that "the Update does not state that the Orrington facility
was the dominant source of that mercury contamination."  DRPSMF ¶ 51.  The Court reviewed the
cited portion of the record and, on this motion for summary judgment, agrees with the non-movants
Mallinckrodt and U.S. Surgical that the update to the Phase I Report does not state that the Orrington
Plant was the dominant source of that mercury contamination or that this was a conclusion of the
Phase I Report.  Rather, the update lists several things that were "consistent with HoltraChem as the
dominant source of Hg in the Penobscot system" as well as some things that were not consistent with

PSMF ¶ 51; DRPSMF ¶ 51.  In April of 2013, the Study Panel issued its Final Phase II Report (Phase II Report), which concluded that, at the time of the release of the report:

1.   there was extensive contamination of the Penobscot River estuary due to mercury released from the Orrington Plant;

2.   the geographic extent and pattern of the mercury contamination—both in deep sediments and surface sediments, as well as in biota—and the timing of such contamination was consistent with the Orrington Plant being the major source of mercury to the estuary;

3.   between 1967 and the early 1970s, six to twelve tons of mercury were discharged from the Orrington Plant into the Penobscot River by Mallinckrodt's Predecessor, with smaller amounts released since that time;

4.   legacy mercury discharged from the Orrington Plant—mostly between 1967 and the 1970s, and to a lesser extent until 2000—was responsible for the then-present-day contamination of the Penobscot River estuary in sediments and biota, as opposed to ongoing outputs from the upper estuary;

---

such a conclusion. *Additional Attachs.*, Attach. 6, *Ex. 25: Excerpts from the Update to the PMRS Phase I Report, Dated July 27, 2009, Federal RCRA Case (ECF No. 480)* at xxiii-xxiv (ECF No. 58) (*Phase I Report Update*).  The Court excised this language from Mr. Wyman's paragraph 51 to more accurately reflect the record.

      The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 51, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

5.      the contamination in the Penobscot River estuary was ten to twenty times as high as regional background concentrations;

6.      the legacy mercury released by Mallinckrodt's Predecessor in the late 1960s and early 1970s created mercury concentrations in surface sediments that were ten- to twenty-fold higher in the upper estuary than in sediments either upstream of the Veazie Dam or south of Fort Point;

7.      more than ninety percent of the lobster samples taken from sites closest to the mouth of the Penobscot River (at Odom Ledge, South Verona, and Fort Point) contained mercury in amounts that exceeded up to twice the level of mercury concentration set to protect human health by the Maine Center for Disease Control and Prevention (Maine CDC) for mercury in seafood of 200 nanograms per gram;

8.      average methylmercury concentrations in rock crabs exceeded the 200 nanogram per gram wet weight limit for human consumption set by the Maine DEP at four sites in the upper Penobscot Bay, and individual crabs exceeded this limit in six additional sites; and

9.      in the absence of remedial treatment, mercury contamination of the Penobscot River estuary will continue for decades.[47]

---

[47]     Mallinckrodt and U.S. Surgical deny Mr. Wyman's paragraph 52, arguing that the Court in the Federal RCRA Case "did not adopt the Phase II Report," as is stated in paragraph 52. DRPSMF ¶ 52. The Court agrees that it did not adopt the report; rather it dismissed the parties' objections without prejudice, anticipating that they would be the subject of a subsequent bench trial. The Court therefore removed that portion of Mr. Wyman's paragraph 52 which states that the Court accepted the Phase II Report over objections. *See* PSMF ¶ 52.

Mallinckrodt and U.S. Surgical also argue that "the statements concerning the Maine Fish Tissue Actions Level [(FTAL)] of 200 ng/g . . . mischaracterize the purpose and meaning of the FTAL," and deny those statements. DRPSMF ¶ 52. The Court reviewed the cited portions of the record and

PSMF ¶ 52; DRPSMF ¶ 52.

In the Federal RCRA Case, in the context of commending the Study Panel and the parties' expert witnesses and reflecting the Phase II Report's findings, the Court stated that "[e]normous volumes of mercury" were discharged by the Orrington Plant into the Penobscot River.[48]    PSMF ¶ 53 (alteration in original); DRPSMF ¶ 53. According to the Study Panel Report, between 1967 and the early 1970s, the Orrington Plant discharged between six and twelve tons of mercury into the

---

overrules Mallinckrodt and U.S. Surgical's denial.  Regardless of whether the FTAL was actually set with the purpose of protecting health, that was a conclusion of the Phase II Report.  *See Additional Attachs.*, Attach. 7, *Ex. 26: Excerpts from the Final PRMS Phase II Report, Dated April 2013, Federal RCRA Case (ECF No. 652)* at 14-2 (ECF No. 58) (stating that 200 nanograms per gram was the "Hg target concentration to protect human health").

Mr. Wyman's paragraph 52 includes the asserted conclusion that "[i]n the absence of remedial treatment, the mercury contamination of the Penobscot River estuary will continue for decades." PSMF ¶ 25.  Mallinckrodt and U.S. Surgical object to this portion of paragraph 52 on the grounds that it is "too vague to allow for a response" because it does not define "mercury contamination."  DRPSMF ¶ 52.  In Mallinckrodt and U.S. Surgical's view, "[a]ny comparison of natural recovery times with remediation recovery times is meaningless absent a definition of what recovery means."  DRPSMF ¶ 52.  To acknowledge this portion of paragraph 52 is ambiguous does not mean it is false.  For purposes of the motion, however, the Court is required to view the ambiguity in the light most favorable to the non-movants, which it does.

Mallinckrodt and U.S. Surgical object to paragraph 52 of Mr. Wyman's statement of material facts on the grounds that it is an "inappropriate compound statement of material fact that fails to conform with D. Me. Local Rule 56(b)."  The Court agrees that paragraph 52 technically violates the local rule but it overrules Mallinckrodt and U.S. Surgical's objection as they were fully able to respond.

[48]    Mr. Wyman's paragraph 53 presents these comments as a finding by the Court in the Federal RCRA Case.  PSMF ¶ 53.  Mallinckrodt and U.S. Surgical qualify Mr. Wyman's paragraph 53, pointing out that the Court's statement was not—as Mr. Wyman stated—a factual finding, but rather was "made in the context of the Court commending the Study Panel and the parties' expert witnesses" and therefore "[u]se of subjective language was appropriate in that context but does not have a tendency to make a fact more or less probable in the instant case . . . ."  DRPSMF ¶ 53.  The Court agrees that this language did not constitute a factual finding in the Federal RCRA Case, reflecting instead the Court's summation of the Study Panel Report.  *See Me. People's All. v. HoltraChem Mfg. Co.*, No. 1:00-cv-00069-JAW, 2015 WL 5155573, at *19 (D. Me. Sept. 2, 2015) (*Order on Remediation Plan*) (discussing "discharge[s] of . . . enormous volumes of mercury" in paragraph that begins, "[a]ccording to the Study Panel Report").  The Court therefore altered the language of paragraph 53 to more accurately reflect the record.  However, the Court rejects Mallinckrodt and U.S. Surgical's request to strike on the basis of Federal Rules of Evidence 401-403.  DRPSMF ¶ 53.  Having issued the order cited by Mr. Wyman, the Court is not concerned it will be confused about what it wrote or that the possibility of its being confused about language it authored will be unduly prejudicial in ruling on this motion.

Penobscot River.[49]  PSMF ¶ 54; DRPSMF ¶ 54.  As of 2002, mercury concentrations in the Penobscot River estuary ranked among the highest in Maine and on the upper end of mercury concentrations anywhere in the United States.[50]  PSMF ¶ 55; DRPSMF ¶ 55.  The evidence was clear in the Federal RCRA Case that the Orrington Plant has been a dominant source of mercury contamination of the Penobscot River over its lifetime.[51]  PSMF ¶ 56; DRPSMF ¶ 56.  As of 2002, any contribution of mercury to the Penobscot River estuary by sources other than Mallinckrodt's Predecessor was indivisible from that which Mallinckrodt's Predecessor was responsible for.[52]  PSMF ¶ 57; DRPSMF ¶ 57.

---

[49]     Mallinckrodt and U.S. Surgical qualify paragraph 54 of Mr. Wyman's statement of material facts to include the beginning of the sentence quoted by Mr. Wyman.  DRPSMF ¶ 54.  The Court reviewed the cited portion of the record and, for the reasons discussed in footnote 48, supra, the Court altered the language of paragraph 54.

[50]     Mallinckrodt and U.S. Surgical qualify Mr. Wyman's paragraph 55, pointing out that the portion of the record cited by Mr. Wyman was written in 2002, and so any statement comparing mercury concentrations in the Penobscot River to other areas must necessarily be bounded in time.  DRPSMF ¶ 55.  The Court reviewed the cited portion of the record, agrees with Mallinckrodt and U.S. Surgical, and altered paragraph 55 to more accurately reflect the record.

[51]     Paragraph 56 of Mr. Wyman's statement of material facts reads, "The evidence was clear [in the Federal RCRA Case] that Mallinckrodt has been the dominant source of mercury contamination of the Penobscot River estuary."  PSMF ¶ 56.  Mallinckrodt and U.S. Surgical deny paragraph 56, arguing that it "misquotes Judge Carter's Decision" and that "[t]he trial testimony Judge Carter cited when he referred to Mallinckrodt as 'a dominant source of mercury in the Penobscot River' referred to operations of the plant over its lifetime and was not limited to pre-1982 operations under" Mallinckrodt's Predecessor's ownership.  DRPSMF ¶ 56.  The Court reviewed the cited portions of the record and, on this motion for summary judgment, agrees with the non-movants Mallinckrodt and U.S. Surgical on both counts.  The Court altered paragraph 56 to more accurately reflect the record.

[52]     Paragraph 57 of Mr. Wyman's statement of material facts reads, "Any contribution of mercury to the Penobscot River estuary by sources other than Mallinckrodt['s Predecessor] is indivisible from that which Mallinckrodt['s Predecessor] is responsible for."  PSMF ¶ 57.  Mallinckrodt and U.S. Surgical deny this statement, arguing that "[t]echnology has developed since Judge Carter's 2002 Decision to allow scientists to pinpoint the sources of mercury through a chemical analysis of mercury isotopes."  DRPSMF ¶ 57.  The Court reviewed the cited portions of the record and, on this motion for summary judgment, agrees with the non-movants Mallinckrodt and U.S. Surgical.  Mallinckrodt and U.S. Surgical have admissible evidence that mercury contributions are divisible and the Court is required to view that evidence in the light most favorable to Mallinckrodt and U.S. Surgical.  The Court altered Mr. Wyman's paragraph 57 to more accurately reflect the record.

The Penobscot River estuary continues to suffer from ongoing mercury contamination caused at least in part by Mallinckrodt's Predecessor.[53]  PSMF ¶ 58; DRPSMF ¶ 58.  Despite the passage of time since Judge Carter's 2002 decision, and within the context of the Federal RCRA Case, the Penobscot River estuary remains unacceptably contaminated with mercury.[54]  PSMF ¶ 59; DRPSMF ¶ 59.  Also, within the context of the Federal RCRA Case, the risk from this contamination by Mallinckrodt's Predecessor is ongoing and, according to the Study Panel's Phase II Report, will continue for a long duration in the absence of remediation.[55]  PSMF ¶ 60; DRPSMF ¶ 60.

---

[53]      Paragraph 58 of Mr. Wyman's statement of material facts states, "The Penobscot River estuary 'continues to suffer . . . from ongoing mercury contamination caused by Mallinckrodt.'"  PSMF ¶ 58. Mallinckrodt and U.S. Surgical qualify this paragraph, objecting on the grounds that "the term 'mercury contamination' is vague and undefined" and that their "responsibility for mercury contamination needs to be defined relative to background concentrations, which are high in the Penobscot River estuary."  DRPSMF ¶ 58.  Subject to this objection, Mallinckrodt and U.S. Surgical admit the paragraph.  DRPSMF ¶ 58.  The Court reviewed the cited portions of the record and altered paragraph 58 to reflect Mallinckrodt and U.S. Surgical's concern regarding the background concentrations of mercury in the Penobscot River estuary.

[54]      Paragraph 59 of Mr. Wyman's statement of material facts states, "Despite the passage of time since Judge Carter's Decision, 'the Penobscot River estuary remains unacceptably contaminated with mercury,' a ruling described as updating and reiterating Judge Carter Decision."  PSMF ¶ 59. Mallinckrodt and U.S. Surgical qualify this paragraph, "deny[ing] that the Penobscot River is unacceptably contaminated" with respect to the issues in this case because the statement cited by Mr. Wyman "came in the context of the [Federal RCRA Case] Court's irreparable harm analysis" and the Court "made no finding regarding public health risks from consumption of lobster or crab."  DRPSMF ¶ 59.  Because the Court concludes that the standards are different for the claims brought by Mr. Wyman and the claims brought in the Federal RCRA Case, *see* Section V.A.2, *infra*, the Court altered Mr. Wyman's paragraph 59 to clarify that it refers only to the Federal RCRA Case.

[55]      Mallinckrodt and U.S. Surgical qualify paragraph 60 of Mr. Wyman's statement of material facts, which states, "The risk from this contamination by Mallinckrodt['s Predecessor] is ongoing and will continue for a long duration in the absence of remediation."  PSMF ¶ 60.  In large part, the qualification tracks Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 59, and the Court altered paragraph 60 to reflect that it refers only to the Federal RCRA Case for the reasons expressed in footnote 54, supra.  Mallinckrodt and U.S. Surgical also state that the record citations offered by Mr. Wyman provide support only for the notion that the Study Panel's Phase II Report concluded that the risk posed by contamination would continue for a long duration absent remediation. DRPSMF ¶ 60.  The Court reviewed the cited portions of the record, agrees with non-movants Mallinckrodt and U.S. Surgical, and altered paragraph 60 to make clear that it is the Study Panel's Phase II Report that concluded the risk posed by contamination would be of long duration absent remediation.

On July 18, 2013, Special Master Susan Calkins issued a scheduling order in the Federal RCRA Case which referred to the Study Panel's Phase II Report as "the critical document in this case;" the schedule was based on the dates the report was filed and the parties filed their challenges.  DSAMF ¶¶ 113-14; PRDSAMF ¶¶ 113-14.  The scheduling order allowed for discovery only from the Study Panel and set a March 31, 2014, trial date.  DSAMF ¶ 115; PRDSAMF ¶ 115.  By January of 2014, both parties acknowledged that the scheduling order's timeframe was too tight and sought additional time.  DSAMF ¶ 116; PRDSAMF ¶ 116.  On February 2, 2014, still weeks before the Maine DMR's first fishery closure, the Court permitted a modest extension and noted that the case had been pending long enough for the attorneys to be prepared for trial and that there was a significant public interest in resolving the lawsuit.  DSAMF ¶ 117; PRDSAMF ¶ 117.

In a February 28, 2014, telephone conference in the Federal RCRA Case, the Court dismissed without prejudice the parties' written objections to the Phase II Report as superfluous, stating that "the very nature of this is that the objections will be presented and the parties will have a right to argue their objections during the course of the [Phase II] hearing."  DSAMF ¶ 118 (alteration in original); PRDSAMF ¶ 118.  In remarks at the outset of the Phase II trial in the Federal RCRA Case, the Court framed the issues in terms of the Phase II Report by asking the parties to advise the Court as to which portion of the report each witness would be covering and tying the focus of the proceedings to the Study Panel's "detailed report with findings and recommendations."  DSAMF ¶ 119; PRDSAMF ¶ 119.  The parties' witness lists

in the Federal RCRA Case's Phase II trial did not include any individuals from the state agencies involved in the Maine DMR's Zone D lobster fishery closure.  DSAMF ¶ 120; PRDSAMF ¶ 120.

### D.   Effects of Mercury Contamination

Bacteria in the Penobscot River estuary are converting mercury into methylmercury, an organic form of mercury that enters and persists in the bodies of animals and human beings exposed to it for a period of time.[56]  PSMF ¶ 61; DRPSMF ¶ 61.  Methylmercury bioaccumulates in biota and biomagnifies in the food chain, becoming more concentrated as it passes from prey to predator.  PSMF ¶ 62; DRPSMF ¶ 62.  It does not break down over time, and the methylation of mercury is a continuous process that can go on for decades or longer—creating the most severe adverse impacts downstream of the original mercury source.   PSMF ¶¶ 63-64; DRPSMF ¶¶ 63-64.

Methylmercury is a highly toxic substance with adverse health effects associated with exposure to humans above certain thresholds.[57]   PSMF ¶ 65; DRPSMF ¶ 65.  Below these thresholds, there is minimal risk of deleterious effects. DSAMF ¶ 45; PRDSAMF ¶ 45.  Methylmercury, even in low dosages above those thresholds, is inimical to human health; it attacks the nervous system, the kidneys,

---

[56]    Mallinckrodt and U.S. Surgical admit Mr. Wyman's paragraph 61 except to the extent it implies that methylmercury persists indefinitely in the bodies of humans and animals.  DRPSMF ¶ 61. The Court reviewed the cited portions of the record, agrees with Mallinckrodt and U.S. Surgical, and altered paragraph 61 to reflect Mallinckrodt and U.S. Surgical's qualification.

[57]    Mallinckrodt and U.S. Surgical admit Mr. Wyman's paragraph 65 except to the extent it implies adverse health effects are associated with any degree of exposure.  DRPSMF ¶ 65.  The Court reviewed the cited portions of the record, agrees with Mallinckrodt and U.S. Surgical, and altered paragraph 65 to reflect Mallinckrodt and U.S. Surgical's qualification.

the immune system, and the reproductive system, and it is extremely toxic to the developing brain in fetuses and young children.[58]  PSMF ¶ 66; DRPSMF ¶ 66.  The most common source for methylmercury exposure to humans comes from eating fish and shellfish; when a person eats fish or shellfish with high methylmercury concentration levels, the mercury is nearly completely absorbed through the digestive process.  PSMF ¶¶ 67-68; DRPSMF ¶¶ 67-68.  The mercury is taken up into the blood and circulated throughout the body, including penetration of the brain.[59]  PSMF ¶ 69; DRPSMF ¶ 69.  Once ingested, methylmercury stays in the body for several months, though in approximately forty-five days, humans lose about fifty percent of mercury levels that existed directly after ingestion.[60]  PSMF ¶¶ 70-71; DRPSMF ¶¶ 70-71.  Some level of mercury is present in all seafood, but it is not a concern for human health unless it reaches a certain threshold level.[61]  DSAMF ¶ 46; PRDSAMF ¶ 46.  Given the public health benefits of seafood, neither the Maine CDC nor the Maine DMR wants to stop people from consuming seafood merely because it contains some mercury.[62]  DSAMF ¶ 47; PRDSAMF ¶ 47.  The mercury contamination of the

---

[58]    Mallinckrodt and U.S. Surgical make largely the same qualification to paragraph 66 of Mr. Wyman's statement of material facts as they make to paragraph 65.  DRPSMF ¶ 66; *see also* Footnote 57, *supra*.  The Court altered paragraph 66 to reflect Mallinckrodt and U.S. Surgical's qualification.

[59]    Mallinckrodt and U.S. Surgical qualify paragraph 69 of Mr. Wyman's statement of material facts to the extent it implies that methylmercury persists in the human body indefinitely.  DRPSMF ¶ 69.  The Court reviewed the cited portions of the record, agrees with Mallinckrodt and U.S. Surgical, and altered paragraph 69 to reflect Mallinckrodt and U.S. Surgical's qualification.

[60]    In light of the Court's decision to combine Mr. Wyman's paragraphs 70 and 71, the Court regards Mallinckrodt and U.S. Surgical's qualification of paragraph 70 as moot.  *See* DRPSMF ¶ 70.

[61]    The Court regards Mr. Wyman's qualification of paragraph 46 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶¶ 70-71, and rejects the qualification for the reasons expressed in footnote 8, supra.

[62]    The Court regards Mr. Wyman's qualification of paragraph 47 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted

Penobscot River estuary caused by Mallinckrodt's Predecessor poses a substantial risk of harm to humans exposed to it.[63]  PSMF ¶ 72; DRPSMF ¶ 72.

### E.    The 2014 and 2016 Fishery Closures

Upon receipt of the Phase II Report, the Maine DMR reviewed the data concerning mercury levels in lobsters and crabs indicating that they may have levels that exceed the Maine CDC FTALs, possibly warranting a consumption advisory for sensitive populations.[64]  PSMF ¶ 73; DRPSMF ¶ 73.  The Maine DMR requested analysis of this data by the State Toxicologist and the Maine DEP staff.  PSMF ¶ 74; DRPSMF ¶ 74.  Based in part on the analysis of the extent of the mercury levels in the estuary by the State Toxicologist and the Maine DEP, effective as of February 22, 2014, the Maine DMR closed the area from Wilson Point to the Fort Point Lighthouse on Cape Jellison (the 2014 Closure) to fishing for lobster and crab on an emergency

---

in the statement, PRDSAMF ¶ 47, and rejects the qualification for the reasons expressed in footnote 8, supra.

[63]    Mallinckrodt and U.S. Surgical deny the portion of paragraph 72 of Mr. Wyman's statement of material facts that reads "as evidenced by the closure of fishing grounds by MDMR in 2014," PSMF ¶ 72, as lacking in record support.  DRPSMF ¶ 72.  The Court reviewed the portion of the record cited by Mr. Wyman, agrees with non-movants Mallinckrodt and U.S. Surgical that it does not provide support for the inference that the Court in the Federal RCRA Case found that the fishery closures were evidence that mercury contamination posed a risk of harm to exposed humans, and excised this portion of paragraph 72 from its recitation of the undisputed facts.

[64]    Paragraph 73 of Mr. Wyman's statement of material facts reads:

> Upon the receipt of the PRMS, the Maine [DMR] reviewed the data concerning mercury levels in lobsters and crabs indicating that they may have levels that exceed the Maine [CDC FTALs] warranting a consumption advisory for sensitive populations, as set forth in the Bureau of Health [FTALs] . . ..

PSMF ¶ 73.  Mallinckrodt and U.S. Surgical qualify this statement, pointing out that "[t]he FTAL is intended as a guide and does not automatically trigger a consumption advisory or other action," as it is "the level at which decision-makers begin considering whether any action should be taken . . .."  DRPSMF ¶ 73.  For this proposition, Mallinckrodt and U.S. Surgical cite paragraph 65 of Mallinckrodt and U.S. Surgical's statement of additional material facts, DSAMF ¶ 65, which Mr. Wyman admits.  PRDSAMF ¶ 65.  The Court therefore agrees with Mallinckrodt and U.S. Surgical regarding its qualification of Mr. Wyman's paragraph 73 and altered the paragraph accordingly.

basis to—in part—protect public health due to the risk of mercury contamination in lobsters and crabs.[65]  PSMF ¶ 75; DRPSMF ¶ 75.

The emergency rule for the 2014 Closure was made permanent on May 19, 2014.  PSMF ¶ 76; DRPSMF ¶ 76.  As justification for the 2014 Closure, the Maine DMR expressly referred to the PRMS.  PSMF ¶ 77; DRPSMF ¶ 77.  The basis statements for the 2014 Closure explained that there was less data available for crabs than lobsters but that it would be difficult to enforce a closure for lobster and not crab, as the gear is the same.[66]  PSMF ¶ 78; DRPSMF ¶ 78.  The Maine DMR's

---

[65]    Paragraph 75 of Mr. Wyman's statement of material facts reads, "Based on the analysis of the extent of the mercury levels in the estuary by the State Toxicologist and the [Maine] DEP, effective as of February 22, 2014, [the Maine] DMR closed the area from Wilson Point to the Fort Point Lighthouse on Cape Jellison to fishing for lobster and crab on an emergency basis to 'protect [the] public health due to the risk of mercury contamination in lobsters and crabs.'"  PSMF ¶ 75.  Mallinckrodt and U.S. Surgical admit that protection of public health was one reason for Maine DMR's closure decision but deny that it was the sole reason, and further deny "that the consumption of lobster or crabs from the closed area posed a public health risk."  DRPSMF ¶ 75.

    The Court overrules the denial that consumption posed a public health risk.  The Court does not regard Mr. Wyman's paragraph 75 as merely reciting the Maine DMR's purported justification for the closures rather than asserting its truth.  However, the Court did alter paragraph 75 to reflect non-movants Mallinckrodt and U.S. Surgical's assertion that public health was only one of the reasons for the Maine DMR's closure decision.  For this proposition, Mallinckrodt and U.S. Surgical cite paragraphs 92 through 105 of Mallinckrodt and U.S. Surgical's statement of additional material facts.  DRPSMF ¶ 75.  The first two of these paragraphs, which Mr. Wyman admits, *see* PRDSAMF ¶¶ 92-93, state that "[a] number of factors influenced the [Maine] DMR's decisions to implement the fishery closures," DSAMF ¶ 92, and "[i]n considering whether to take a management action related to mercury concentrations in lobsters and crabs in Zone D, the [Maine] DMR was concerned about the public's perception of the Maine lobster market as a whole and consumer confidence in Maine lobster."  DSAMF ¶ 93.  The Court regards these two admitted statements as supporting Mallinckrodt and U.S. Surgical's partial denial of paragraph 75.

[66]    Mr. Wyman's paragraph 78 states, "The Basis Statements for the first [Maine] DMR closure explained that there was less data available for crabs, but there was still a concern about contamination levels for crabs . . . and, in the Basis Statement of the permanent rule, it was added that 'it would be difficult to enforce a closure for lobster and not crab, as the gear is the same.'"  PSMF ¶ 78 (emphasis omitted).  Mallinckrodt and U.S. Surgical qualify that portion of paragraph 78 which states "there was still a concern about contamination levels for crabs," arguing that the basis statements only indicate that crab harvesting was being closed as a precautionary measure and because it would otherwise be difficult to enforce a lobster closure.  DRPSMF ¶ 78.  The Court reviewed the cited portions of the record, agrees with Mallinckrodt and U.S. Surgical, and altered Mr. Wyman's paragraph 78 to more accurately reflect the record.

response to comments on the 2014 Closure partially explained the basis for the rule

as follows:

> The level of mercury in fin fish that warrants consideration of a consumption advisory by the [Maine CDC] for the most sensitive population is 200 nanograms (a billionth of a gram) of methylated mercury per gram of tissue and is the corresponding mercury level in edible tissue that if consumed at a rate of 8 oz per week by an adult will exceed the [United States Environmental Protection Agency (EPA)] toxicity value.  The [United States Food and Drug Administration] action level is for regulatory purposes and is not a comparable value.  At the 200 ng/g level, no more than one 8-ounce meal per week for pregnant and nursing women, and children under the age of 8 is recommended. Two average size whole lobsters would yield approximately 8 ounces of meat.  There is currently no lobster-[]specific action level and therefore the State Toxicologist and [the Maine] DMR used the fin fish action levels in making a determination for this action.
>
> The intent of the closure was to ensure that consumers will feel confident that they can continue to eat Maine lobster safely, regardless of the location where it was caught.  Due to the inability to trace specific locations of harvest in the fishery, such as the proposed closure, [the Maine] DMR believes that the closure is the most effective way to ensure public health is protected while having the least impact on the lobster supply chain and markets.[67]

PSMF ¶ 79; DRPSMF ¶ 79.  The Court in the Federal RCRA Case accepted the 2014

Closure as directly related to the level of mercury in the Penobscot River estuary and

---

[67]   Mallinckrodt and U.S. Surgical admit that paragraph 79 of Mr. Wyman's statement of material facts is an accurate reflection of the Maine DMR's response to a public comment on the 2014 rulemaking which rendered the first closure permanent; however, they qualify the paragraph, "deny[ing] that this response provides a complete and accurate statement of the purpose or meaning of Maine's F[TAL] or the intent behind the closure."  DRPSMF ¶ 79.  The Court regards this qualification as argument outside the scope of the facts asserted in the statement and rejects it for the reasons expressed in footnote 8, supra.  However, as the Court already found on this motion for summary judgment that the Maine DMR had a variety of reasons for the 2014 Closure, *see* Footnote 65, *supra*, the Court altered paragraph 79 to reflect that this response provided only a partial explanation from the Maine DMR.

viewed the closure as a game-changer on whether the injury suffered by the Penobscot River estuary was irreparable.[68]  PSMF ¶ 80; DRPSMF ¶ 80.

After the 2014 Closure, the Maine DMR sent letters to Mr. Wyman and others dated March 4, 2014, acknowledging that the closure would significantly impact fishermen who fished in the closed area.[69]  PSMF ¶ 81; DRPSMF ¶ 81.  Additionally, the Maine DMR, together with the Maine DEP and Maine CDC, initiated an independent two-year sampling study to confirm the results of the PRMS.[70]  PSMF ¶ 82; DRPSMF ¶ 82.  One year of results from this 2014 sampling study showed levels of mercury in lobsters sampled from the 2014 Closure area and south of the 2014 Closure greater than mercury levels reported in the PRMS; mercury levels in crab

---

[68]     Mr. Wyman's paragraph 80 states that the Court in the Federal RCRA Case "held that the first closure was 'directly related to the level of mercury in the Penobscot estuary . . . .' and declared that '[t]he Court views the [Maine] DMR closure from lobstering and crabbing of a large area at the mouth of the Penobscot Bay as a game-changer' on the issue of the public health risks created by Mallinckrodt's contamination of the Penobscot River estuary."  PSMF ¶ 80 (some alterations in original).  Mallinckrodt and U.S. Surgical deny this statement, arguing that it mischaracterizes the Court's decision in the Federal RCRA Case.  DRPSMF ¶ 80.  Mallinckrodt and U.S. Surgical assert that that decision "states that the Court 'accepts' the first closure 'as directly related to the level of mercury in the Penobscot estuary,'" and that "[t]he Court viewed the closure 'as a game-changer' on the issue of whether the injury suffered by the Penobscot River estuary was irreparable."  DRPSMF ¶ 80.  The Court reviewed the cited portions of the record, agrees with Mallinckrodt and U.S. Surgical that Mr. Wyman incorrectly characterized the Court's decision in the Federal RCRA Case, and altered paragraph 80 to more accurately reflect the record.

[69]     Mr. Wyman's paragraph 81 reads, "After the first closure, [the Maine] DMR sent letters dated March 4, 2014 to commercial fishermen impacted by the first closure further explaining the reasons for the closure and acknowledging that such fishermen would likely suffer therefrom."  PSMF ¶ 81.  Mallinckrodt and U.S. Surgical qualify this statement, asserting that the record "does not establish to whom the letters were sent other than to Kenneth Wyman" and does not support the statement that fishermen would likely suffer as a result of the closure.  DRPSMF ¶ 81.  The Court reviewed the cited portion of the record and agrees with non-movants Mallinckrodt and U.S. Surgical.  The Court altered paragraph 81 to more accurately reflect the record.

[70]     The Court regards Mallinckrodt and U.S. Surgical's qualification of paragraph 82 of Mr. Wyman's statement of material facts as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 82, and rejects the qualification for the reasons expressed in footnote 8, supra.  The Court does, however, note its agreement with Mallinckrodt and U.S. Surgical that the 2014 sampling report contains only one year of results.  DRPSMF ¶ 82.  The Court altered paragraph 82 to reflect this clarification.

were found to be lower than expected based on previous PRMS results.[71]  PSMF ¶ 83;

DRPSMF ¶¶ 82-83.

Subsequently, effective June 21, 2016, in part as a result of the 2014 sampling

report, on an emergency basis, the Maine DMR expanded the closure southwards for

both lobsters and crabs to a line starting in Castine, Maine, and going to Squaw Point

on Cape Jellison in Stockton Springs, Maine (2016 Closure).[72]  PSMF ¶ 84; DRPSMF

¶ 84.  This change was made permanent on November 15, 2016.  PSMF ¶ 84;

DRPSMF ¶ 84.  The explanation given by the Maine DMR for the 2016 Closure was

essentially the same as that given for the 2014 Closure, except for the expanded area

where elevated mercury levels were found in lobsters relative to those reported in the

PRMS.[73]  PSMF ¶ 85; DRPSMF ¶ 85.

---

[71]     Mr. Wyman's paragraph 83 reads:
          The results of the 2014 Sampling Report showed elevated levels of mercury in lobsters
          sampled from the first closure area and also elevated levels from lobsters sampled
          south of the first closure greater than mercury levels reported in the PRMS. . . .
          Mercury in crabs were found to be lower than expected based on previous PRMS
          results.
PSMF ¶ 83.  Mallinckrodt and U.S. Surgical qualify this statement, objecting that "the term 'elevated'
. . . is a vague and relative term and its meaning is unclear in this context."  DRPSMF ¶ 83.  As
paragraph 83 makes clear that "elevated" is used in relation to mercury levels reported by the PRMS,
the Court disagrees with Mallinckrodt and U.S. Surgical that its meaning is unclear; however, the
Court does not regard the word "elevated" as additive to the point Mr. Wyman is making in paragraph
83, as the comparison to the PRMS mercury levels makes clear that the mercury levels in the sampled
lobsters were elevated.
          The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification of
paragraph 83 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 83,
and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.
[72]     Mallinckrodt and U.S. Surgical deny that the 2014 sampling report "was the sole reason for
the expanded closure" but otherwise admit paragraph 84 of Mr. Wyman's statement of material facts.
DRPSMF ¶ 84.  For the reasons expressed in footnote 65, supra, the Court agrees with Mallinckrodt
and U.S. Surgical and altered paragraph 84 to reflect their qualification.
[73]     Mallinckrodt and U.S. Surgical admit the majority of paragraph 85 of Mr. Wyman's statement
of material facts but deny that the long quote included in paragraph 85 is supported by the provided
record citation and object once again to Mr. Wyman's use of the word "elevated."  DRPSMF ¶ 85.  As
before, the Court altered paragraph 85 of Mr. Wyman's statement of material facts to clarify that
"elevated" is in comparison to the levels reported by the PRMS.  Additionally, the Court reviewed the
cited portion of the record and agrees with Mallinckrodt and U.S. Surgical that the quote used by Mr.

After the 2016 Closure, the Maine DMR—in conjunction with the Maine CDC—undertook an analysis of samples of lobsters and crabs taken from the closed areas of the Penobscot River estuary in 2015 to further assess the need for a continuation of the closures.[74]  PSMF ¶ 86; DRPSMF ¶ 86.  The State Toxicologist's analysis of the incomplete 2015 data collection showed that mercury levels in lobsters in the closed areas remained high and that at some of the measuring points just south of the Orrington Plant, crabs showed mercury levels in excess of the FTAL.[75]  PSMF ¶ 87; DRPSMF ¶ 87.  As of now, there is no pending decision at the Maine DMR to change the status of either the 2014 or the 2016 Closure with regard to crabs.[76]  PSMF ¶ 88; DRPSMF ¶ 88.

---

Wyman is not included there.  The Court therefore did not include the quote in its recitation of the undisputed facts.  In light of this decision by the Court, the remainder of Mallinckrodt and U.S. Surgical's qualification of paragraph 85 is moot.

[74]     The Court regards Mallinckrodt and U.S. Surgical's qualification of Mr. Wyman's paragraph 86 as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 86, and rejects the qualification for the reasons expressed in footnote 8, supra.

[75]     Mallinckrodt and U.S. Surgical qualify paragraph 87 of Mr. Wyman's statement of material facts, asserting that "[t]he 2015 data collection and report is incomplete" and that "[n]o conclusions were made from the 2015 data, and the M[aine] CDC cautioned against doing so without further analysis because there were issues with sample size."  DRPSMF ¶ 87.  With regard to the status of the 2015 data collection and report as incomplete, the Court reviewed the cited portion of the record and agrees with the non-movants Mallinckrodt and U.S. Surgical.  With regard to the statement that no conclusions were made from the 2015 data, however, the Court notes that Mallinckrodt and U.S. Surgical did not make the portion of the record they cited available to the Court.  The Court altered paragraph 87 to reflect the first qualification but not the second, which the Court finds Mallinckrodt and U.S. Surgical waived.

        The Court regards the remainder of Mallinckrodt and U.S. Surgical's qualification of paragraph 87 of as argument outside the scope of the facts asserted in the statement, DRPSMF ¶ 87, and rejects that portion of the qualification for the reasons expressed in footnote 8, supra.

[76]     Paragraph 88 of Mr. Wyman's statement of material facts reads, "At this time, there is no pending decision at [the Maine] DMR to change the status of either closures."  PSMF ¶ 88.  Mallinckrodt and U.S. Surgical qualify this statement, arguing that the cited portions of the record only support the statement that there is no pending decision with respect to crabs.  DRPSMF ¶ 88.  The Court reviewed the cited portions of the record and, taking all reasonable inferences in favor of the non-movants, agrees with Mallinckrodt and U.S. Surgical.  The Court revised paragraph 88 accordingly.

The Maine DMR does not have in-house expertise regarding toxicology or the public health implications of mercury contamination, and it defers to the Maine CDC to advise it on those issues. DSAMF ¶ 39; PRDSAMF ¶ 39. Since 1996, Dr. Andy Smith has been the State Toxicologist with the Maine CDC; it is his job to consult with other state agencies and provide advice regarding toxicology and risk assessment.[77] DSAMF ¶¶ 40-41; PRDSAMF ¶¶ 40-41. The Maine CDC does not have any decision-making authority when it consults with other state agencies. DSAMF ¶ 42; PRDSAMF ¶ 42. The Maine CDC thinks of risk in terms of toxicity and exposure and believes that risk assessments should take both of those into account.[78] DSAMF ¶ 44; PRDSAMF ¶ 44. The Maine CDC consulted with the Maine DMR regarding closures of portions of the lobster and crab fisheries in Lobster Management Zone D but did not have decision-making authority with respect to those closures. DSAMF ¶ 43; PRDSAMF ¶ 43. Average mercury levels in lobsters in the area covered by the 2014 and 2016 Closures (Closure Area) are comparable to average mercury concentrations in other seafood available on the market such as canned tuna, and less than half the mercury concentrations of other seafood available on the market such as swordfish.[79] DSAMF ¶ 48; PRDSAMF ¶ 48.

---

[77] The Court regards Mr. Wyman's qualifications of paragraphs 40 and 41 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶¶ 40-41, and rejects the qualifications for the reasons expressed in footnote 8, supra.

[78] The Court regards Mr. Wyman's qualification of paragraph 44 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 44, and rejects the qualification for the reasons expressed in footnote 8, supra.

[79] The Court regards Mr. Wyman's qualification of paragraph 48 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted

Dr. Smith was involved with developing Maine's FTAL. DSAMF ¶ 49; PRDSAMF ¶ 49. The FTAL was developed in the 1990s by the Maine Bureau of Health, which is now the Maine CDC. DSAMF ¶ 50; PRDSAMF ¶ 50. The FTAL is based in part on a reference dose, defined by the EPA "as an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure level (mk/kg-day) for the human population, including sensitive subpopulations, that is likely to be without an appreciable risk of deleterious effects during a lifetime."[80] DSAMF ¶ 51; PRDSAMF ¶ 51.

The reference dose, in turn, is based on the benchmark dose, which is the amount of methylmercury in umbilical cord blood associated with the threshold for a health effect on sensitive populations according to epidemiological studies of mercury.[81] DSAMF ¶ 52; PRDSAMF ¶ 52. To derive the reference dose, the EPA divided the benchmark dose by ten to account for uncertainty, meaning that the reference dose is ten times lower than the lowest dose at which any deleterious effects have been observed in epidemiological studies. DSAMF ¶ 52; PRDSAMF ¶ 52. To derive the FTAL, the Maine Bureau of Health took the reference dose, multiplied it by an assumed body weight for pregnant women, and then divided the product by an

---

in the statement, PRDSAMF ¶ 48, and rejects the qualification for the reasons expressed in footnote 8, supra.

[80] Mr. Wyman qualifies paragraph 51 of Mallinckrodt and U.S. Surgical's statement of additional material facts, contending that the "reference dose is one element of the equation used to determine the FTAL." PRDSAMF ¶ 51. The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered additional paragraph 51 to more accurately reflect the record.

[81] The Court regards Mr. Wyman's qualification of paragraph 52 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 52, and rejects the qualification for the reasons expressed in footnote 8, supra. The Court does not view additional paragraph 52 as irrelevant or confusing.

assumed fish consumption rate of one eight-ounce fish meal per week.[82]   DSAMF ¶¶ 53-54; PRDSAMF ¶¶ 53-54.  An average-size legal lobster contains approximately three to four ounces of meat.  DSAMF ¶ 55; PRDSAMF ¶ 55.

The FTAL's assumed consumption rate is based on the ninety-fifth percentile consumption rate of sportfish derived from surveys of recreational anglers and is approximately twenty-five percent higher than the ninety-fifth percentile consumption rate of sportfish found in a survey of Maine anglers.[83]   DSAMF ¶ 56; PRDSAMF ¶ 56.  This consumption rate is an assumption that may not apply in all scenarios.  DSAMF ¶ 57; PRDSAMF ¶ 57.  Neither the Maine DMR nor the Maine CDC had any lobster-specific consumption data available in considering whether to implement a management action in Zone D.  DSAMF ¶ 58; PRDSAMF ¶ 58.  The FTAL also assumes a bodyweight of sixty kilograms for women of childbearing age, but the EPA now recommends assuming a bodyweight of sixty-eight kilograms for women of childbearing age.[84]   DSAMF ¶¶ 59-60; PRDSAMF ¶¶ 59-60.

The FTAL for methylmercury is 200 nanograms per gram.  DSAMF ¶ 61; PRDSAMF ¶ 61.  One would need to repeatedly consume food exceeding the FTAL to

---

[82]    The Court regards Mr. Wyman's qualifications of paragraphs 53 and 54 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statements, PRDSAMF ¶¶ 53-54, and rejects the qualifications for the reasons expressed in footnote 8, supra.

[83]    The Court regards Mr. Wyman's qualification of paragraph 56 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 56, and rejects the qualification for the reasons expressed in footnote 8, supra.

[84]    The Court regards Mr. Wyman's qualification of paragraph 60 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 60, and rejects the qualification for the reasons expressed in footnote 8, supra.

reach the blood-mercury level associated with the benchmark dose.[85]  DSAMF ¶ 62; PRDSAMF ¶ 62.  Assuming consumption of eight ounces a week of food with a mercury concentration of 400 nanograms per gram, Dr. Smith estimates that it would take one or two months to exceed the reference dose.  DSAMF ¶ 62; PRDSAMF ¶ 62.  At least one scientific study did not establish that short-term exceedances of the reference dose have adverse health consequences.[86]  DSAMF ¶ 63; PRDSAMF ¶ 63.

The FTAL was developed to apply to recreational-caught freshwater or anadromous fish, and the Zone D lobster and crab fishing closure is one of only two situations the Maine CDC is aware of in which it has been applied in a commercial fishery.[87]  DSAMF ¶ 64; PRDSAMF ¶ 64.  The FTAL is intended as a guide and does not automatically trigger a consumption advisory or other action; it is the level at which decision-makers begin considering whether to take any action, and it could

---

[85]    Mr. Wyman qualifies this portion of paragraph 62 of Mallinckrodt and U.S. Surgical's statement of additional material facts, pointing out that "Dr. Smith's testimony concerned exceeding the reference dose, not the benchmark dose."  PRDSAMF ¶ 62.  Mr. Wyman is correct; however, the benchmark dose is ten times higher than the reference dose, *see* DSAMF ¶ 52, so if this statement is true of the reference dose, it is true of the benchmark dose.  The Court rejects Mr. Wyman's qualification of additional paragraph 62.

[86]    Paragraph 63 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "Scientific studies have not established that short-term exceedances of the reference dose have adverse health consequences."  DSAMF ¶ 63.  Mr. Wyman qualifies this statement, noting that "Dr. Smith was testifying about one published article and said that the article didn't reach a conclusion about short term exceedances of the reference dose."  PRDSAMF ¶ 63.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered paragraph 63 of Mallinckrodt and U.S. Surgical's statement of additional material facts to more accurately reflect the record.

[87]    Mr. Wyman qualifies paragraph 64 of Mallinckrodt and U.S. Surgical's statement of additional material facts, pointing out that "Dr. Smith testified about two situations in which it was applied to commercially caught fish."  PRDSAMF ¶ 64.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered paragraph 64 of Mallinckrodt and U.S. Surgical's statement of additional material facts to more accurately reflect the record.

The Court regards Mr. Wyman's further qualification of additional paragraph 64 as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 64, and rejects the qualification for the reasons expressed in footnote 8, supra.

lead to a variety of different management actions or no action at all.  DSAMF ¶ 65;
PRDSAMF ¶ 65.

Since at least 2009, the Maine CDC has had a standing advisory in place for
all ocean fish and shellfish, advising that pregnant and nursing women, women who
may get pregnant, and children under eight years of age eat no more than two seafood
meals per week.[88]  DSAMF ¶ 66; PRDSAMF ¶ 66.  The state of Maine has a standing
mercury advisory in place for all freshwater rivers and lakes in the state,
recommending that people limit their consumption of fish from those bodies of water
to no more than two meals per week.[89]  DSAMF ¶ 67; PRDSAMF ¶ 67.  The Maine
DMR has jurisdiction over commercially caught fish with average mercury
concentrations that exceed the FTAL, such as bluefish, halibut, and lobsters in parts
of the Sheepscot River Estuary, but it has not closed those fisheries.[90]  DSAMF ¶ 68;
PRDSAMF ¶ 68.

In giving advice to the Maine DMR, the Maine CDC did not consider
commercially harvested and consumed lobsters in the closure areas to pose a public

---

[88]    The Court regards Mr. Wyman's qualification of paragraph 66 of Mallinckrodt and U.S.
Surgical's statement of additional material facts as argument outside the scope of the facts asserted
in the statement, PRDSAMF ¶ 66, and rejects the qualification for the reasons expressed in footnote
8, supra.

[89]    Mr. Wyman qualifies paragraph 67 of Mallinckrodt and U.S. Surgical's statement of additional
material facts, arguing that "[i]t is not clear from the testimony if the advisory for all freshwater rivers
and lakes is due to mercury . . .."  PRDSAMF ¶ 67.  The Court reviewed the cited portion of the record
and disagrees with Mr. Wyman.  The cited portion of the record comes in the context of testimony
about mercury levels in freshwater fish.  *See* DSAMF, Attach. 4, *Ex. 4: DMR Dep. Tr. Excerpts and
Exs.* at 43:13-44:24 (*Maine DMR Dep.*).  From this, the Court draws the inference on this motion for
summary judgment that the advisory discussed by the Maine DMR's designee under Federal Rule of
Civil Procedure 30(b)(6) is a mercury advisory.

[90]    The Court regards Mr. Wyman's qualification of paragraph 68 of Mallinckrodt and U.S.
Surgical's statement of additional material facts as argument outside the scope of the facts asserted
in the statement, PRDSAMF ¶ 68, and rejects the qualification for the reasons expressed in footnote
8, supra.

health concern, and the Maine CDC did not recommend a commercial advisory or closure.[91]  DSAMF ¶ 69; PRDSAMF ¶ 69.  The Maine CDC merely recommended that the Maine DMR consider whether an advisory was appropriate to account for the possibility that certain recreational harvesters or commercial harvesters using their catch for personal or household consumption might be catching a high percentage of their product from discrete areas with high mercury concentrations.[92]  DSAMF ¶ 70; PRDSAMF ¶ 70.  The Maine DMR does not have any data as to whether such harvesters are indeed doing this.  DSAMF ¶ 70; PRDSAMF ¶ 70.  An advisory for non-commercial lobster harvesting would have been health protective if it was effectively communicated and people responded to it.[93]  DSAMF ¶ 71; PRDSAMF ¶ 71.  The 2014 confirmatory sampling conducted by the state of Maine did not show

---

[91]     The Court regards Mr. Wyman's qualification of paragraph 69 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 69, and rejects the qualification for the reasons expressed in footnote 8, supra.  The Maine CDC's designee testified that lobsters from the closed area in the stream of commerce did not pose a public health concern.  *See* DSAMF, Attach. 5, *Ex. 5: CDC Dep. Tr. Excerpts and Exs.* at 140:15-141:03.  On this motion for summary judgment where Mallinckrodt and U.S. Surgical are the non-movants, the Court regards this as sufficient record support to draw the inference that the Maine CDC was not concerned that commercially harvested and consumed lobsters from the closed areas posed a public health concern.

[92]     Mr. Wyman qualifies paragraph 70 of Mallinckrodt and U.S. Surgical's statement of additional material facts, asserting that "[t]he transcript pages cited do not address any advice given to [the Maine] DMR from [the Maine] CDC."  PRDSAMF ¶ 70.  The Court reviewed the cited portion of the record and disagrees.  The Maine DMR's designee explicitly discusses the advice and recommendations the Maine CDC gave to the Maine DMR.  *See Maine DMR Dep.* at 94:06-17.  Mr. Wyman also states that "[t]he M[aine] CDC recommended that at a minimum . . . [the Maine] DMR consider a consumption advisory for recreational fishing."  PRDSAMF ¶ 70 (emphasis omitted).  This information is already included in additional paragraph 70 and the Court will not repeat it.

[93]     Paragraph 71 of Mr. Wyman's statement of material facts reads, "An advisory for non-commercial lobster harvesting would have been health protective."  DSAMF ¶ 71.  Mr. Wyman qualifies this statement, contending that Dr. Smith conditioned this on the advisory being well-communicated and people responding to it.  PRDSAMF ¶ 71.  The Court reviewed the cited portion of the record, agrees with Mr. Wyman, and altered paragraph 71 to more accurately reflect the record.

levels of concern for crabs.[94]  DSAMF ¶ 72; PRDSAMF ¶ 72.  Neither the Maine CDC nor the Maine DMR is aware of any adverse health consequences caused by past consumption of lobster or crab from the closure areas.[95]  DSAMF ¶ 73; PRDSAMF ¶ 73.

The Maine DMR's primary concern is the conservation of marine resources; it is also concerned with the economic strength of Maine fisheries.[96]  DSAMF ¶ 89; PRDSAMF ¶ 89.  Ultimately, the decision to implement the closures rested with a single individual, Maine DMR Commissioner Patrick Keliher.  DSAMF ¶ 90; PRDSAMF ¶ 90.  His decision to take management action was not statutorily mandated and involved certain judgment calls, though protection of public health is a part of his mandate.[97]  DSAMF ¶ 91; PRDSAMF ¶ 91.

---

[94]    Paragraph 72 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "The confirmatory sampling conducted by the state did not show levels of concern for crabs."  DSAMF ¶ 72.  Mr. Wyman qualifies additional paragraph 72, noting that the state conducted two separate samplings, and while the 2014 sampling did not show levels of concern for crabs, the 2015 sampling did.  PRDSAMF ¶ 72.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered paragraph 72 to more accurately reflect the record.  The Court regards the remainder of Mr. Wyman's qualification of additional paragraph 72 as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 72, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

[95]    The Court regards Mr. Wyman's qualification of paragraph 73 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 73, and rejects the qualification for the reasons expressed in footnote 8, supra.

[96]    The Court regards Mr. Wyman's qualification of paragraph 89 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 89, and rejects the qualification for the reasons expressed in footnote 8, supra.

[97]    Paragraph 91 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "His decision to take management action was not statutorily mandated and involved certain judgment calls."  DSAMF ¶ 91.  Mr. Wyman qualifies this statement, arguing that the Maine DMR's designee "qualified this statement by saying that the Commissioner does have an obligation to protect public health which is part of his mandate."  PRDSAMF ¶ 91.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered paragraph 91 of Mallinckrodt and U.S. Surgical's statement of additional material facts to more accurately reflect the record.  While on this motion for summary judgment, the Court makes the inference that Commissioner Keliher's closure decisions

A number of factors influenced the Maine DMR's decisions to implement the fishery closures. DSAMF ¶ 92; PRDSAMF ¶ 92. In considering whether to take a management action related to mercury concentrations in lobsters and crabs in Zone D, the Maine DMR was concerned about the public's perception of the Maine lobster market and consumer confidence in Maine lobster. DSAMF ¶ 93; PRDSAMF ¶ 93. Despite the lack of risk from commercial lobster consumption, the Maine DMR believed that the primary impact of the 2014 Closure would fall on commercial harvesters.[98] DSAMF ¶ 94; PRDSAMF ¶ 94. The small number of commercial lobster and crab harvesters in the Closure Area was a factor in the Maine DMR's decision to implement the closures, as was the fact that the Closure Area has a limited, seasonal lobster fishery.[99] DSAMF ¶¶ 95-96; PRDSAMF ¶¶ 95-96. Support from lobster

were not statutorily mandated, the Court agrees that the context that he is statutorily required to consider public health is relevant and includes it.

[98] Mr. Wyman qualifies paragraph 94 of Mallinckrodt and U.S. Surgical's statement of additional material facts, referring to paragraph 69 of his response to Mallinckrodt and U.S. Surgical's statement of additional facts and arguing that "[t]here is no testimony or evidence of a lack of risk from commercial lobster consumption." PRSDAMF ¶ 94. Because the Court reviewed additional paragraph 69 and found that the qualification offered by Mr. Wyman was not warranted, *see* footnote 91, *supra*, the Court regards Mr. Wyman's qualification of additional paragraph 94 as moot.

[99] Paragraph 96 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "The closed area also has a limited, seasonal lobster fishery, which influenced the [Maine] DMR's decision to implement the closure." DSAMF ¶ 96. Mr. Wyman qualifies this statement, contending that it "is taken out of context and is misleading." PRDSAMF ¶ 96. He expands on this argument as follows:

> For this statement and several others, [Mallinckrodt and U.S. Surgical] ha[ve] cherry picked a few of the factors that [the Maine] DMR considered in the decision to implement the closure. Ms. Mendelson [the Maine DMR's designee] confirmed those she was asked about, but the list is incomplete, and thus gives a skewed vision of the decision-making process. The Administrative Record . . . speaks for itself. The factors considered in implementing a closure are listed in the record and it is the best and most complete evidence of why [the Maine] DMR acted as it did. The documents make it clear that the primary concern of [the Maine] DMR was the need to take action to protect the public regarding the risk of consuming lobster from this area and the only question was how to most effectively and efficiently protect public health. There were many factors that contributed to the final decision.

PRDSAMF ¶ 96. Mr. Wyman makes the same qualification to additional paragraphs 97, 98, and 100 through 103. PRDSAMF ¶¶ 97-98, 100-03. The Court responds to all these qualifications here.

industry association leaders and dealers influenced the decision to implement the closure; industry association leaders and dealers expressed their belief that lobster marketability would be less adversely impacted by a closure than a consumption advisory, which influenced the Maine DMR's decision to implement a closure. DSAMF ¶ 97; PRDSAMF ¶ 97.

The Maine DMR's decision to implement a closure instead of an advisory was further influenced by a 2008 lobster tomalley advisory that had far-reaching impacts on the Maine lobster industry; the Maine DMR was particularly concerned about the perception of Maine lobster in Asian markets, which are particularly sensitive to advisories.  DSAMF ¶ 98; PRDSAMF ¶ 98.  The Maine DMR's statutory authority for regular rule-making requires that it consider numerous factors in adopting a rule, including the impact on small businesses, economic and environmental considerations, fiscal and social impact, and public comments; the Maine DMR took these considerations into account in adopting its emergency rule-makings related to the closures.  DSAMF ¶ 99; PRDSAMF ¶ 99.

During the public comment period for the 2014 rulemaking closing a portion of Zone D, there was little public opposition to the rulemaking, which was an important factor in the Maine DMR's decision to go forward with the rulemaking.  DSAMF ¶ 100; PRDSAMF ¶ 100.  Similarly, during the public comment period for the expanded closure in 2016, lobster industry trade associations came out in favor of the

---

The Court has reviewed the record citations provided by the parties and disregards Mr. Wyman's qualifications.  The facts proffered by Mallinckrodt and U.S. Surgical have record support, and as they are the non-movants on this motion for summary judgment, the Court is obligated to view contested facts in the light most favorable to them.

expanded closure in 2016, which influenced the Maine DMR's decision to move forward with the rulemaking.   DSAMF ¶ 101; PRDSAMF ¶ 101.   Issues of enforcement also influenced the Maine DMR's decision-making, including concerns about where to locate the 2016 Closure line.   DSAMF ¶¶ 102-03; PRDSAMF ¶¶ 102-03.

Enforcement concerns were the driving force behind closure of the crab fishery. DSAMF ¶ 104; PRDSAMF ¶ 104.   Even though the Maine DMR did not have data to show that levels of mercury in crabs were high at the time of the 2014 Closure, it did not think that it could effectively enforce a closure for lobster but not crab fishing because the gear for crab fishing is the same as the gear for lobster fishing; due to this enforcement issue, it closed the area for both crab and lobster.[100]   DSAMF ¶ 104; PRDSAMF ¶ 104.   To the Maine DMR's knowledge, mercury levels in crab in the Closure Area are not at levels that would warrant a consumption advisory, and the levels in crabs would not warrant a closure absent the difficulty of enforcing a lobster closure without also implementing a crab closure.[101]   DSAMF ¶ 105; PRDSAMF ¶ 105.

---

[100]   Mr. Wyman qualifies paragraph 104 of Mallinckrodt and U.S. Surgical's statement of additional material facts, arguing that "[s]amples of crabs in the P[RMS] showed mercury concentrations of concern to the [Maine] DMR at the time of the first closure." PRDSAMF ¶ 104.   The Court reviewed the cited portions of the record and disregards the qualification.   The Maine DMR's designee testified to the contents of additional paragraph 104, *see Maine DMR Dep.* at 107:13-108:12, and the Court does not regard the portions of the record cited by Mr. Wyman as contradictory.

The Court regards the remainder of Mr. Wyman's qualification of additional paragraph 104 as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 104, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

[101]   Mr. Wyman qualifies additional paragraph 105 by referring to paragraph 72 of his response to Mallinckrodt and U.S. Surgical's statement of additional material facts.   PRDSAMF ¶ 105.   The Court disregards this qualification.   Paragraph 72 of Mr. Wyman's response to Mallinckrodt and U.S. Surgical's statement of additional material facts deals with whether there was data showing mercury levels of concern for crabs, *see* Footnote 94, *supra*; additional paragraph 105 deals with whether there

The Maine DMR did not consider any management actions other than an advisory or a closure to address mercury concentrations in lobster.[102]  DSAMF ¶ 106; PRDSAMF ¶ 106.  The Maine DMR also did not consider closing the Closure Area only to recreational harvesting and determined that creating an advisory for only recreational harvesting would be very difficult.[103]  DSAMF ¶ 107; PRDSAMF ¶ 107. The Maine DMR does not know how or whether any fisherman has been impacted by the fishery closures.  DSAMF ¶ 108; PRDSAMF ¶ 108.

Before 2013, both the Maine CDC and the Maine DMR were aware of past mercury discharges from the Orrington Plant, yet neither agency had any reason to foresee a lobster or crab fishery closure.[104]  DSAMF ¶ 109; PRDSAMF ¶ 109.  Neither

is data showing that mercury levels in crabs are high enough to warrant a consumption advisory.  The contents of paragraph 72 of Mr. Wyman's response to Mallinckrodt and U.S. Surgical's statement of additional material facts are not inconsistent with additional paragraph 105, which is supported by the cited portion of the record.

[102]    Mr. Wyman qualifies additional paragraph 106, noting that "[t]he testimony just prior to the testimony cited concerned mercury levels in crabs, not lobster."  PRDSAMF ¶ 106.  He goes on to say that the Maine DMR's designee "testified that at the time they determined that some management action was warranted, advisory or closure were the two options that were considered."  PRDSAMF ¶ 106.  The Court reviewed the cited portion of the record and disregards Mr. Wyman's qualification. The crab fishery closure was an add-on to the lobster fishery closure and was only undertaken because it would otherwise have been difficult to enforce a lobster closure.  There is no suggestion in the record that the Maine DMR considered an advisory with respect to crab.  *See Maine DMR Dep.* at 109:08-24. Therefore, it is far more likely that the cited testimony of the Maine DMR's designee referred to actions considered with respect to lobster.

[103]    Paragraph 107 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "[The Maine] DMR did not consider closing the now-closed area only to recreational harvesting or an advisory for only recreational harvesting."  DSAMF ¶ 107.  Mr. Wyman qualifies this paragraph, arguing that the Maine DMR's designee "testified that they did not consider closing the now closed area only to recreational harvesting, but they did consider an advisory only for recreational fishing. They determined that it would be a very difficult thing to do, given that there's no mandate about where recreational harvesters set their gear."  PRDSAMF ¶ 107.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered paragraph 107 of Mallinckrodt and U.S. Surgical's statement of additional material facts to more accurately reflect the record.  The cited testimony confirms that the Maine DMR considered this option and disregarded it as difficult.  *See Maine DMR Dep.* at 110:19-111:06.

[104]    The Court regards Mr. Wyman's qualification of paragraph 109 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 109, and rejects the qualification for the reasons expressed in footnote

the Maine DMR nor the Maine CDC is aware of any occasion other than these closures in which a Maine state agency has closed a fishery based on concentrations of a contaminant other than bacteria or biotoxins.  DSAMF ¶ 110; PRDSAMF ¶ 110. Other than the closures at issue, the Maine DMR is unaware of any instance in which it has taken management action based on the FTAL.[105]  DSAMF ¶ 111; PRDSAMF ¶ 111.

### F.    Harm to Kenneth F. Wyman, Jr.'s Business

The lobster harvesting season generally runs from July through November, but this varies according to the weather and no two years have been the same since Mr. Wyman began fishing.  DSAMF ¶ 11; PRDSAMF ¶ 11.  The peak crab harvesting seasons occur in early Spring and late Fall.  DSAMF ¶ 12; PRDSAMF ¶ 12.  Crab and lobster are caught with the same gear and by the same activity; crab fishing is not a separate activity from lobster fishing.[106]  DSAMF ¶ 13; PRDSAMF ¶ 13.

---

8, supra.  Additionally, the Court notes that Mr. Wyman did not provide a record citation for his qualification, PRDSAMF ¶ 109, so even if the qualification was not improper argument, the Court would disregard the qualification for failure to comply with Local Rule 56(c).

[105]    Mr. Wyman qualifies paragraph 111 of Mallinckrodt and U.S. Surgical's statement of additional material facts, asserting that the Maine DMR's designee "testified that she is aware of the Tomalley Advisory but did not know if that was based on the FTAL."  PRDSAMF ¶ 111.  The Court reviewed the portion of the record cited by Mallinckrodt and U.S. Surgical and disregards Mr. Wyman's qualification.  First, the Court does not appreciate a meaningful distinction between being unaware of and not knowing whether something has occurred.  Second, Mr. Wyman did not provide a record citation for his qualification, PRDSAMF ¶ 111, so even if the Court did not disagree with the qualification on a substantive basis, the Court would disregard the qualification for failure to comply with Local Rule 56(c).

[106]    Mr. Wyman denies paragraph 13 of Mallinckrodt and U.S. Surgical's statement of additional material facts, arguing that "[p]rior to the closures, the type of trap made a difference when fishing for crabs."  PRDSAMF ¶ 13.  The Court reviewed the record citations provided by Mr. Wyman and Mallinckrodt and U.S. Surgical and does not have enough context, from the portion of the record provided by Mr. Wyman, to determine whether his denial is correct.  The cited portion of the record does not say whether the type of trap being discussed is better for crabs than for lobsters; rather, it says that that particular type of trap is good for crabs.  The Court does not view this as inconsistent with additional paragraph 13.  Additionally, Mr. Wyman denies additional paragraph 13 because Mr. Wyman "testified that fishing is all about the location of where you put your traps."  PRDSAMF ¶ 13.

Mr. Wyman usually begins setting his traps for the year in March or April.[107]

DSAMF ¶ 14; PRDSAMF ¶ 14.  In 2018, Mr. Wyman set approximately half of his

800 traps in late March or early April, and he set the other half in early-to-mid May.

DSAMF ¶ 15; PRDSAMF ¶ 15.  Mr. Wyman sets his traps based on when he decides

it is time to start making an income and removes his traps in November or

December.[108]  DSAMF ¶¶ 16-17; PRDSAMF ¶¶ 16-17.  He used to fish year-round

but does not do so anymore.[109]  DSAMF ¶ 18; PRDSAMF ¶ 18.  Mr. Wyman testified

that a number of different factors can affect his lobster landings, including the

number of days he hauls traps, the number of traps he hauls per day, the amount and

type of bait he uses, water temperature changes, and the abundance of lobster

predators.[110]  DSAMF ¶ 19; PRDSAMF ¶ 19.  He also testified that his lobster

landings vary based on a number of factors, including scientific factors he does not

---

Again, the Court does not regard this as inconsistent with additional paragraph 13.  The fact that certain locations are better for crabs than for lobsters does not mean the activity of baiting, lowering, and raising traps is different.  The Court rejects Mr. Wyman's denial of additional paragraph 13 because it is required to view contested facts in the light most favorable to the non-movants.

[107]    The Court regards Mr. Wyman's qualification of paragraph 14 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 14, and rejects the qualification for the reasons expressed in footnote 8, supra.

[108]    The Court regards Mr. Wyman's qualification of paragraph 16 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 16, and rejects the qualification for the reasons expressed in footnote 8, supra.

[109]    The Court regards Mr. Wyman's qualification of paragraph 18 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 18, and rejects the qualification for the reasons expressed in footnote 8, supra.

[110]    Mr. Wyman qualifies paragraph 19 of Mallinckrodt and U.S. Surgical's statement of additional material facts, contending that he testified only that the factors listed by Mallinckrodt and U.S. Surgical could affect his lobster landings.  PRDSAMF ¶ 19.  The Court reviewed the cited portions of the record, agrees with Mr. Wyman, and altered additional paragraph 19 to more accurately reflect the record.  The Court regards the remainder of Mr. Wyman's qualification of additional paragraph 19 as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 19, and rejects the remainder of the qualification for the reasons expressed in footnote 8, supra.

understand.[111]   DSAMF ¶ 20; PRDSAMF ¶ 20.  As a general rule, the longer Mr. Wyman fishes during the year, the more landings he has.[112]  DSAMF ¶ 21; PRDSAMF ¶ 21.  Mr. Wyman is not as productive physically as he was ten years ago.[113]  DSAMF ¶ 22; PRDSAMF ¶ 22.

Mr. Wyman is licensed to harvest lobster and crab in Lobster Management Zones C and D, but his current "home zone" is Zone C, meaning he is required to fish at least fifty-one percent of his gear in Zone C; he is therefore not allowed to fish more than 392 traps in Zone D.  DSAMF ¶ 4; PRDSAMF ¶ 4.  Before 2014, Mr. Wyman's home zone was Zone D, where he could fish all of his traps.  DSAMF ¶ 5; PRDSAMF ¶ 5.  That year, prior to the first closure, Mr. Wyman changed his home zone to Zone C in order to put a young lobsterman through an apprenticeship program and not as a result of the 2014 Closure.  DSAMF ¶ 6; PRDSAMF ¶ 6.  Since changing his home zone, Mr. Wyman needs to travel south to Zone C to haul the majority of his traps.  DSAMF ¶ 7; PRDSAMF ¶ 7.  Zone C is the most southerly location in which Mr. Wyman fishes and is as far from his home harbor of Stockton Springs as any area he

---

[111]    The Court regards Mr. Wyman's qualification of additional paragraph 20 as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 20, and rejects the qualification for the reasons expressed in footnote 8, supra.

[112]    The Court regards Mr. Wyman's qualification of additional paragraph 21 as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 21, and rejects the qualification for the reasons expressed in footnote 8, supra.  That there are specific scenarios in which the general rule laid out by Mallinckrodt and U.S. Surgical does not hold does not contradict the idea that there is a general rule.

[113]    Paragraph 22 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "As Mr. Wyman has gotten older, Mr. Wyman is not able to put in as many hours on the water as he did when he was younger, and he is 'not as productive physically as [he] was ten years ago.'"  DSAMF ¶ 22.  Mr. Wyman denies a portion of this statement, asserting that "[t]here is no testimony that he has not been able to spend as much time on the water after the closures."  PRDSAMF ¶ 22.  The Court reviewed the cited portions of the record and agrees with Mr. Wyman that the record does not support the statement that Mr. Wyman does not put in as many hours on the water.  The Court did not include that portion of additional paragraph 22 in its recitation of the undisputed facts.

fished before or after the 2014 Closure.  DSAMF ¶ 8; PRDSAMF ¶ 8.  Prior to his zone change in 2014, Mr. Wyman fished far fewer traps in Zone C (approximately 300) and far more traps in Zone D (approximately 500) than he has since.  DSAMF ¶ 9; PRDSAMF ¶ 9.

Before the 2014 and 2016 Closures by the Maine DMR, in Mr. Wyman's view, the mercury contamination in the Penobscot estuary did not affect his business in any way.[114]  PSMF ¶ 89; DRPSMF ¶ 89.  Prior to the 2014 Closure, Mr. Wyman maintained approximately 150 traps in the 2014 Closure area and approximately 110 to 120 traps in the 2016 Closure Area, consisting of approximately one-third of his 800 authorized traps.  PSMF ¶ 90; DRPSMF ¶ 90.  After the 2014 Closure, Mr. Wyman moved approximately sixty of his traps displaced by the 2014 Closure into the area that would later be closed in 2016; he placed the remaining traps that had been located in the 2014 Closure area in the Penobscot Bay.[115]  PSMF ¶ 91; DRPSMF ¶ 91.  After the 2016 Closure, Mr. Wyman moved all the traps from the 2016 Closure area into the Penobscot Bay.  PSMF ¶ 92; DRPSMF ¶ 92.  As a result of the two Maine

---

[114]    Paragraph 89 of Mr. Wyman's statement of material facts reads, "Prior to the two closures of the fishing grounds by [the Maine] DMR, the mercury contamination in the Penobscot estuary did not affect [Mr. Wyman's] business in any way."  PSMF ¶ 89.  Mallinckrodt and U.S. Surgical object to this paragraph as lacking an adequate foundation.  DRPSMF ¶ 89.  Mallinckrodt and U.S. Surgical argue that "[m]ercury contamination has existed on the Penobscot for as long as Mr. Wyman has been fishing there, so he has no basis to testify as to the performance of his business but for the mercury contamination."  DRPSMF ¶ 89.  Furthermore, Mallinckrodt and U.S. Surgical assert they "have not had an opportunity to further develop evidence on this issue, including expert opinion testimony regarding the Maine lobster industry and how it has been impacted by mercury contamination, which has been public knowledge for decades."  DRPSMF ¶ 89.  To respond to Mallinckrodt and U.S. Surgical's objection, the Court altered Mr. Wyman's paragraph to clarify that the statement is Mr. Wyman's opinion.

[115]    Mallinckrodt and U.S. Surgical qualify paragraph 91 of Mr. Wyman's statement of material facts, stating that Mr. Wyman "did not have any traps in the water in February 2014."  DRPSMF ¶ 91.  The Court does not read paragraph 91 as suggesting that Mr. Wyman had traps in the water in February of 2014, and so disregards the qualification.

DMR closures, by Mr. Wyman's calculation, his harvest of lobsters suffered a substantial decline: The business' average lobster catch in pounds from Zones C and D combined in the five years after the 2014 Closure (2014-2018) declined over thirty-one percent in comparison with the three-year average before the 2014 Closure (2011-2013).[116]  PSMF ¶ 93; DRPSMF ¶ 93.

For a variety of reasons, Mr. Wyman viewed the Closure Area as considerably more productive than the locations in Penobscot Bay where he was forced to relocate his traps:

1.  the Closure Area's relative lack of competition in comparison to the Penobscot Bay;

2.  the loss of a favorable trough in the seabed in the Closure Area, which created a concentration of lobsters moving after molting—something which does not exist in the Penobscot Bay;

3.  the loss of productivity of lobster traps in the Closure Area maximized by twenty-five years of fine-tuning of strategic location of traps, as

---

[116]   Mallinckrodt and U.S. Surgical object to paragraph 93 as "not based on Mr. Wyman's personal knowledge," as he "testified that he does not personally keep track of his lobster or crab fishing landings and he has no personal knowledge of his lobster or crab fishing landings in any given year." DRPSMF ¶ 93.  Additionally, Mallinckrodt and U.S. Surgical assert that even if Mr. Wyman's "lobster harvest declined as [he] say[s], the evidence does not establish that the decline was caused by the two closures," as Mr. Wyman "acknowledged that many factors affect [his] landings in any given year, and [he] do[es] not know how these factors affected [his] landings in the relevant time period" and Mallinckrodt and U.S. Surgical "have not had an opportunity to disclose or elicit expert testimony regarding th[e] factors affecting lobster landings."  DRPSMF ¶ 93.
      The Court included Mr. Wyman's paragraph 93 but clarified that the statement is Mr. Wyman's opinion.  Mallinckrodt and U.S. Surgical's objections and the obligation to view conflicting evidence in the light most favorable to the non-movants do not require the Court to disregard all countervailing evidence if supported by a proper record citation, which this paragraph is.

compared to Mr. Wyman's experience in Penobscot Bay where he has had to begin again learning where to best locate his traps;

4.      the additional time Mr. Wyman spent harvesting the same number of traps in the Penobscot Bay after the closures with lower harvests of lobster in comparison to the time spent before the closures; and

5.      the loss of high-quality lobsters, or "selects," which are more abundant in the Closure Area in comparison to lobsters harvested in Penobscot Bay.[117]

PSMF ¶ 94; DRPSMF ¶ 94. The northern part of Penobscot Bay, where the Closure Area is located, is not as productive for lobster fishing as the southern parts of the Bay.[118]  DSAMF ¶ 31; PRDSAMF ¶ 31.

---

[117]     Mallinckrodt and U.S. Surgical deny paragraph 94 of Mr. Wyman's statement of material facts, DRPSMF ¶ 94, which the Court notes is supported only by the testimony and declaration of Mr. Wyman.  PSMF ¶ 94.  Paragraph 94 is phrased as if the facts within it are definitively established; however, on a motion for summary judgment where Mr. Wyman is the movant, the Court does not regard Mr. Wyman's testimony—where that testimony is credibly denied by the non-movants—as capable of establishing facts that, at trial, would be subject to cross-examination.  The Court therefore altered paragraph 94 to make clear that it establishes only Mr. Wyman's beliefs about the effects of moving his traps.  In light of this alteration, the Court regards Mallinckrodt and U.S. Surgical's denial as moot.

[118]     Mr. Wyman qualifies paragraph 31 of Mallinckrodt and U.S. Surgical's statement of additional material facts by arguing that the Deputy Commissioner of the Maine DMR "had no personal knowledge or record evidence of the referenced statement and would have no basis for disputing [Mr.] Wyman's testimony to the contrary in terms of his fishing experience." PRDSAMF ¶ 31.  The Court reviewed the cited portions of the record and disagrees with Mr. Wyman's characterization of the Deputy Commissioner's testimony.  First, Mr. Wyman did not provide the Court with the entirety of his record citation.  The Court does not have pages 204 and 205 of the Deputy Commissioner's deposition transcript.  Mr. Wyman cited pages 203 to 206 of the transcript but provided the Court only page 203 from that range; Mallinckrodt and U.S. Surgical provided the Court with page 206.  *See Additional Attachs.*, Attach. 1, *Ex. 2: Additional Pages of Trs. and Exs. from Dep. of Maine Department of Marine Resources* at 202-03 (ECF No. 76) (including only pages 202-203 of the Deputy Commissioner's deposition transcript); *Maine DMR Dep.* at 206 (including page 206).  Second, it is not clear from the portion of the record citation that the Court was able to review that the Deputy Commissioner does not have personal knowledge of which parts of Penobscot Bay are more or less productive.  Third, on this motion for summary judgment, the Court is bound to take all reasonable inferences in favor of the non-movants Mallinckrodt and U.S. Surgical and so—where reasonable—must resolve disputes over conflicting testimony in their favor.  The Court regards it as a reasonable

Mr. Wyman believes that the Closure Area contains an unusually high number of peekytoe crabs in comparison to the Penobscot Bay.[119]  PSMF ¶ 95; DRPSMF ¶ 95. Prior to 2014, Mr. Wyman did not have sufficient access to markets to sell all the crab he could harvest in the Closure Area.[120]   PSMF ¶ 96; DRPSMF ¶ 96.  Mr. Wyman created his crab business in the Fall of 2014.[121]   DSAMF ¶ 32; PRDSAMF ¶ 32.  In the Fall of 2014, Mr. Wyman secured MDI Seafood as a buyer for his crabs, though in 2015 he sold all of his crabs to Ed Woods or Bill Kirby.[122]   PSMF ¶ 97; DRPSMF

---

inference that the Deputy Commissioner of the Maine DMR would have personal knowledge about the relative productivity of portions of the Penobscot Bay.  The Court disregards Mr. Wyman's qualification of additional paragraph 31.

[119]    Paragraph 95 of Mr. Wyman's statement of material facts reads, "The closed areas contain an unusually high abundance of 'peekytoe' (rock) crabs in comparison to Penobscot Bay."  PSMF ¶ 95. Mallinckrodt and U.S. Surgical qualify this statement, arguing that "[t]he relative populations of crab in various locations is properly a subject for expert testimony, which the parties have not yet had an opportunity to develop."  DRPSMF ¶ 95.  The Court disagrees.  As an experienced fisherman, Mr. Wyman may testify about specialized matters within his field of knowledge.  The Court, however, altered paragraph 95 to clarify that the statement is based on Mr. Wyman's testimony.

[120]    Mallinckrodt and U.S. Surgical qualify paragraph 96 of Mr. Wyman's statement of material facts, arguing that "[p]rior to 2014, [Mr. Wyman] had markets for his crab, but he had not yet found Dave Smith at MDI Shellfish who was willing to take all of the crabs Mr. Wyman could catch" and that "Mr. Wyman did not create his crab business until the fall of 2014, and it is possible there were years before 2014 during which Mr. Wyman did not catch a single crab."  DRPSMF ¶ 96.  The Court does not regard Mallinckrodt and U.S. Surgical's qualification as inconsistent with paragraph 96 and disregards the qualification.

[121]    Mr. Wyman denies paragraph 32 of Mallinckrodt and U.S. Surgical's statement of additional material facts, arguing that he "corrected his testimony on the very next page of the transcript . . . ." PRDSAMF ¶ 32.  The Court reviewed the portion of the record cited by Mr. Wyman and rejects his denial.  In the portion of the record cited by Mr. Wyman, he states, in response to being asked why 2015 was his best year for crab sales, "Because that's—I created—I didn't create.  I found a market that was willing to take all the crabs that I could catch."  DSAMF, Attach. 1, *Wyman Dep. Tr. Excerpts and Exs.* at 230:09-18 (*Wyman Dep.*).  The Court regards it as more likely that Mr. Wyman was correcting his wording to clarify that he did not create a market for his crabs, but rather found such a market, as opposed to Mr. Wyman's interpretation that he was implicitly correcting his answer to a previous and unrelated question.

[122]    Paragraph 97 of Mr. Wyman's statement of material facts reads, "[Mr. Wyman] secured a buyer (MDI Seafood) for crabs in the Fall of 2015 that was willing to purchase all the crabs [he] could harvest on the condition that the supply was consistent."  PSMF ¶ 97.  Mallinckrodt and U.S. Surgical qualify paragraph 97, contending that "Mr. Wyman testified that he secured MDI Seafood as a buyer in the Fall of 2014" and that "[h]e testified that he sold all of his crab in 2015 to Ed Woods or Bill Kirby."  DRPSMF ¶ 97 (emphasis omitted).  The Court reviewed the portions of the record cited by both parties and agrees with Mallinckrodt and U.S. Surgical that they are inconsistent.  The Court suspects that one or both of the parties has evidence that directly answers this question; however, as

¶ 97.  MDI Seafood was willing to purchase all the crabs Mr. Wyman was able to harvest on the condition that the supply was consistent.  PSMF ¶ 97; DRPSMF ¶ 97. In 2015, after the 2014 Closure, Mr. Wyman's crab sales were the highest the business had experienced, coming from harvesting principally from the 2016 Closure area.[123]  PSMF ¶ 98; DRPSMF ¶ 98.  Beginning in 2016, after the second closure, Mr. Wyman believes that his annual crab harvest dropped sharply, generating sales averaging approximately fifty percent less than what he sold in 2015, and Mr. Wyman testified that he lost MDI Seafood as a purchaser of his crabs because he was unable to supply a sufficient number of crabs.[124]  PSMF ¶ 99; DRPSMF ¶ 99.  According to Mr. Wyman, before the closures, he could maximize the efficiency of time spent on the water by concentrating on fishing for crabs before the first lobster molt in the Spring and again after the abundance of lobsters diminishes in late Fall, whereas after the closures, these efficiencies were lost by the loss of a crab-intensive habitat.[125]  PSMF ¶ 100; DRPSMF ¶ 100.

---

such evidence is not available on the record, the Court must take all reasonable inferences in favor of non-movants Mallinckrodt and U.S. Surgical.  The Court therefore altered paragraph 97 to reflect Mallinckrodt and U.S. Surgical's qualification.

[123]    Mallinckrodt and U.S. Surgical qualify Mr. Wyman's paragraph 98, stating that they "object to this statement and request[] that it be stricken on the grounds that it is misleading and likely to confuse the issues" because "Mr. Wyman did not create his crab business until the Fall of 2014" and so "[t]o say that crab sales in 2015 were the highest the business had experienced creates the false impression that there are other full years to compare it to."  DRPSMF ¶ 98.  The Court reviewed the cited portions of the record and disagrees with Mallinckrodt and U.S. Surgical that paragraph 98 is misleading.  The Court does not view paragraph 98 as inconsistent with other evidence in this record. The Court rejects the qualification.

[124]    Mallinckrodt and U.S. Surgical deny paragraph 99 as "not based on Mr. Wyman's personal knowledge" because "[h]e testified that he does not personally keep track of his lobster or crab fishing landings and he has no personal knowledge of his lobster or crab fishing landings in any given year" and that "he is relying on an expert witness to calculate his loss."  DRPSMF ¶ 99.  The Court reviewed the cited portions of the record and overrules the objections; however, the Court altered paragraph 99 to clarify that the paragraph is based on Mr. Wyman's testimony.

[125]    Mallinckrodt and U.S. Surgical deny paragraph 100 of the PSMF, stating that "[c]rab and lobster are caught with the same gear and by the same process; crab fishing is not a separate activity

Mr. Wyman testified that he needs to spend more time on the water after the closures to make up for what he asserted was a loss of harvests compared to pre-closure levels and this resulted in loss of time with his family and other activities he enjoyed in his free time, as well as greater exposure to the dangers of commercial lobstering, which Mr. Wyman believes is one of the most dangerous professions.[126] PSMF ¶ 101; DRPSMF ¶ 101.  Mr. Wyman further testified that he has suffered the hardship of having to spend more time working in harsh weather conditions in the Penobscot Bay which he could previously avoid by fishing in the Closure Area where the land mass provides weather protection during poor or windy weather.[127]  PSMF ¶ 102; DRPSMF ¶ 102.

---

from lobster fishing." DRPSMF ¶ 100.  The Court reviewed the cited portions of the record and does not view Mallinckrodt and U.S. Surgical's denial as inconsistent with Mr. Wyman's paragraph 100. The statement itself reflects the efficiency of crab fishing before the lobster molt, and thus has to do with when during the year Mr. Wyman primarily catches crab, as opposed to the process he uses to catch crabs.  The Court rejects the denial.  The Court altered paragraph 100, however, to reflect that it is based on Mr. Wyman's own statements.

[126]    Mallinckrodt and U.S. Surgical deny paragraph 101, stating that "Mr. Wyman has no records comparing the time he spent on the water before the closures to the time he spends on the water after the closures," that he fishes more of his traps further from his "home harbor of Stockton Springs not because of the closure but because Mr. Wyman chose in 2014 to change his home zone from Zone D to Zone C," and that his "productivity has declined with age."  DRPSMF ¶ 101.  In addition, Mallinckrodt and U.S. Surgical "request that the Court strike the language, 'greater exposure to the dangers of commercial lobstering, one of the most dangerous of all professions,' since that language lacks foundation" and its probative value is substantially outweighed by its prejudicial effect.  DRPSMF ¶ 101 (quoting PSMF ¶ 101).

The Court reviewed the record citations put forward by each party, agrees with Mallinckrodt and U.S. Surgical to the extent that Mr. Wyman's testimony does not make these assertions established facts, and altered paragraph 101 to clarify that it reflects Mr. Wyman's testimony, not established fact.

[127]    Paragraph 102 of Mr. Wyman's statement of material facts reads, "[Mr.] Wyman has suffered the hardship of working more in harsh weather conditions in Penobscot Bay in cold blustery NW winds that occur in the Spring and late Fall that he could avoid by fishing in the closed areas in such conditions where the land mass provides weather protection."  PSMF ¶ 102.  For a variety of reasons, Mallinckrodt and U.S. Surgical deny paragraph 102.  DRPSMF ¶ 102.  The Court altered paragraph 102 to clarify that it reflects only Mr. Wyman's beliefs and otherwise rejects Mallinckrodt and U.S. Surgical's denial.

Mr. Wyman does not regularly track how much lobster or crab he gets from a particular trap or the amount of time he spends lobster or crab fishing.[128]  DSAMF ¶¶ 23-24; PRDSAMF ¶¶ 23-24.  He does, however, have a meter on his boat that keeps track of how many hours the boat has been in use over its lifetime, though the only data he has collected from this meter are two undated photographs from two separate points in time that he does not recall.[129]  DSAMF ¶ 24; PRDSAMF ¶ 24.  He also does not personally keep track of his lobster or crab fishing landings and has no sense of how much money he made in the years after the closures as compared to the years prior.[130]  DSAMF ¶¶ 29-30; PRDSAMF ¶¶ 29-30.

---

[128]    The Court regards Mr. Wyman's qualification of paragraph 23 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 23, and rejects the qualification for the reasons expressed in footnote 8, supra.  The fact that Mr. Wyman has on occasion tracked particular strings of traps does not contradict the statement that he did not regularly do so.

Mr. Wyman qualifies paragraph 24 of Mallinckrodt and U.S. Surgical's statement of additional material facts, arguing that he has "provided documents in discovery from which the hours of use of his boat can be determined."  PRDSAMF ¶ 24.  However, he does not provide a record citation for this assertion, and the Court disregards it.  Additionally, Mr. Wyman states that "[e]ngine hours can also be calculated based on oil changes . . . ."  PRDSAMF ¶ 24.  But the Court does not regard this statement as inconsistent with the statement in Mallinckrodt and U.S. Surgical's statement of additional material facts, which is that Mr. Wyman himself does not keep track of this data.  The Court therefore disregards this portion of Mr. Wyman's qualification.

[129]    Mr. Wyman qualifies this portion of paragraph 24 of Mallinckrodt and U.S. Surgical's statement of additional material facts, stating that he has "supplemented discovery responses by providing, inter alia, an image of the engine hour meter at the end of the 2018 season."  PRDSAMF ¶ 24.  However, he does not provide a record citation for this assertion, and the Court disregards it.

[130]    Paragraph 29 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "Mr. Wyman does not personally keep track of his lobster or crab fishing landings and he has no personal knowledge of his lobster or crab fishing landings in any given year."  DSAMF ¶ 29.  Mr. Wyman denies the portion of this statement asserting that he has no personal knowledge of his lobster or crab fishing landings in any given year, arguing that he "obviously has personal knowledge of landings because he personally made the landings."  PRDSAMF ¶ 29.  The Court agrees with Mr. Wyman that additional paragraph 29 goes beyond the scope of the record citation given by Mallinckrodt and U.S. Surgical and did not include that portion of additional paragraph 29 in its recitation of undisputed facts.

Paragraph 30 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "Mr. Wyman has no sense of how much money he made in the years after the closure compared to the years before the closure."  DSAMF ¶ 30.  Mr. Wyman denies this paragraph, arguing that "[t]he record cited is to testimony by [Mr.] Wyman that he was not familiar with a particular QuickBooks record marked as an exhibit and could not recall from memory the amount of money he made in 2017 versus

The number of traps Mr. Wyman hauls in a day of fishing varies, but on the high end he can haul 300 traps in a day; he does not regularly track how many traps he hauls on a particular day or in a particular year or the number of days he hauls traps in a year.  DSAMF ¶ 25; PRDSAMF ¶ 25.  Mr. Wyman hauls his traps in a sequence, such that in the course of approximately four days of fishing, he will have hauled all 800 of his traps once.  DSAMF ¶ 26; PRDSAMF ¶ 26.  The weather does not impact this sequence.  DSAMF ¶ 26; PRDSAMF ¶ 26.  Though Mr. Wyman has never received such a fine, to avoid being fined by the Marine Patrol he must haul each of his traps at least once every thirty days while it is set.  DSAMF ¶ 27; PRDSAMF ¶ 27.  No two days are the same for Mr. Wyman in terms of how he fishes, and he regularly changes his fishing practices, including the type of bait he uses, the size of his bait bags, and the locations of his traps.  DSAMF ¶ 28; PRDSAMF ¶ 28.

Since the closures, Mr. Wyman has not spoken to other lobstermen or to lobster associations about accommodating his traps or productive areas where he might be able to move his traps, citing the territoriality of lobstermen, the potential for gear conflicts, and his superior knowledge of the fishery.  DSAMF ¶ 33; PRDSAMF ¶ 33.  Marine Patrol was instructed to work with fishermen concerned about transitioning their fishing gear from inside the Closure Area to outside the Closure Area and to

2013."  PRDSAMF ¶ 30 (emphasis omitted).  However, the record citation given by Mallinckrodt and U.S. Surgical shows Mr. Wyman stating, in reaction to the question, "Do you have any recollection or independent understanding of your sales for that year for lobsters," that "[a]ll [he] know[s] is [he] caught lobsters and [he] sold them."  *Wyman Dep. Tr.* at 190:07-09.  From this language, the Court draws the inference that Mr. Wyman does not personally keep track of how much money he makes year-over-year.  Additionally, the Court reviewed the portion of Mr. Wyman's testimony in which he states that he highly doubts any records exist related to his lobster catch prior to 2008.  *Id.* at 154:09-12.  This statement is further support for additional paragraph 30.  The Court rejects Mr. Wyman's denial of additional paragraph 30.

work with other area fishermen to ensure their accommodation of additional fishing gear from displaced fishermen in the areas they traditionally fished.[131]  DSAMF ¶ 34; PRDSAMF ¶ 34.  The Maine DMR communicated to fishermen that Marine Patrol was willing to provide such assistance.[132]  DSAMF ¶ 35; PRDSAMF ¶ 35.  It is not uncommon for fishermen to seek the assistance of Marine Patrol to protect against the conduct of other fishermen.[133]  DSAMF ¶ 36; PRDSAMF ¶ 36.  The Maine DMR is not aware of any gear conflicts among fishermen as a result of the closures.[134]  DSAMF ¶ 37; PRDSAMF ¶ 37.

### G.    The Federal RCRA Case Phase III Report

In January of 2016, the Court in the Federal RCRA Case selected Amec Foster Wheeler Environment and Infrastructure, Inc. (Amec) to perform an evaluation of potential remedies to speed the recovery of the Penobscot River estuary from its state of mercury contamination.  DSAMF ¶ 74; PRDSAMF ¶ 74.  In September of 2018, Amec submitted its Phase III Engineering Study Report (Phase III Report).  DSAMF ¶ 75; PRDSAMF ¶ 75.  The Phase III Report explains that Amec conducted a human

---

[131]    The Court regards Mr. Wyman's qualification of paragraph 34 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 34, and rejects the qualification for the reasons expressed in footnote 8, supra.

[132]    The Court regards Mr. Wyman's qualification of paragraph 35 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 35, and rejects the qualification for the reasons expressed in footnote 8, supra.

[133]    The Court regards Mr. Wyman's qualification of paragraph 36 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 36, and rejects the qualification for the reasons expressed a footnote 8, supra.

[134]    The Court regards Mr. Wyman's qualification of paragraph 37 of Mallinckrodt and U.S. Surgical's statement of additional material facts as argument outside the scope of the facts asserted in the statement, PRDSAMF ¶ 37, and rejects the qualification for the reasons expressed in footnote 8, supra.

health risk assessment, which found that the hazard from exposure to mercury via consumption of American lobster in the Penobscot River is not of concern.[135]  DSAMF ¶ 76; PRDSAMF ¶ 76.  Amec's human health risk assessment further concluded that the assumed consumption rate utilized for the FTAL is based on a consumption rate nineteen times greater than the local consumer consumption rates for lobster.[136] DSAMF ¶ 77; PRDSAMF ¶ 77.

Amec recommended a combination of remedial alternatives which it estimated would cost between $246,068,000 and $333,376,000.  DSAMF ¶ 78; PRDSAMF ¶ 78. Amec anticipated that even with remedial treatment, system-wide recovery to a surface weighted average concentration of 500 nanograms per gram of mercury in sediment would likely take a minimum of an additional twenty-five years after completion of the remedial work.  DSAMF ¶ 79; PRDSAMF ¶ 79.  Ecological recovery would take an unknown longer amount of time after sediments reached their target concentrations.  DSAMF ¶ 80; PRDSAMF ¶ 80.  Amec concluded that even the most aggressive remedial alternatives evaluated would not lower mercury concentrations in lobster tissue in the 2016 Closure area below the Maine CDC's FTAL.[137]  DSAMF

---

[135]     Mr. Wyman qualifies paragraph 76 of Mallinckrodt and U.S. Surgical's statement of additional material facts, contending that "Amec purported to conduct a 'human health risk assessment,' but its choice of data and analysis is so fatally flawed as to render its conclusions invalid" and explaining some of his reasons for holding this belief.  PRDSAMF ¶ 76.  The Court disregards the qualification because it is required to view conflicting evidence in the light most favorable to the non-movants.

[136]     The Court rejects Mr. Wyman's qualification of additional paragraph 77, *see* PRDSAMF ¶ 77, for the reasons expressed in footnote 135, supra.

[137]     Paragraph 81 of Mallinckrodt and U.S. Surgical's statement of additional material facts reads, "Amec concluded that even the most aggressive remedial alternatives evaluated would not lower mercury concentrations in lobster tissue in the 2016 closed area below the Maine C[DC] F[TAL]." DSAMF ¶ 81.  Mr. Wyman qualifies additional paragraph 81, quoting the language cited by Mallinckrodt and U.S. Surgical.  PRDSAMF ¶ 81 ("The cited reference states: 'Under the more conservative risk reduction approach (using the upper bound BSAF), Alternative 2: Enhanced MNR

¶ 81; PRDSAMF ¶ 81.  The alternatives which Amec concluded would get closest to this level were system-wide dredging to a system-wide sediment mercury concentration goal of 300 nanograms per gram and enhanced natural attenuation to a system-wide sediment mercury concentration goal of 300 nanograms per gram. DSAMF ¶ 82; PRDSAMF ¶ 82.

Amec did not recommend system-wide dredging because it would take decades to implement, would destroy habitat, had the potential for increased mercury uptake by biota during and after dredging, and would be particularly expensive.  DSAMF ¶ 83; PRDSAMF ¶ 83.  Amec estimated that system-wide dredging to a sediment concentration of 300 nanograms per gram would cost $5,544,190,000.  DSAMF ¶ 84; PRDSAMF ¶ 84.

Amec also did not recommend enhanced monitored natural attenuation to a sediment concentration of 300 nanograms per gram based on the uncertainty as to how this remedial alternative would be applied system-wide and the potential for negative effects from its application.  DSAMF ¶ 85; PRDSAMF ¶ 85.  Enhanced monitored natural attenuation is innovative and has not been demonstrated on field scale for open systems such as estuaries.  DSAMF ¶ 85; PRDSAMF ¶ 85.  System-wide application of this alternative would require extensive pre-design modeling to

---

(PRG of 300 ng/g) and Alternative 3: Dredging (PRG of 300 ng/g) would result in a decrease to below 200 ng/g, with the exception of the 2016 lobster closure area when assuming the upper bound BSAF'").

Mallinckrodt and U.S. Surgical's proposed additional paragraph 81 is an extrapolation from the Phase III Report.  This is an exceedingly complex area and although it may turn out that Mallinckrodt and U.S. Surgical are incorrect, the Court is required to view contested facts in the light most favorable to Mallinckrodt and U.S. Surgical and therefore rejects Mr. Wyman's qualification. The inference drawn here by non-movants Mallinckrodt and U.S. Surgical is a reasonable one, and the Court must credit it.

determine the implementation strategy. DSAMF ¶ 85; PRDSAMF ¶ 85. There is the concern that added material might deposit in unintended areas such as in shipping channels and adversely impact navigation. DSAMF ¶ 85; PRDSAMF ¶ 85. In addition, permits for this alternative could be difficult to obtain due to the increased turbidity and particulate load that would result from material addition which could affect biota (e.g. burial of fish eggs). DSAMF ¶ 85; PRDSAMF ¶ 85.

Amec further concluded that remediation at or below background mercury concentrations would be technically impractical. DSAMF ¶ 86; PRDSAMF ¶ 86. Amec found that the concentration of particulate mercury from samples at the former Veazie Dam averaged 217.5 nanograms per gram.[138] DSAMF ¶ 87; PRDSAMF ¶ 87. Ms. Ladner from the Maine DEP testified that the background mercury concentration in the Penobscot River is approximately 290 nanograms per gram.[139] DSAMF ¶ 88; PRDSAMF ¶ 88.

## III.   THE PARTIES' POSITIONS

### A.   Kenneth F. Wyman's Motion for Summary Judgment

Mr. Wyman argues that the record in this case "distills down to some simple, common sense propositions which have been so carefully examined, so thoroughly litigated and so completely ruled upon" that the Court should grant him a partial

---

[138]   Mr. Wyman denies paragraph 87 of Mallinckrodt and U.S. Surgical's statement of additional material facts because "[t]he referenced table does not contain averages." PRDSAMF ¶ 87. The Court reviewed the cited portion of the record and rejects Mr. Wyman's denial. Though the cited table of the does not contain an average, the average is easily calculable based on the information on that page.

[139]   Mr. Wyman admits that Ms. Ladner testified as cited but qualifies the description of Ms. Ladner's testimony in additional paragraph 88 because "[s]he testified to what she 'believe[d]['] to be the 'right number,[']' or 'something like that.'" PRDSAMF ¶ 88 (internal quotation marks omitted) (some alterations in original). The Court reviewed the cited portion of the record, agrees with Mr. Wyman, and altered additional paragraph 88 to reflect that Ms. Ladner testified to an approximation.

summary judgment on liability and causation with regard to his claims for continuing and permanent public nuisance and strict liability. *Pls.' Mot.* at 1. Mr. Wyman argues that these issues "have already been litigated and resolved in Phase I of the federal RCRA case" as well as Phase II and that the Phase I ruling has also been affirmed by the First Circuit. *Id.* at 2-3. Mr. Wyman argues that Mallinckrodt and U.S. Surgical are "precluded from challenging the rulings in these decisions to the extent they overlap on liability and causation issues in this case based on the doctrine of non-mutual offensive collateral estoppel (issue preclusion) . . .." *Id.* at 3. Mr. Wyman then recites what he argues are the undisputed material facts, *id.* at 3-15, before proceeding to his argument.

### 1.    Principles of Issue Preclusion Applicable to This Case

Mr. Wyman argues that his reliance "on prior rulings of this Court in the federal RCRA case, namely, Judge Carter's Decision, the First Circuit's Decision and Judge Woodcock's Decision, to satisfy key elements of liability" on his "public nuisance and strict liability claims is entirely justified when examination is made of the principles of issue preclusion, including nonmutual offensive issue preclusion." *Id.* at 16. Specifically, Mr. Wyman "seek[s] to give preclusive effect to seven factual rulings in the Judge Carter, the First Circuit and Judge Woodcock Decisions":

| | |
|---|---|
| Ruling 1: | Mallinckrodt discharged enormous amounts of mercury into the Penobscot River between 1967 and 1982; |
| Ruling 2: | resulting in contamination of the Penobscot River estuary with highly toxic methylmercury; |
| Ruling 3: | with Mallinckrodt's discharges being the dominant source of the mercury contamination of the Penobscot River; |
| Ruling 4: | posing a substantial and unacceptable risk to public health, especially for sensitive populations (such as fetuses |

| | |
|---|---|
| | carried by pregnant women and children with developing brains); |
| Ruling 5: | resulting in the closure of fishing grounds by [the Maine] DMR in 2014 based on the sampling of shellfish recorded in the PRMS showing levels in excess of the threshold for mercury in seafood of 200 ng/g wet wt.(.2 parts per million or 200 nanograms per gram) set in the F[TAL] by [the Maine] CDC; |
| Ruling 6: | demonstrating the extent of the adverse health effects resulting from Mallinckrodt's mercury contamination; |
| Ruling 7: | the effects of which will continue for a long duration unless remedied. |

*Id.* at 16-17 (emphasis omitted) (citations omitted).  Mr. Wyman concedes that these "prior rulings do not satisfy all the elements of the public nuisance and strict liability claims," as "[t]here are other elements that must be satisfied, such as damages and proximate cause, for which resort will be made to the record in addition to the prior rulings in the federal RCRA case . . . ."  *Id.* at 17.  However, he argues, these "seven rulings relied upon do most of the heavy lifting in establishing the right to summary judgment on liability and causation, with damages to be proven at trial."  *Id.*

Mr. Wyman cites *In re Light Cigarettes Marketing Sales Practices Litigation*, 691 F. Supp. 2d 239, 243 (D. Me. 2010) (*In re Light Cigarettes*), for the "traditional elements for a claim of issue preclusion under the common law . . . ."  *Pls.' Mot.* at 17.  Mr. Wyman asserts that "[a] core question in this case is whether the first element for traditional issue preclusion—identity of issues—can be met," and argues that "the adjudication to be given preclusive effect does not have to be based on the same cause of action as the subsequent proceeding" as "[c]ollateral estoppel . . . deals with the preclusive determination of *factual matters*."  *Id.* at 18 (emphasis in Mr. Wyman's memorandum) (quoting *Galvin v. Metrocities Mortg., LLC*, 1:16-cv-00268-JDL, 2017

WL 5632868, at *12 (D.N.H. Nov. 17, 2017)).  Mr. Wyman is "not saying that the ultimate legal ruling in the federal RCRA case should preclude Mallinckrodt from defending against Plaintiffs' public nuisance or strict liability claims," but rather that seven factual determinations made in the Federal RCRA Case should be binding on Mallinckrodt and U.S. Surgical "for purposes of satisfying some of the elements of [Mr. Wyman's] public nuisance and strict liability claims."  *Id.*

Mr. Wyman argues that "[i]t is particularly appropriate to give RCRA findings preclusive effect to [his] public nuisance claims because '[n]uisance principles form the core doctrinal foundation for modern environmental statutes, *including the RCRA.*'"  *Id.* at 18-19 (some alterations in original) (emphasis in Mr. Wyman's memorandum) (quoting *Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001)).  Mr. Wyman notes that "the identity of the issues need not be absolute; rather, it is enough that the issues are in substance identical," *id.* at 19 (quoting *Jones v. Boston*, 845 F.3d 28, 33 (1st Cir. 2016)), and that "[i]n this case, some of the issues decided in the federal RCRA case are identical to some of the elements for the public nuisance and the strict liability claims while others are substantially similar."  *Id.*  Additionally, Mr. Wyman contends that "the First Circuit has repeatedly recognized[] that issue preclusion is no longer limited to ultimate issues; necessary 'intermediate findings' can now be used to preclude relitigating, 'even where those findings are not explicit.'"  *Id.* at 19-20 (quoting *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012)).  Mr. Wyman says that "these principles come into play with respect to most of the six findings that [he] rel[ies] upon."  *Id.* at 20.  He next argues that "[t]he

remaining requirements for applying traditional claims preclusion—that the prior rulings were actually decided, central to the decision, and were sufficiently final are easily met in this case." *Id.* at 20-22 (footnotes omitted). He then says that "[t]here are four additional requirements when non-mutual offensive issue preclusion is involved" but that "[n]one of the four factors . . . are relevant to this case." *Id.* at 22-23.

### 2.    The Public Nuisance Claims

Mr. Wyman argues that he is entitled to partial summary judgment on his public nuisance claims. He states that Maine statutory law "grants a private cause of action for damages for statutory public nuisance by any person injured thereby." *Id.* at 23 (citing 17 M.R.S. § 2701). He argues that he "has standing under Section 2701 to bring an action for a public nuisance under [17 M.R.S. §] 2802 because Mallinckrodt has interfered with his right as a licensed commercial fisherman to harvest lobsters," which he states "is a property right protected by Maine law." *Id.* at 24. He contends "[t]here can be no room for argument with the proposition that Mallinckrodt's [Predecessor's] conduct resulting in extensive contamination of the Penobscot River estuary with highly toxic[] methylmercury constitutes a 'corrupting or rendering unwholesome or impure the water of a river,'" *id.* at 25 (quoting 17 M.R.S. § 2802), based on "[t]he findings made by Judge Carter, the First Circuit and Judge Woodcock concerning Mallinckrodt's [Predecessor's] contamination of the Penobscot River estuary . . . . so long as [Mr. Wyman] can show that the contamination by Mallinckrodt['s Predecessor] was the proximate cause" of his injury. *Id.* at 25-26.

Alternatively, Mr. Wyman asserts, he is "entitled to summary judgment on liability for statutory public nuisance based on . . .. the evidence that led to the rulings" he relies on in his motion. *Id.* at 26.

Mr. Wyman next turns to the common law of public nuisance, and he again argues that he has met the elements for such a cause of action. Mr. Wyman quotes *Hanlin Group, Inc. v. International Minerals & Chemical Corp.*, 759 F. Supp. 925 (D. Me. 1990), for the proposition that "[a]n action for public nuisance is available under Maine law if the defendant has violated or threatens to violate a public right and the plaintiff has suffered an injury different in kind from that sustained by the public generally." *Pls.' Mot.* at 26-27 (alteration in original) (quoting *Hanlin*, 759 F. Supp. at 935). He states that "[i]t has long been recognized that the release of hazardous waste into the environment unreasonably infringes upon a public right" and that "[i]t has also been held that this kind of public nuisance imposes liability as a matter of law." *Id.* at 27. He does not cite any state of Maine or First Circuit caselaw explicitly for either of these propositions, but rather says that "[g]iven the enormity of the contamination of the Penobscot River estuary by Mallinckrodt['s Predecessor], it is likely that Maine courts would agree, especially when throughout its judicial history Maine has had a statute on its books declaring contamination of public waters to be a public nuisance per se." *Id.* at 28 (citing *Hanlin*, 759 F. Supp. at 933 n.13).

Mr. Wyman asserts that analysis under the Restatement (Second) of Torts also leads to the conclusion that Mallinckrodt and U.S. Surgical should be held liable for common law public nuisance. *Id.* at 28-29. Mr. Wyman goes through each of the

Restatement's "three circumstances that are deemed to be 'unreasonable interference with a public right . . .." *Id.* at 28 (quoting Restatement (Second) of Torts § 821B(2) (Restatement Torts)). The first is "conduct [that] involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience . . .." Restatement Torts § 821B(2)(a). Mr. Wyman contends that "[t]he first three rulings in the federal RCRA case [that he raised] establish . . . . that Mallinckrodt['s Predecessor] (1) discharged enormous amounts of mercury into the Penobscot River, (2) the Penobscot River estuary is contaminated with mercury, and (3) Mallinckrodt['s Predecessor] is the dominant cause of this contamination." *Pls.' Mot.* at 29 (internal citation omitted). He also argues that "[t]he fourth, fifth and sixth rulings of the federal RCRA case . . . establish that the contamination by Mallinckrodt['s Predecessor] of the Penobscot River estuary with highly toxic methylmercury resulted in the specific kind of interference with a public right recognized by the Restatement because of the effects on public health." *Id.* at 30 (emphasis omitted). Lastly, he argues that "the record in this case fully supports a finding of liability on the common law public nuisance based on harm to the public health, wholly apart from the prior rulings." *Id.* at 31.

The second circumstance the Restatement deems to be unreasonable interference is "conduct [that] is proscribed by a statute, ordinance or administrative regulation . . .." Restatement Torts § 821B(2)(b). Mr. Wyman argues that the "allegations in this case are identical to those considered in *Hanlin* and thus form a second reason for finding that Mallinckrodt's [Predecessor's] contamination of the

71

Penobscot River estuary with mercury is an unreasonable interference with a public right." *Pls.' Mot.* at 32.

The third circumstance the Restatement refers to is "conduct [that] is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Restatement Torts § 821B(2)(c).  Mr. Wyman asserts that Mallinckrodt's Predecessor "knew from the beginning of operations in December 1967 that it was losing mercury from operations through air emissions and from other releases it claims could not be identified" and "knew or should have known in early May 1969" about the loss of mercury through wastewater but failed to act on this information. *Pls.' Mot.* at 34. Additionally, Mr. Wyman contends that the seventh ruling he pointed to "establishes that the effects of Mallinckrodt's [Predecessor's] contamination significantly affecting public health will continue for a long time unless remediated" and that liability therefore attaches. *Id.* at 34-35.

### 3.    Strict Liability

Mr. Wyman claims that he has satisfied the elements of 38 M.R.S. § 1319-U(5), which "provides a private cause of action against a person responsible for the disposal of hazardous waste that endangers the health, safety or welfare of others without the need to prove negligence" because "[m]ercury is a hazardous waste within the meaning of this statute" and "[t]he evidence supporting the claim here that the hazardous waste discharged into the Penobscot River estuary resulted in an endangerment to the public health is the same" as that for public nuisance. *Id.* at 35.

Mr. Wyman also asserts that he has satisfied the elements of a common law strict liability claim because "[t]he circumstances in this case precisely parallel those in [*Department of Environmental Protection v. Ventron Corp.*, 468 A.2d 150 (N.J. 1983)]," a case in which the New Jersey Supreme Court found strict liability. *Id.* at 37-38.

### 4.    Special Damages

Mr. Wyman states that "[f]or each of the categories of liability addressed above, [he] must show that [he] suffered special injury, separate and distinct from what the public at large may suffer, to have standing to bring a common law nuisance claim." *Id.* at 38 (citing *Hanlin*, 759 F. Supp. at 936-37). He states that this requirement is satisfied by "the two closures by [the Maine] DMR [which] prevented [Mr.] Wyman from harvesting lobsters and crabs in areas that had been highly productive for him without much competition and where he had fined tuned his knowledge of where to place his traps and also subjected [Mr.] Wyman to serious noneconomic damages." *Id.* at 39.

### 5.    Proximate Cause

Mr. Wyman asserts that "[o]n this record, the Court should find that Mallinckrodt's [Predecessor's] contamination of the Penobscot River estuary was the proximate cause of the special injuries suffered by [Mr. Wyman] as a matter of law." *Id.* He states that "the M[aine] DMR closures were the direct result of the . . . mercury that Mallinckrodt['s Predecessor] discharged into the Penobscot River estuary, causing [Mr. Wyman] to suffer special injuries directly resulting from those closures,"

as evidenced by the first six rulings in the Federal RCRA case Mr. Wyman identifies, as well as "independently from the undisputed evidence underlying those rulings." *Id.* at 39-40 (emphasis omitted).

Foreseeability, in Mr. Wyman's view, "need not be an issue here any more than it would be for a plaintiff seeking damages from injuries suffered from being hit by [a] defendant's speeding car." *Id.* at 40. However, were this not the case, he believes "the special injuries suffered by [Mr. Wyman] were clearly and obviously foreseeable, if proof of such is required" because "special injuries to commercial fishermen are foreseeable when their fishing grounds are contaminated with hazardous waste." *Id.* at 40-41.

Mr. Wyman states that

[t]he only argument available to Mallinckrodt [and U.S. Surgical] in the circumstances of this case is to claim that the chain of causation, with its known foreseeable consequences, was broken because the decision by [the Maine] DMR to issue the closures was the result of an arbitrary and capricious administrative action, without any substantial basis, beyond the discretion of the Commissioner.

*Id.* at 41. However, in his estimation, U.S. Surgical and "Mallinckrodt [are] hardly in a position to succeed on such a claim given this Court's prior rulings in the federal RCRA case" regarding the relationship between the closures and Mallinckrodt's Predecessor's discharges, as well as the Court's "adoption of the M[aine] CDC F[TAL]s of 200 nanograms per gram on which the closures were based as a benchmark for future proceedings on remediation." *Id.* at 41-42. Mr. Wyman claims that there is no credible argument that the Maine DMR's closures are invalid, that

Mallinckrodt and U.S. Surgical have had an adequate opportunity to fully litigate the issue, and that discovery taken in this case supports the closures.  *Id.* at 43.

## B.    Mallinckrodt and U.S. Surgical's Opposition

Mallinckrodt and U.S. Surgical argue that Mr. Wyman's motion "does not meet the heavy burden required to establish that issue preclusion should be applied under the highly unusual circumstances of this case" for a variety of reasons:

> RCRA liability involved different issues and standards of proof, issues essential to the claims and defenses in this case were not litigated, the RCRA liability findings were made by a federal judge (not a jury) 17 years ago, and deciding liability for state law tort claims without discovery or the ability to develop the record would be unfair to [Mallinckrodt and U.S. Surgical] and would distort the jury's understanding of the remaining issues, and issue preclusion would not generate significant efficiency gains.

*Defs.' Opp'n* at 1-2.  Mallinckrodt and U.S. Surgical lay out the relevant facts as they view them, *id.* at 4-19, before proceeding to each of these issues in turn.

### 1.    Issue Preclusion

Mallinckrodt and U.S. Surgical assert that Mr. Wyman's "burden is particularly heavy since [he] request[s] nonmutual offensive issue preclusion," which is discretionary and is "not appropriate where it would not promote judicial economy, there was little incentive to defend vigorously issues in the first suit, the second action affords the defendant procedural opportunities unavailable in the first action that could cause a different result, or it would otherwise be unfair to a defendant."  *Id.* at 19-20 (citing *In re Light Cigarettes*, 691 F. Supp. 2d at 243-44).  They raise a series of arguments for why imposition of nonmutual offensive issue preclusion is inappropriate.  *Id.* at 20-31.

### a.     Lack of Identity of Issues

Mallinckrodt and U.S. Surgical quote *Faigin v. Kelly*, 184 F.3d 67 (1st Cir. 1999), for the proposition that "the reach of collateral estoppel must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding." *Defs.' Opp'n* at 20 (quoting *Faigin*, 184 F.3d at 78).   They argue that "[t]he legal issues addressed and determined in the RCRA proceedings were vastly different from those at issue here" because the plaintiffs in the Federal RCRA case did not need to show actual harm, whereas Mr. Wyman's statutory and common law public nuisance and strict liability claims would require proof of actual harm. *Id.* at 21.   Additionally, they assert, for the common law public nuisance, Mr. Wyman needs to establish that Mallinckrodt's Predecessor acted unreasonably; for the common law strict liability claim, Mr. Wyman needs to establish that Mallinckrodt's Predecessor's actions were abnormally dangerous; and for all of the claims, Mr. Wyman needs to prove "special injury different and greater than injury suffered by the public generally." *Id.* at 21-22.   Mallinckrodt and U.S. Surgical contend that "[n]one of these issues was before the court in the RCRA proceedings" and also that "the general and specific causation questions in this case . . . neither were nor could have been before the Court in the federal RCRA case" because the closures complained of did not occur until later. *Id.* at 22.   Mallinckrodt and U.S. Surgical also argue that they have a number of previously unavailable defenses which they should not be precluded from raising, including "statute of

limitations, comparative fault, coming to the nuisance, and intervening and superseding cause." *Id.*

### b. Proximate Cause and Causation and the Centrality of Federal RCRA Case Findings Related to the Closures

Mallinckrodt and U.S. Surgical argue that they did not have an opportunity or incentive to litigate the cause of the closures in the Phase II trial in the Federal RCRA Case because liability did not turn on that issue and the trial took place shortly after the 2014 Closure. *Id.* at 22-24. They state that Mr. Wyman "make[s] much of the Court's statement that the closure was 'directly related to the level of mercury in the Penobscot estuary.'" *Id.*at 24 (quoting *Pls.' Mot.* at 41-42). However, Mallinckrodt and U.S. Surgical contend that "this is far from a finding that [Mallinckrodt's Predecessor's] activities between 1967 and 1982 were the proximate cause of the closures, which [Mr. Wyman] must prove in this case." *Id.* Additionally, they argue, "exceedances of the FTAL [do not] establish proximate causation here" because "the Court did not adopt the FTAL as a benchmark for future proceedings on remediation" and discovery has shown that "exceedances of the FTAL did not cause the closures." *Id.* at 24-25.

Furthermore, Mallinckrodt and U.S. Surgical assert that "[d]iscovery from state agencies in this case has significantly added to the parties' understanding of the closures, further illustrating that the closures were not litigated in the federal RCRA case." *Id.* at 25. They argue they should be able to bring this new evidence before a jury and that it is clear the cause of the closures has not been litigated. *Id.* at 25-26.

Even if the closures had been litigated, Mallinckrodt and U.S. Surgical state, the cause of Mr. Wyman's "specific alleged injuries was not litigated in the federal RCRA case." *Id.* at 26.

### c.   Efficiency, Jury Confusion, and Fairness

Mallinckrodt and U.S. Surgical argue that nonmutual offensive issue preclusion would be unfair because they have raised a variety of defenses not available to them in the Federal RCRA Case, including the statute of limitations, intervening and superseding cause, comparative fault, coming to the nuisance, and the retroactivity of a statutory strict liability claim to activity before the statute was promulgated in 1981. *Id.* at 27-29.   Additionally, Mallinckrodt and U.S. Surgical assert that they are entitled to a jury trial in this action, which was not true of the Federal RCRA Case. *Id.* at 29.

Mallinckrodt and U.S. Surgical also argue that "[i]ssue preclusion would yield few, if any, efficiency benefits and would likely confuse the jury" because even if Mr. Wyman was "entitled to an issue preclusion ruling in [his] favor, the parties would nevertheless proceed to trial on damages, punitive damages, and the question of abatability," and many of these questions would be tied to the causation question or would require extensive discovery.   *Id.* at 29-31.   Because of this, they argue, resolution of these questions would risk confusing the jury and would erase any efficiency gains to be had by imposition of issue preclusion.   *Id.* at 30-31.

### 2.   Proximate Causation

Mallinckrodt and U.S. Surgical point out Judge Carter's recognition that RCRA has a low causation standard and then assert that Mr. Wyman is "required to prove that [Mallinckrodt's Predecessor's] conduct proximately caused their injuries under Maine law, a more exacting standard that has yet to be litigated and cannot be resolved based on the factual findings of the federal RCRA case." *Id.* at 31. Mallinckrodt and U.S. Surgical argue that, "[w]hile case law on point is sparse, courts have found that government responses to pollution events may break the causal chain between the pollution and the consequences of the government action." *Id.* at 33. While not seeking to have the Court find as a matter of law "that government action breaks the causal chain between antecedent conditions and injury caused by the government action," Mallinckrodt and U.S. Surgical argue it at least raises a genuine issue of material fact on proximate cause. *Id.* at 34.

Additionally, Mallinckrodt and U.S. Surgical argue that the harm Mr. Wyman alleges is attenuated because evidence suggests that lobsters in the Closure Area are not a health risk and that Mr. Wyman's claimed injuries were actually "caused by a discretionary policy judgment by a state agency." *Id.* at 34-35. They allege that "[a] reasonable fact-finder could conclude that the closure constitutes an intervening and superseding cause," particularly as "[a]fter twenty-seven years of fishing in the conditions [he] claim[s] caused [his] harm, [Mr. Wyman] claim[s] no injury until the intervening action by the Maine D[MR]." *Id.* at 36. Furthermore, they state, "[e]ven if one could conclude as a matter of law that [Mallinckrodt's Predecessor's] discharges were the proximate cause of the fishery closures, there would remain a genuine issue

of material fact as to the proximate cause of the individual harm [Mr. Wyman] allege[s]" due to changes in Mr. Wyman's fishing practices and other factors affecting Mr. Wyman's profits that are unrelated to the closures. *Id.* at 37-38.

### 3.   Special Injury

Mallinckrodt and U.S. Surgical contend that there is a genuine issue of material fact as to whether Mallinckrodt's Predecessor's actions caused Mr. Wyman special injury, an element of both his statutory and common law public nuisance claims. *Id.* at 38.   Mallinckrodt and U.S. Surgical state that "[t]here is no competent evidence of an injury to any property right of" Mr. Wyman's, as "he has no personal knowledge of his relative lobster landings year-over-year" and will be relying on expert testimony he has not yet gathered.  *Id.* at 39.  Additionally, "[e]ven assuming that [Mr. Wyman's] landings are down since the closure, there is a genuine issue of material fact as to whether the decreases were caused by the closure" because "there are numerous factors that could have caused a drop in Mr. Wyman's lobster landings in the last several years . . .." *Id.*

### 4.   Common Law Public Nuisance

Mallinckrodt and U.S. Surgical argue that "[t]he federal RCRA case did not establish that there was an unreasonable interference with a public right such that a common law public nuisance exists," as the RCRA standard is lower than the common law public nuisance standard, and Mallinckrodt and U.S. Surgical have not had an opportunity to develop a record on these points.  *Id.* at 40.  They assert that Mr. Wyman does not "allege any interference with rights [he] had in common with

the public for more than 30 years after [Mallinckrodt's Predecessor's] last mercury release," and "[e]ven now, there is no public health risk for commercial fishing;" rather, the "interference came from the [Maine] DMR's decision to protect the Maine lobster brand, not from any actual health or safety effects . . . ." *Id.* Furthermore, they argue, Mallinckrodt's Predecessor "did not know or have reason to know that [its] activity would have a significant effect upon a public right, as "[w]hen the plant started up, the engineering firm that designed it did not believe mercury would be discharged from the plant." *Id.* at 41. They add that Mallinckrodt's Predecessor "significantly curbed its mercury releases" once it discovered the discharges. *Id.*

### 5.    Statute of Limitations

Mallinckrodt and U.S. Surgical claim that "[i]mposing issue preclusion would unfairly deprive [them] of a statute of limitations defense," as Mr. Wyman's public nuisance and strict liability claims are subject to a six-year statute of limitations unless he can establish a continuing tort. *Id.* at 41-42. They state that whether a public nuisance constitutes a continuing tort depends on whether it is readily abatable. *Id.* at 42. This issue is the subject of a separate motion for summary judgment by Mallinckrodt and U.S. Surgical, and they assert that at the very least, the abatability issue should be a "fact question to be resolved at trial." *Id.*

### 6.    Common Law Strict Liability

Mallinckrodt and U.S. Surgical argue that "[t]he federal RCRA case did not establish that [they] engaged in abnormally dangerous activity as to establish common law strict liability" because "[i]n the federal RCRA case, the[y] could be held

liable just for contributing to an imminent and substantial endangerment," which is a lower standard. *Id.* at 43-44. They suggest that "[t]he available evidence . . . raises a genuine issue of fact" as to their liability. *Id.* at 44. They also assert that, contrary to Mr. Wyman's suggestion, "mercury is not categorically regulated as a hazardous waste" in Maine, and its classification "is contingent on how it is used and the amount that is disposed of." *Id.* at 46. Thus, according to Mallinckrodt and U.S. Surgical, the question of whether Mallinckrodt's Predecessor engaged in abnormally dangerous activity should be presented to a jury. *Id.* at 47.

### 7.    Statutory Strict Liability

Lastly, Mallinckrodt and U.S. Surgical suggest that "[s]ummary judgment on [Mr. Wyman's] statutory strict liability claim is inappropriate because [he] seek[s] to improperly apply 38 M.R.S. § 1319-U(5) retroactively insofar as [he] seek[s] to hold [them] liable for conduct before the statute became effective in September 1981." *Id.* They argue that Maine statutes are assumed to be prospective unless the contrary legislative intent is clearly expressed or necessarily implied and that the statute Mr. Wyman utilizes does not establish such a legislative intent. *Id.* at 47-48. They assert that issue preclusion, therefore, should not apply to this claim because "[t]he vast majority of mercury releases for which [Mr. Wyman] claim[s] Mallinckrodt['s Predecessor] is responsible occurred between 1967 and 1970 . . . ." *Id.* at 48.

### C.    Mr. Wyman's Reply

Mr. Wyman begins his reply with what he terms "general observations," stating that Mallinckrodt and U.S. Surgical's response "gives remarkably little

attention to the merits" of Mr. Wyman's motion and "is . . . notable for its claim, repeated again and again, that the State of Maine has no health concerns for commercially harvested lobsters or crabs," which Mr. Wyman states is a deliberate falsehood to the Court. *Pls.' Reply* at 1-2 (emphasis omitted). Additionally, Mr. Wyman argues that his motion should succeed even "if issue preclusion does not resolve all the elements of the claims addressed in the pending summary judgment . . .." *Id.* at 2. Mr. Wyman then recites the "simple foundation" for his summary judgment, which consists of a further recital of what he believes to be the governing facts and rulings from the Federal RCRA Case, *id.* at 2-12, before proceeding with his argument.

### 1.   Issue Preclusion

Mr. Wyman first addresses "the relationship between RCRA and public nuisance for purposes of issue preclusion," concluding that nuisance principles undergird the RCRA and that a causation requirement is embedded within RCRA. *Id.* at 13-14. Mr. Wyman represents that this supposed causation requirement "sounds very close to the concept of the 'substantial factor' test" used to establish causation in Maine common law tort claims. *Id.* at 14. He also states that "avoiding joint and several liability is an uphill battle for any defendant in an environmental case who shoulders the burden of proving that the harm is divisible." *Id.* at 16 (quoting *City of Bangor v. Citizens Commc'ns Co.*, 437 F. Supp. 2d 180, 218-19 (D. Me. 2006)).

Mr. Wyman next asserts that the Court should apply issue preclusion to Judge Carter's findings that Mallinckrodt's Predecessor "has been a dominant source of mercury contamination of the Penobscot River estuary" and that its contribution is "indivisible" from other sources of mercury.  *Id.* (quoting PSMF ¶¶ 56-57).  Mr. Wyman argues these findings are entitled to preclusive effect since "[t]he causation element of a RCRA case is the same or substantially similar to the common law requirements of causation for a public nuisance" because it is immaterial that Judge Carter's findings could have been narrower than they were and because any new evidence Mallinckrodt and U.S. Surgical may have on this issue should have been presented at the time.  *Id.* at 17-22.  Lastly, Mr. Wyman contends that the rulings of this Court related to causation in Phase II of the Federal RCRA Case are also entitled to preclusive effect, as these findings also were "closely aligned to the liability issues" in this case and Mallinckrodt and U.S. Surgical had an opportunity to counter them at the time.  *Id.* at 22-24.

### 2. Proximate Cause

Mr. Wyman states, in reference to this Court's statement that the 2014 Closure was  "game-changer," that "the Court knows" whether this statement was "referring to the public health reasons for the closure," and thus Mr. Wyman "leave[s] it to the Court to decide whether to apply issue preclusion to these findings."  *Id.* at 24 (quoting DRPSMF ¶ 80).  However, from Mr. Wyman's vantage, "even in the absence of these rulings, the administrative record makes clear that both closures were the result of sampling of lobsters and crab with concentrations of mercury in

excess of the FTAL from the PRMS and from confirming samplings in 2014 and 2015," and "[t]herefore, there is no dispute about causation in fact," as "[t]he special harm suffered by [Mr. Wyman] was a direct result of the closures which were the direct result of contamination by Mallinckrodt['s Predecessor]." *Id.* Additionally, Mr. Wyman argues that the closures were a foreseeable result of Mallinckrodt's Predecessor's contamination and that "the only way . . . to break the foreseeability is to establish that the State of Maine's response to the contamination to protect public health was unreasonable . . .." *Id.* at 24-25.

Mr. Wyman next argues that "even without applying issue preclusion" to the issue of proximate cause, the record of what led to the closures is complete, and he is entitled to summary judgment because it is clear that the Maine DMR's response was reasonable and motivated by a desire to protect public health. *Id.* at 25-27.

### 3.   Public Nuisance

Mr. Wyman argues that "it is nothing short of absurd to claim that there is room for argument about the unreasonableness of Mallinckrodt's [Predecessor's] discharges" or that a further record on this topic needs to be developed, in light of what is known "about the devastating effect on the environment, wildlife, and aquatic life, resulting from the most horrific contamination in the history of the State of Maine after 19 years of litigation and given what we know from the former and now deceased plant manager about how this all came about . . .." *Id.* at 27-28. Additionally, Mr. Wyman argues that the record is uncontroverted that the Maine DMR "acted out of a statutory mandate to protect the public health, period" in

deciding to close areas of the Penobscot River estuary, and there can be no argument that they acted out of a desire "to protect the lobster brand." *Id.* at 28.

### 4.   Strict Liability

With regard to his statutory strict liability claim, Mr. Wyman first cites *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), for the proposition that "a wrongdoer may be held liable under a strict liability statute where the conduct occurred before the statute was enacted but the harm giving rise to the accrual of a cause of action occurred after the enactment," and thus argues that whether the statute under which he brings his statutory strict liability applies retroactively is immaterial. *Pls.' Reply* at 28-29.  Second, Mr. Wyman argues that Mallinckrodt and U.S. Surgical admit "that the vast majority of their mercury discharges occurred from 1967 to 1971, well before they were regulated by the Clean Water Act," and so their argument that "Maine DEP regulations exclude from the definition of hazardous waste point source discharges subject to regulation under Section 402 of the Clean Water Act" must fail.  *Id.* at 29.  Third, Mr. Wyman calls Mallinckrodt and U.S. Surgical's argument, that Mallinckrodt's Predecessor's release of mercury did not constitute release of regulated hazardous waste because it did not generate 100 kilograms or more per month of mercury waste or accumulate 600 kilograms or more per month, "absurd on its face."  *Id.*  Mr. Wyman claims that "[t]he notion that the [Maine] DEP regulations allow the discharge of 220.46 pounds of toxic mercury per month into a river without regulation makes no sense and is indeed simply not true,"

as the regulation cited by Mallinckrodt and U.S. Surgical applies only to the generation of hazardous waste, not to its discharge. *Id.* at 29-30.

With regard to his common law strict liability claim, Mr. Wyman cites *Ventron* for the proposition that "the record is fully developed for purposes of concluding that Mallinckrodt [and U.S. Surgical] should be held strictly liable as a matter of law . . .." *Pls.' Reply* at 30 (emphasis omitted). Furthermore, according to Mr. Wyman, "[e]ven if ignorance of the consequences of discharges of highly toxic mercury waste were a defense," Mallinckrodt and U.S. Surgical have yet to produce evidence that they were in fact ignorant. *Id.* at 31. Additionally, Mr. Wyman views the "issue of whether an activity is abnormally dangerous" as being an issue for the Court, rather than a jury, and asserts that the record is sufficiently complete for the Court to make such a finding. *Id.*

## IV.   LEGAL STANDARD

A grant of summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

Once the moving party "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must show "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), while disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54).

When determining an issue of state law in the absence of controlling authority from that state's highest court, the Court "must make an 'informed prophecy' as to how the state's highest court . . . would rule if faced with the issue." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *Sanders v. Phoenix Ins. Co.*, 843 F.3d 37, 42 (1st Cir. 2016)). In order to do so, the Court "may look to 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the [state's highest court] would decide the issue at hand.'" *Id.* (quoting *N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 38 (1st Cir. 2001)).

## V.       DISCUSSION

### A.       Issue Preclusion

Federal common law governs whether a federal court should give preclusive effect to a prior federal court adjudication, *Faigin*, 184 F.3d at 78, and requires a party seeking to preclude litigation of an issue by reference to a previous adjudication to establish:

> (1) that the issue to be precluded is the same as that disputed in a prior proceeding, (2) that the issue was actually litigated in the earlier proceeding, (3) that the issue was determined by a valid and binding final judgment or order, and (4) that the determination of the issue in the prior proceeding was essential to the final judgment or order.

*Enica v. Principi*, 544 F.3d 328, 337 (1st Cir. 2008).   The party invoking collateral estoppel has the burden to establish each element.   *Hoult v. Hoult*, 157 F.3d 29, 31-32 (1st Cir. 1998).

"For non-mutual offensive issue preclusion, however, these traditional elements are necessary but not sufficient," *In re Light Cigarettes*, 691 F. Supp. 2d at 243, and a court should consider multiple additional policy concerns:

> First, offensive issue preclusion does not necessarily promote judicial economy; plaintiffs are incentivized to "wait and see" because they can "rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins."   Second, if a defendant in the first action is sued for small or nominal damages, the party "may have little incentive to defend vigorously, particularly if future suits are not foreseeable."   Third, offensive issue preclusion may be unfair to a defendant "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."   Finally, offensive issue preclusion may be unfair where "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result."

*In re Light Cigarettes*, 691 F. Supp. 2d at 243-44 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979)).  The Supreme Court in *Parklane* stated that the "presence or absence of a jury as factfinder is basically neutral . . .."  439 U.S. at 332 n.19.  Trial courts have "broad discretion" to determine when to apply offensive issue preclusion, which is generally not appropriate "where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant." *Id.* at 331.

The Court declines, in this case, to apply non-mutual offensive issue preclusion in these circumstances.

### 1. Actuality of Litigation and Centrality of Findings

In his motion, Mr. Wyman lists seven purported rulings on which he relies. *Pls.' Mot.* at 16-17.  The first two rulings are not in dispute, as Mallinckrodt and U.S. Surgical have admitted them: (1) that Mallinckrodt's Predecessor discharged significant quantities of mercury, resulting in contamination of the Penobscot River estuary with highly toxic methylmercury, *Defs.' Opp'n* at 16 ("there is no dispute that the Orrington plant was a contributor of mercury to the system"); and (2) "that Mercury is being converted in the Penobscot River estuary by bacteria into methylmercury."  DRPSMF ¶ 61.  The remaining five findings of fact raised by Mr. Wyman, however, are controverted, and the Court addresses each to determine whether it was in fact litigated or central to an adjudication in the Federal RCRA Case.

### a.   Ruling Three: Dominant Source of Mercury Contamination

Mr. Wyman asserts that the Court in the Federal RCRA Case ruled that Mallinckrodt's Predecessor's discharges were "the dominant source of the mercury contamination of the Penobscot River . . . ." *Pls.' Mot.* at 16.  Mr. Wyman is referring here to language from Judge Carter's 2002 order, in which he stated, "The evidence was clear that Mallinckrodt has been a dominant source of mercury in the Penobscot River," citing two portions of the trial transcript for the Phase I trial.  *Me. People's All.*, 211 F. Supp. 2d at 255.  This language was quoted by the First Circuit in its affirmance of Judge Carter's order.  *See Me. People's All. v. Mallinckrodt*, 471 F.3d 277, 280, 285, 298 (1st Cir. 2006).

The Court first notes that Mr. Wyman inaccurately refers to Judge Carter's statement.  Judge Carter referred to Mallinckrodt as "a dominant source," not "the dominant source."  The distinction makes a difference.  The word "dominant" has two definitions relevant in this context: first is "commanding, controlling, or prevailing over all others;" second is "very important, powerful, or successful."  *Dominant*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).  If Judge Carter meant the first definition, he would not have said "a dominant source;" he would have written, "the dominant source."  By his careful choice of language, Judge Carter was, in the Court's view, using "dominant" in the second, not the first, sense.

Additionally, the Court does not find that Judge Carter's use of the word "dominant" constituted a ruling.  A determination that Mallinckrodt's Predecessor was a dominant source of mercury into the Penobscot River was not necessary to a

decision on the merits under the RCRA standard, which required only a finding that Mallinckrodt's Predecessor "contributed . . . to the past . . . handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ." 42 U.S.C. § 6972(a)(1)(B). Thus, use of the word "dominant" was dicta, and cannot bind Mallinckrodt and U.S. Surgical in this litigation. *See Sexual Minorities Uganda v. Lively*, 899 F.3d 24, 29 (1st Cir. 2018) (explaining that statements that do not "have any bearing on the analytical foundations of the dispositive order or impact the result" are dicta that "lack any binding or preclusive effect"). That the language was repeated by the First Circuit in its affirmance of Judge Carter's order does not transform it into a ruling with preclusive effect.

Mr. Wyman excellently frames the argument—both in his motion and at oral argument—that the Court should not be "tempted to speculate that a prior decision could have rested on narrower grounds than those actually chosen . . . ." *Pls.' Mot.* at 21 n.19 (quoting 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4421 (3d ed. 2017 update)); *see also Tr. of Proceedings, Oral Arg.* at 60:21-61:05 (ECF No. 95) (*Oral Arg. Tr.*). Mr. Wyman quotes *Hoult*, *Pls.' Mot.* at 21 n.19, for the proposition that "a finding is 'necessary' if it was central to the route that led the factfinder to the judgment reached, even if the result 'could have been achieved by a different, shorter and more efficient route.'" *Hoult*, 157 F.3d at 32 (quoting *Commercial Assocs. v. Tilcon Gammino, Inc.*, 998 F.2d 1092, 1097 (1st Cir. 1993)). But as *Hoult* makes clear, "[t]elling a party that it cannot

prove or contest a fact of importance in the case at hand is a severe measure" and "Courts have been willing to take that step only where it is certain that the issue has already been decided in a prior case . . . ." *Id.* Mr. Wyman himself repeats this point, quoting *Commercial Associates* for the proposition that issue preclusion is only appropriate if "a factual issue w[as] vigorously litigated in a prior proceeding . . . ." *Pls.' Mot.* at 21 n.19 (quoting *Commercial Assocs.*, 998 F.2d at 1097).

Mallinckrodt and U.S. Surgical point to the record evidence Judge Carter relied on for the "dominant source" language and note that "the trial testimony Judge Carter cited . . . referred to operations of the plant over its entire lifetime (through 2001), not just pre-1982 operations under [Mallinckrodt's Predecessor's] ownership," and that the same witness who gave that testimony "also testified that he could not determine whether the plant was a significantly greater source of mercury to the river before 1971 than it was in later years." *Defs.' Opp'n* at 16-17. The Court reviewed the record and agrees with Mallinckrodt and U.S. Surgical that whether Mallinckrodt's Predecessor alone was a dominant source of mercury has not been actually litigated, as the parties in the Federal RCRA Case were reasonably focused on the RCRA "contributed to" standard.[140]  *See* Footnote 51, *supra.*

---

[140]     One issue, for example, is the extent to which the background level of mercury as opposed to the mercury Mallinckrodt's Predecessor discharged predominates as the source of mercury in the Penobscot estuary.  Amec concluded that the background concentration of mercury in sediment in the area is 180 nanograms per gram.  *Phase III Engineering Study Report* at 6-3, *Me. People's All. v. Holtrachem Mfg. Co.* (No. 1:00-cv-00069-JAW), ECF No. 972 (*Phase III Report*) ("It should be noted that remediation to total mercury concentrations at or below background (180 ng/g) would be technically impractical to achieve, given the likelihood of continuing sediment migration and redistribution in the Penobscot River as well as specifically in the Estuary").  Stacey Ladner of the Maine DEP agreed that there is a region-wide mercury issue due to atmospheric deposition of mercury.  *See* DSAMF ¶ 149.  Further, Amec also wrote that "[o]verall, mercury concentrations in aquatic biota (lobster . . .) in the Penobscot River either are generally decreasing (0.2 to 6.5 percent annual decline),

### b.   Ruling Four: Substantial and Unacceptable Risk to Public Health

Mr. Wyman argues that the Court in the Federal RCRA Case ruled that Mallinckrodt's Predecessor's discharges of mercury pose "a substantial and unacceptable risk to public health, especially for sensitive populations . . .." *Pls.' Mot.* at 16 (citing PSMF ¶¶ 49-52, 59, 61-72).  Mr. Wyman bases this argument on several statements from the Federal RCRA Case.  First is Judge Carter's statement:

> It is now established in the record that mercury (Hg) deposited in the Penobscot River in significant quantities and to substantial negative effect from the [Orrington Plant] has and is now in the process of methylation posing a danger to the health of the wildlife in the River and risks of a substantial nature to the well-being of human beings who ingest the products of the River.  That is the distillation of the factual predicate on which this case is to proceed.

---

indicating the potential for some natural attenuation, or are stable." *Phase III Report* at 2-10.  The Amec report also concluded:

> Because pre-remediation risks for both the 2014 and 2016 closure areas were below acceptable levels and lobster is an important economic resource for the State of Maine, a more conservative risk reduction approach was undertaken for lobster consumption using an upper-bound BSAF.  Under this more conservative risk reduction approach (using the upper bound BSAF), no remedial action is needed to meet acceptable risk levels for the lobster based on the local consumer consumption rates.

*Id.* at 6-4.  Further, the parties have agreed that Maine has adopted 200 nanograms per gram as the FTAL for methylmercury.  DSAMF ¶ 61; PRDSAMF ¶ 61.  However, the Amec report elsewhere found that the "[t]he percentage of lobster with mercury concentrations in excess of the [Maine] CDC fish tissue action level of 200 ng/g generally decreases downstream." *Phase III Biota Monitoring Report* at 3-15, *Me. People's All. v. Holtrachem Mfg. Co.* (No. 1:00-cv-00069-JAW), ECF No. 982.  At the same time, the Amec report observed that "the percentage of action mercury concentrations above the action level at South Verona (90 percent) does not follow the general decreasing pattern downstream." *Id.* at 3-15-16.

As the parties have not placed these portions of the Amec report before the Court in this motion for summary judgment, the Court has not considered them to rule on the motion.  The Court refers to the Amec report to illustrate the complexity of the issues before the Court, including the background concentration of mercury, the concentration of mercury in lobsters in the closed area, consumer advisories about the consumption of lobster, the assumed rates of local lobster consumption, the natural attenuation rate, whether the Verona Island area is an exception to natural attenuation and, if so, why, the prospects for remediation, and the regulatory stance of the Maine DMR.  These considerations start the conversation and here the Court is discussing only the beginning of the analysis and has not addressed such issues as other potential sources of mercury contamination and whether Mallinckrodt and/or U.S. Surgical's contribution has been or remains dominant as against the background concentration and the potential of mercury from other sources.

*Additional Attachs.*, Attach. 5, *Ex. 24: Order Approving Phase I Report* (ECF No. 58)

(*Order Approving Phase I Report*). Second is this Court's statement in the Federal

RCRA Case that "the Penobscot River estuary remains unacceptably contaminated

with mercury," a finding that "update[d] and reiterate[d] Judge Carter's 2002 finding

of 'imminent and substantial endangerment to public health and the environment.'"

*Order on Remediation Plan*, 2015 WL 5155573, at *28 (quoting *Me. People's All.*, 211

F. Supp. 2d at 251). Third is Judge Carter's and this Court's description of the effects

of methylmercury on humans. *Me. People's All.*, 211 F. Supp. 2d at 245-46; *Order on

Remediation Plan*, 2015 WL 5155573, at *21.

The RCRA causation standard requires a finding that disposal of hazardous

waste "may present an imminent and substantial endangerment to health or the

environment . . . ." 42 U.S.C. § 6972. This was a central issue to Phase I of the Federal

RCRA Case, and it has been thoroughly litigated throughout that case, as the rulings

raised by Mr. Wyman demonstrate. The Court does not view this question as being

in dispute in this litigation. However, to the extent that Mr. Wyman is relying on

these statements to establish either that Mallinckrodt's Predecessor's disposal of

mercury did indeed damage public health or the level of danger to public health posed

by the mercury disposals, these issues have not been litigated, and Mallinckrodt and

U.S. Surgical should have the opportunity to do so here.[141]

---

[141]    While Mr. Wyman does not say so explicitly, the Court infers from Mr. Wyman's list of rulings
that Mr. Wyman is relying on these statements to establish that the public health consequences of
Mallinckrodt's Predecessor's mercury disposals led directly to the Maine DMR's fishery closures. The
Court finds that the statements Mr. Wyman relies on for what he terms "Ruling 4," *Pls.' Mot.* at 16, do
not provide sufficient support to make out this conclusion, and this factual issue has not been litigated.

### c.   Ruling Five: Resulting in Closure of Fishing Grounds

Mr. Wyman alleges that the Court in the Federal RCRA Case ruled that the public health risk from Mallinckrodt's Predecessor's discharges of mercury "result[ed] in the closure of fishing grounds by [the Maine] DMR in 2014 based on the sampling of shellfish recorded in the PRMS showing levels in excess of the threshold for mercury in seafood of 200 ng/g wet wt. . . . set in the [FTAL] by [the Maine] CDC . . . ." *Pls.' Mot.* at 16.  For this ruling, Mr. Wyman relies on this Court's statements in the Federal RCRA Case that the Court "accept[ed] [the 2014 Closure] as directly related to the level of mercury in the Penobscot estuary" and that "the Court view[ed] the M[aine] DMR closure from lobstering and crabbing of a large area at the mouth of Penobscot Bay as a game-changer." *Order on Remediation Plan*, 2015 WL 5155573, at *28.

As Mr. Wyman rightly wrote about the statements in this Court's September 2, 2015 Remediation Order, "the Court will decide what was meant. . .." *Pls.' Reply* at 8.  To place this comment in context, in the Phase II Trial, the Court heard nearly a month of testimony and reviewed volumes of documents, almost all of which was generated in June 2014.  The Maine DMR made its closure permanent on May 14, 2014, just before the Court presided over the month-long hearing.  As the Court observed in its September 2, 2015 Remediation Order, "[m]uch of the Study Panel's attention was directed to Mendall Marsh," but there was "a separate area of concern," namely the "area of the Penobscot River just before it opens up into Penobscot Bay." *Order on Remediation Plan*, 2015 WL 5155573, at *26.  No one—not Maine People's

Alliance, not Mallinckrodt, not even the Study Panel—had focused on the area of the Penobscot River that Maine DMR closed to lobster and crab fishing. There was some testimony about this area, specifically (ironically enough) testimony from Mr. Wyman himself, but there was no testimony from state officials as to why they issued the emergency closure.

The Court's comment in 2015 was in response to Mallinckrodt's arguments that "the River is recovering faster than the Study Panel estimates," "the Penobscot River [was] less contaminated than the Phase II Report suggests," "the mercury levels found in Penobscot biota" were within "the range of values found in widely consumed seafood in the United States," and Mr. Wyman had failed to demonstrate any actual harm. *Id.* at *11-*13 (internal quotations omitted). From the Court's perspective, the 2014 Closure, which the Maine DMR said was in part due to the Study Panel's report, challenged the strength of Mallinckrodt's arguments and Mallinckrodt had not effectively responded to the implications of the closure on its presentation. Although the fact of the closure and Maine DMR's stated reasons for doing so were before the Court as evidence, the parties' lack of attention to the closure left the Court with the Maine DMR statement and the fact of closure, but little else on this narrow issue. In other words, the 2014 Closure was a game-changer because it had not been adequately addressed, explained or refuted. As such, the Court does not consider the fact that it addressed the 2014 Closure in 2015 to preclude its consideration of the issue in 2020.

97

### d.  Ruling Six: Demonstrating Extent of Adverse Health Effects

Mr. Wyman states that the Court's statement in the Federal RCRA Case that it "view[ed] the M[aine] DMR closure from lobstering and crabbing of a large area at the mouth of the Penobscot Bay as a game-changer," *Order on Remediation Plan*, 2015 WL 5155573, at *28, supports the conclusion that the 2014 Closure "demonstrate[ed] the extent of the adverse health effects resulting from Mallinckrodt's [Predecessor's] mercury contamination . . .." *Pls.' Mot.* at 17. The beginning of the Court's sentence, however states, "Although the parties fenced over the exact degree of harm from the current level of mercury contamination throughout the estuary," *Order on Remediation Plan*, 2015 WL 5155573, at *28, and the Court did not resolve this question in the Federal RCRA Case as resolution of that issue was not necessary under the RCRA standard.  As the Court has discussed, Mallinckrodt and U.S. Surgical have not yet had an opportunity to litigate the actual public health consequences of Mallinckrodt's Predecessor's mercury discharges, and the Court does not view it as appropriate to preclude them from doing so.

### e.  Ruling Seven: Continuing Effects

Mr. Wyman cites several portions of this Court's 2015 order in the Federal RCRA Case for the proposition that the effects of Mallinckrodt's Predecessor's mercury discharges "will continue for a long duration unless remedied." *Pls.' Mot.* at 17 (citing PSMF ¶ 60 (citing *Order on Remediation Plan*, 2015 WL 5155573)).  Mr. Wyman does not quote any portions of the Court's orders in the Federal RCRA Case, so the Court is not sure exactly what language he is referring to.  However, this

statement presupposes public health risks from the mercury discharges, and the Court has already found that this has not previously been litigated. The Court therefore cannot apply preclusive effect to it.

### 2.    Identity of Issues

Mr. Wyman cites *Manganella* for the proposition that "[i]ssue preclusion 'can apply where the subsequent proceeding involves a cause of action different from the first.'" *Id.* at 18 (quoting *Manganella*, 700 F.3d at 591). But *Manganella* goes on to make clear that this is only the case when "the issues are in substance identical." 700 F.3d at 591. In the Federal RCRA case, the plaintiffs had only to establish that Mallinckrodt's Predecessor had "contributed . . . to the past . . . handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ." 42 U.S.C. § 6972(a)(1)(B); *see also Me. People's All.*, 211 F. Supp. 2d at 246 (stating that RCRA liability does not turn on a showing that "the contamination is harming, or will harm, health or the environment" and "[a] finding that an activity may present an imminent and substantial endangerment does not require a showing of actual harm"). This is substantially different from the requirement, for Mr. Wyman's public nuisance and strict liability claims, that he establish that Mallinckrodt and U.S. Surgical actually caused his harm. *See* 17 M.R.S. § 2701 (requiring person bringing statutory nuisance action to establish injury to his or her "comfort, property or the enjoyment of" his or her estate); 38 M.R.S. § 1319-U(5) (requiring person bringing statutory strict liability action to establish that

his or her "health, safety or welfare" has been endangered by the disposal or treatment of hazardous waste); Restatement Torts § 821C(1) (stating that to recover damages in a common law public nuisance action, a person must show that he or she has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference"); Restatement Torts § 519(1) ("One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity").

The Supreme Court has stated that "[i]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) (quoting 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4417 (2d ed. 2002)). The Court concludes that the causation standard for RCRA is significantly broader than that under public nuisance or strict liability, and the issues here are not identical.

Mr. Wyman cites the Fifth Circuit case of *Cox* for the proposition that "[i]t is particularly appropriate to give RCRA findings preclusive effect to [his] public nuisance claims because '[n]uisance principles form the core doctrinal foundation for modern environmental statutes, including the RCRA.'" *Pls.' Mot.* at 18-19 (alteration in original) (emphasis omitted) (quoting *Cox*, 256 F.3d at 289); *see also Oral Arg. Tr.* at 59:13-15. But Mr. Wyman has not shown the Court any case in which findings in a RCRA case have been applied to establish causation in a later nuisance case. In

the Court's view, the fact that RCRA was based on nuisance principles does not mean that the causation principles for RCRA and nuisance are substantially similar, particularly as Mr. Wyman acknowledges that "[s]ome terms and concepts [in RCRA] . . . [are] meant to be more liberal than their common law counterparts." *Pls.' Mot.* at 19 n.16 (some alterations in original) (quoting *Cox*, 256 F.3d at 291).

In Mr. Wyman's reply memorandum, he brings up two further arguments on this point: First, he argues that the RCRA causation standard is similar to the "substantial factor" test used in Maine "to define common law causation,"[142] *Pls.' Reply* at 14; second, he argues that the RCRA causation standard incorporates common law principles of joint-and-several liability. *Id.* at 15-16. Mr. Wyman's decision to include these arguments in his reply, as opposed to his initial motion, violates District of Maine Local Rule 7(c), which requires that a reply memorandum be "strictly confined to replying to new matter raised in the objection or opposing memorandum." D. ME. LOC. R. 7(c). Mr. Wyman did not include arguments related to joint-and-several liability or the substantial factor test in his moving brief, *see Pls.' Mot.* at 18-20, and Mallinckrodt and U.S. Surgical did not raise these issues in their response. *Defs.' Opp'n* at 20-22. Thus, as a matter of fairness, the Court hesitates to consider these arguments by Mr. Wyman. Mallinckrodt and U.S. Surgical have not had an opportunity to respond, and in considering these arguments, the Court is therefore put in the uncomfortable position of advocate, having to examine Mr. Wyman's arguments independent of response to determine potential weaknesses. *See*

---

[142]     Mr. Wyman also raised this argument at oral argument. *See Oral Arg. Tr.* at 58:22-60:02.

*Goldenson v. Steffens*, No. 2:10-cv-00440-JAW, 2013 WL 145587, at *9 (D. Me. Jan. 14, 2013) ("The failure to raise issues in the first instance is to be discouraged because it circumvents the normal process for airing issues and may be used strategically for the movant to gain an unfair advantage, remaining silent on an important issue in hopes that the non-movant does not raise it").  The Court considers these arguments by Mr. Wyman waived.

Even if this were not the case, however, the Court does not find these arguments meritorious.  The tort "substantial factor" test is once again narrower than the RCRA test, requiring that a tortfeasor's conduct "be a substantial cause of the damages," *Cty. Forest Prods., Inc. v. Green Mountain Agency, Inc.*, 2000 ME 161, ¶ 49, 758 A.2d 59, 72, while RCRA requires only that the wrongdoer be a contributor. Additionally, as noted above, while RCRA requires only that a wrongdoer release waste of a type that could contribute to a risk of harm, tort liability requires actual harm.  With regard to joint and several liability, Mallinckrodt and U.S. Surgical have credibly alleged that new techniques have arisen in the intervening years between now and Judge Carter's finding that the contamination of the Penobscot River was "indivisible," *Me. People's All.*, 211 F. Supp. 2d at 255, that allow them to actually disaggregate sources of mercury in the Penobscot River estuary.  *See* DRPSMF ¶ 57. Mallinckrodt and U.S. Surgical should have the opportunity to put this evidence before a finder-of-fact, just as Mr. Wyman should have the opportunity to challenge it.

### 3.    Efficiency and Fairness

The sum of Mr. Wyman's argument regarding the additional policy considerations raised by the imposition of non-mutual offensive issue preclusion is his statement in his motion that none of these "factors . . . are relevant to this case." *Pls.' Mot.* at 23. The Court disagrees. First, as Mallinckrodt and U.S. Surgical argue, they have a variety of affirmative defenses here "that were unavailable to them in the federal RCRA case." *Defs.' Opp'n* at 27. These affirmative defenses—including statute of limitations, intervening and superseding cause, comparative fault, and coming to the nuisance, *id.* at 27-29—have not previously been litigated, and it would be unfair to deprive Mallinckrodt and U.S. Surgical of an opportunity to develop the record on these issues. Second, as Mallinckrodt and U.S. Surgical note, *id.* at 29, this Court has previously "given weight to the deprivation of a jury trial" in determining whether non-mutual offensive issue preclusion should apply and found that it weighed against its application. *In re Light Cigarettes*, 691 F. Supp. 2d at 251. Third, any trial on damages—which Mr. Wyman acknowledges will be required in any event, *see Pls.' Mot.* at 17—will necessarily require extensive discovery, including expert discovery, and will require a significant expenditure of the Court's time. Fourth, the Court's discussion of the possibility for jury confusion in *In re Light Cigarettes* is applicable here:

> Punitive damages may not be used to "punish a defendant for injury that it inflicts upon nonparties." [*Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007)]. If issue preclusion were imposed, however, much of the Defendants' underlying liability would be based in part on actions that inflicted injuries upon nonparties. Despite instructions to compartmentalize certain factual findings, the jury could be confused

about what facts may or may not be considered when determining punitive damages. *Grisham* [*v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1037 (C.D. Cal. 2009)] (raising the same concern).

691 F. Supp. 2d at 251 (emphasis omitted).   Because Mr. Wyman has not satisfied the Court that he has met the traditional requirements of issue preclusion and because additional fairness considerations weigh against its application, the Court declines to apply the doctrine of issue preclusion to the factual findings raised by Mr. Wyman.

### B.    Proximate Cause

"Evidence is sufficient to support a finding of proximate cause if the evidence and inferences that may reasonably be drawn from the evidence indicate that the [defendant's actions] played a substantial part in bringing about or actually causing the injury or damage" and "that the injury or damage was either a direct result or a reasonably foreseeable consequence of" the defendant's actions. *Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509. "The question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact . . .." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757.

The Court has a difficult time squaring Mr. Wyman's argument that the 2014 and 2016 Closures were caused by the Maine DMR's foreseeable reaction to a public health issue caused by Mallinckrodt with his argument that "[p]rior to the two closures of the fishing grounds by the [Maine] DMR, the mercury contamination in the Penobscot estuary did not affect [Mr. Wyman's] business in any way." *Pls.' Reply* at 9 (alteration in original) (quoting PSMF ¶ 89).  Mr. Wyman, in other words, is

asserting that were it not for the closures, he would still be fishing in the closed locations and would have no problem selling his lobsters and crabs.[143]   This is different from the cases Mr. Wyman raised in his motion.  *See Pls.' Mot.* at 24.  In *Burgess v. M/V Tamano*, the fishermen and clammers bringing claims were alleging that it was the pollution of the water itself that was the source of their injury.  370 F. Supp. 247, 250 (D. Me. 1973).  Similarly, in *Curd v. Mosaic Fertilizer, LLC*, the injury plaintiffs were alleging was loss of marine life as a result of pollution.  39 So. 3d 1216, 1218 (Fla. 2010) ("The fishermen claim that the spilled pollutants resulted in a loss of underwater plant life, fish, bait fish, crabs, and other marine life").  It is not clear that consequences flowing from discretionary decisions of government agencies are the type of harm contemplated by the torts of nuisance and strict liability, and Mallinckrodt and U.S. Surgical raised two cases suggesting that they are not.  *See Defs.' Opp'n* at 33-34 (citing *Benefiel v. Exxon Corp.*, 959 F.2d 805, 807-08 (9th Cir. 1992); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 881-82 (N.D. Cal. 2009)).

Mr. Wyman states that "[t]he only argument available to Mallinckrodt [and U.S. Surgical] in the circumstances of this case is to claim that the chain of causation, with its known foreseeable consequences, was broken because the decision by [the Maine] DMR to issue the closures was the result of an arbitrary and capricious administrative action . . .."  *Pls.' Mot.* at 41.  Mr. Wyman cites no caselaw for this proposition, and the Court does not view non-movants Mallinckrodt and U.S.

---

[143]     Mr. Wyman reiterated this position at oral argument.  *See Oral Arg. Tr.* at 65:07-19.

Surgical's burden as being so high.  Rather, in the Court's view, it is enough for them to show on this motion for summary judgment that a factfinder could plausibly find that the Maine DMR's closures were not a reasonably foreseeable result of Mallinckrodt's Predecessor's activities.[144]

Mallinckrodt and U.S. Surgical have made such a showing.  They have put forward evidence that the Maine CDC and Amec do not believe that lobsters from the Closure Area present an actual health concern.  *Defs.' Opp'n* at 34-35.  They have also established a genuine dispute as to whether the Maine DMR's decision regarding the closures was in fact a reaction to public health by raising a number of different factors considered by the agency, such as the perception of the Maine lobster brand.  *Id.* at 35.  Furthermore, over thirty years passed between Mallinckrodt's Predecessor's last discharge and Maine DMR's 2014 Closure.  *Id.* at 34.  Whatever Mr. Wyman thinks of the merits of this argument, a reasonable factfinder could find, on this record and taking all inferences in favor of the non-movants, that the Maine DMR's closure decisions constitute an intervening cause and break the chain of causation between the contamination of the Penobscot River estuary and Mr. Wyman's harm.

Because a genuine dispute exists as to whether Mr. Wyman has established proximate causation between the mercury contamination and his injury, Mr. Wyman is not entitled to summary judgment on his public nuisance or strict liability claims.

---

[144]     At oral argument, Mr. Wyman acknowledged that "reasonably foreseeable" was the proper standard but seemed to argue that any discretionary action taken by the Maine DMR in relation to the mercury contamination that was not arbitrary and capricious should be considered foreseeable. *Oral Arg. Tr.* at 65:25-66:23.  If that is indeed Mr. Wyman's position, the Court views it as overly broad.  Discretionary actions are, by their nature, discretionary.  Whether an agency has authority to impose, or acted properly in imposing, a regulation is separate from whether that regulation is reasonably foreseeable.

### C.    Special Damages

Mr. Wyman argues that he has suffered special damages because "the two closures by [the Maine] DMR prevented [him] from harvesting lobsters and crabs in areas that had been highly productive for him without much competition and where he had fined tuned his knowledge of where to place his traps and also subjected [him] to serious noneconomic damages." *Pls.' Mot.* at 39.  He states, without citing caselaw, that "[t]hese are precisely the kind of special injuries that grant Plaintiffs standing to bring common law public nuisance claims." *Id.*  Mallinckrodt and U.S. Surgical argue that "[t]here is no competent evidence of an injury to any property right of" Mr. Wyman and that, "[a]s Mr. Wyman himself stated, expert discovery is needed on" the issue of whether his relative lobster landings have decreased since the 2014 Closure. *Defs.' Opp'n* at 39.  They state that Mr. Wyman's "'subjective impressions' of his loss [are] insufficient to establish a special injury." *Id.* (quoting *Darney v. Dragon Prods. Co.*, 771 F. Supp. 2d 91, 115 (D. Me. 2011)).  Additionally, they argue that "there are numerous factors that could have caused a drop in Mr. Wyman's lobster landings in the last several years, perhaps most notably his change of home zones in 2014" and that "[w]hether the closure itself caused [Mr. Wyman's] special harm is not established on this record." *Id.*

Taking all inferences in favor of the non-movants, there is a genuine dispute over whether the state-imposed restriction on where Mr. Wyman may fish, without a firm showing of resultant economic loss, constitutes special damages.  At trial, Mr. Wyman will be required to adduce evidence that moving his fishing grounds has

actually caused damages to him beyond the speculative. Said another way, in the context of a motion for summary judgment, where the Court is required to view contested issues in the light most favorable to the non-movants, the record does not allow a ruling that there is no genuine issue of material fact on the question of special harm.

### D.    Strict Liability

While Mr. Wyman's failure to establish a lack of a genuine dispute as to proximate cause and special damages means that he is not entitled to summary judgment on his tort claims, the Court writes briefly on the issue of the retroactivity of Mr. Wyman's statutory strict liability claim. Mallinckrodt and U.S. Surgical assert that the Maine Supreme Judicial Court has a presumption against the retroactive applicability of statutes, *Defs.' Opp'n* at 47 (quoting *Terry v. St. Regis Paper Co.*, 459 A.2d 1106, 1109 (Me. 1983)), and that "the statute relied on [by Mr. Wyman] became effective in September 1981, and there is no indication that the Legislature intended 38 M.R.S. § 1319-(U)(5) to have retroactive application." *Id.*

In response, Mr. Wyman writes that "[t]he Maine Law Court has held that a wrongdoer may be held liable under a strict liability statute where the conduct occurred before the statute was enacted but the harm giving rise to the accrual of a cause of action occurred after the enactment." *Pls.' Reply* at 28-29 (citing *Bernier*, 516 A.2d 534). *Bernier* is inapplicable. "The Maine Law Court has declined to extend the holding in *Bernier* beyond the asbestos realm." *Descoteau v. Analogic Corp.*, 696 F. Supp. 2d 138, 141 (D. Me. 2010). If Mr. Wyman is to argue that 38 M.R.S. § 1319-

U(5) may properly be applied retroactively, he will have to marshal additional arguments that do not rely solely on *Bernier*.

Beyond his reliance on *Bernier*, Mr. Wyman writes that "[t]he civil liability section of the statute was enacted in 1980" and "Mallinckrodt['s Predecessor] owned and operated the Orrington [Plant] at that time and was still discharging mercury for another 2 years with resulting contamination that could not be distinguished from prior discharges in larger amounts."  *Pls.' Reply* at 28.  Whether the contamination during particular periods can be disaggregated is an open question of fact, and Mallinckrodt and U.S. Surgical will be entitled to bring evidence of disaggregation to a jury.

## VI.    CONCLUSION

The Court DENIES Kenneth F. Wyman, Jr. and F/V Megan K II LLC's Motion for Partial Summary Judgment on Liability and Causation for Counts I-II and III-IV (ECF No. 52).[145]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of April, 2020

---

[145]    In light of the Court's order denying Mr. Wyman's Motion for Partial Summary Judgment, the Court DISMISSES as moot Mallinckrodt and U.S. Surgical's Rule 56(d) Motion to Deny or Defer Plaintiffs' Motion for Partial Summary Judgment (ECF No. 63).