UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KENNETH F. WYMAN, JR. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18-cv-00095-JAW |
| | ) | |
| UNITED STATES SURGICAL | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

A lobster and crab fisherman brings claims based on harm suffered as a result of the long-ago disposal of tons of mercury into the Penobscot River.  The successor to the corporate entity which engaged in this disposal seeks summary judgment on the permanent and continuing nuisance and permanent and continuing strict liability causes of action, arguing that they are barred by the applicable six-year statute of limitations.  Because the Court concludes that the permanent nuisance and strict liability claims accrued on the date of the last tortious disposal and these claims are therefore barred by the statute of limitations, the Court grants summary judgment on these claims.  Because the Court concludes that the statutory continuing strict liability claim also accrued on the date of the last tortious disposal, the Court grants summary judgment on this claim.

However, because the Court concludes that there is a genuine dispute over whether the alleged nuisance caused by the dumping of mercury is readily abatable,

the Court denies summary judgment on the continuing nuisance claim and the common law continuing strict liability claim.

## I.   PROCEDURAL HISTORY

On March 5, 2018, Kenneth F. Wyman, Jr. and F/V Megan K II LLC (collectively Mr. Wyman) filed a complaint against United States Surgical Corporation and its wholly owned subsidiary Mallinckrodt US LLC (collectively Mallinckrodt). *Compl.* (ECF No. 1); *Mallinckrodt US LLC's Corporate Disclosure Statement* (ECF No. 13). On May 14, 2018, Mallinckrodt filed a partial motion to dismiss for failure to state a claim. *Defs.' Partial Mot. to Dismiss* (ECF No. 9). On May 30, 2018, Mr. Wyman filed a response to Mallinckrodt's motion to dismiss. *Pls.' Obj. to Defs.' Partial Mot. to Dismiss* (ECF No. 16). On June 13, 2018, Mallinckrodt filed a reply to Mr. Wyman's objection. *Defs.' Reply in Supp. of Partial Mot. to Dismiss* (ECF No. 22).

On June 15, 2018, Mallinckrodt answered the Complaint, *Defs.' Joint Answer and Affirmative Defenses* (ECF No. 23), and on June 27, 2018, Mr. Wyman moved to amend the Complaint. *Pls.' Mot. to Amend Compl. (Corrected)* (ECF No. 25). On July 23, 2018, a Magistrate Judge granted Mr. Wyman's motion to amend without objection, *Order Granting Without Obj. Mot. to Amend* (ECF No. 30), and Mr. Wyman filed his amended complaint that same day. *First Am. Compl.* (ECF No. 31). On August 6, 2018, Mallinckrodt answered the First Amended Complaint. *Defs.' Joint Answer to First Am. Compl. and Affirmative Defenses* (ECF No. 37). On March 6,

2019, the Court denied Mallinckrodt's Partial Motion to Dismiss.  *Order Denying Defs.' Partial Mot. to Dismiss* (ECF No. 50).

On March 7, 2019, Mr. Wyman filed a motion for partial summary judgment, *Pls.' Mot. in Supp. of Mot. for Partial Summ. J. on Liability and Causation for Counts I-II and III-IV* (ECF No. 52), and a statement of material facts.  *Pls.' Statement of Material Facts as to Which There Is No Genuine Dispute* (ECF No. 54) (PSMF).  On April 26, 2019, Mallinckrodt filed a response to Mr. Wyman's motion for partial summary judgment, *Defs.' Opp'n to Pls.' Mot. for Partial Summ. J.* (ECF No. 66), a response to Mr. Wyman's statement of material facts, and a statement of additional material facts.  *Defs.' Opposing Statement of Material Facts and Statement of Additional Material Facts* (ECF No. 67) (for Mallinckrodt's opposing statement of material facts, DRPSMF; for Mallinckrodt's statement of additional material facts, DSAMF).  On June 7, 2019, Mr. Wyman filed a reply to Mallinckrodt's response, *Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for Partial Summ. J.* (ECF No. 74), and a response to Mallinckrodt's statement of additional material facts.  *Pls.' Resp. to Defs.' Statement of Additional Material Facts* (ECF No. 75).  On October 16, 2019, Mr. Wyman filed an amended reply to Mallinckrodt's statement of additional material facts.  *Pls.' Am. Resps. to Defs.' Statement of Additional Material Facts* (ECF No. 89) (PRDSAMF).

Also, on April 26, 2019, Mallinckrodt filed three additional documents: a motion pursuant to Federal Rule of Civil Procedure 56(d) to defer or deny summary judgment, *Defs.' Rule 56(d) Mot. to Deny or Defer Pls.' Mot. for Partial Summ. J.* (ECF

No. 63); a cross-motion for partial summary judgment, *Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 64) (*Defs.' Mot.*); and a statement of material facts in support of its cross-motion for partial summary judgment. *Statement of Material Facts in Supp. of Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 65) (DSMF).  On June 7, 2019, Mr. Wyman filed three documents: an opposition to Mallinckrodt's Rule 56(d) motion, *Pls.' Opp'n to Defs.' Rule 56(d) Mot.* (ECF No. 70); an opposition to Mallinckrodt's cross-motion for partial summary judgment, *Pls.' Opp'n to Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 71) (*Pls.' Opp'n*); and a response to Mallinckrodts' statement of material facts with additional material facts.  *Pls.' Opposing Statement of Material Facts and Statement of Additional Material Facts in Opp'n to Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 72) (for Mr. Wyman's opposing statement of material facts, PRDSMF; for Mr. Wyman's statement of additional material facts, PSAMF).

On July 12, 2019, Mallinckrodt filed a reply to Mr. Wyman's response to its Rule 56(d) motion.  *Reply in Supp. of Defs.' Rule 56(d) Mot.* (ECF No. 83).  Also, on that date, Mallinckrodt filed a reply to Mr. Wyman's response to its cross-motion for partial summary judgment, *Reply in Supp. of Defs.' Cross-Mot. for Partial Summ. J.* (ECF No. 81) (*Defs.' Reply*), and a reply to Mr. Wyman's statement of additional material facts (DRPSAMF).  *Defs.' Reply Statement of Material Facts in Supp. of Cross-Mot. for Partial Summ. J.* (ECF No. 82) (DRPSAMF).

On July 21, 2019, Mr. Wyman filed an unopposed motion for oral argument on the pending motions, *Pls. Mot. for Oral Arg. on Pending Mots.* (ECF No. 84); *Defs.' Resp. to Pls.' Mot. for Oral Arg. On Pending Mots.* (ECF No. 86), which the Court

granted on July 24, 2019.  *Order Granting Mot. for Oral Arg./Hr'g* (ECF No. 87).  The Court held oral argument on February 19, 2019.  *Min. Entry for Proceedings Held Before Judge John A. Woodcock, Jr.* (ECF No. 94).  On April 21, 2020, the Court issued an order denying Mr. Wyman's motion for partial summary judgment and dismissing as moot Mallinckrodt's Rule 56(d) motion.  *Order on Pls.' Mot. for Partial Summ. J.* (ECF No. 96).

## II.   FACTUAL BACKGROUND[1]

### A.   Kenneth F. Wyman, Jr. and Mercury Discharges into the Penobscot River

Mr. Wyman has held a commercial fishing license since 1987, which has authorized him to harvest lobster and crabs from Lobster Management Zones C and D.  DSMF ¶¶ 1-2; PRDSMF ¶¶ 1-2.  Although Lobster Management Zones were not established until 1997, Mr. Wyman has always fished for lobster and crabs in what are now Zones C and D.   DSMF ¶ 3; PRDSMF ¶ 3.   Mr. Wyman alleges that Mallinckrodt is responsible for mercury discharges between December of 1967 and April of 1982 from a chlor-alkali facility in Orrington, Maine (the Orrington Plant).  DSMF ¶ 4; PRDSMF ¶ 4.  In 1970, the United States Government sued the owners and operators of the Orrington Plant (Mallinckrodt's Predecessors); the case was resolved by a 1972 consent decree between the United States Government and Mallinckrodt's Predecessors authorizing some limited discharge of mercury into the

---

[1]      The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . .."  *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

Penobscot River.  DSMF ¶¶ 5-6; PRDSMF ¶¶ 5-6.  In August of 1973, the United States Environmental Protection Agency issued a discharge permit to Mallinckrodt's Predecessors.  DSMF ¶ 7; PRDSMF ¶ 7.

### B.   The Maine People's Alliance Lawsuit

In 2000, the Natural Resources Defense Council, Inc. and the Maine People's Alliance filed a citizen suit with docket number 1:00-cv-00069-JAW against Mallinckrodt Inc. under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B), in the United States District Court for the District of Maine (Federal RCRA Case).  DSMF ¶ 8; PRDSMF ¶ 8.  Mallinckrodt Inc. was found liable under the RCRA in 2002 for mercury discharges at the Orrington Plant from December 9, 1967, until April 30, 1982.  DSMF ¶ 9; PRDSMF ¶ 9.  During the liability phase of the Federal RCRA Case, several individuals testified that "they do not eat fish or shellfish from the Penobscot River or Bay because they are concerned that the fish have dangerous levels of mercury that may harm their health."[2]  DSMF ¶ 10; PRDSMF ¶ 10.  In that case, the Court found that individuals who lived on or near the Penobscot River had suffered injuries fairly traceable to the mercury discharged

---

[2]      In support of this paragraph, Mallinckrodt quotes Judge Gene Carter's opinion, *Maine People's Alliance v. HoltraChem Mfg. Co.*, 211 F. Supp. 2d 237, 253 (D. Me. 2002).  DSMF ¶ 10.  Mr. Wyman admits that Mallinckrodt accurately quoted Judge Carter's opinion, but he interposed a qualified response, stating that "such findings are irrelevant to this case because they describe harm to the public at large."  PRDSMF ¶ 10.  The Court regards this qualification as argument outside the scope of the facts asserted in the statement and the Court disregards it as violative of District of Maine Local Rule 56(c).  *See Michaud v. Calais Reg'l Hosp.*, No. 1:15-cv-359-NT, 2017 WL 902133, at *1 n.1 (D. Me. Mar. 7, 2017) (noting that "qualifications" that exceed the scope of the original statement are appropriately presented as additional facts, rather than qualifications).

Furthermore, Mr. Wyman's qualified response contradicts his legal position that the statute of limitations on the nuisance claim did not begin to run until the permanency of the nuisance would have become known to the reasonable person.  *Pls.' Opp'n* at 12-13.  When the public at large would have become concerned about the mercury levels of the fish in the Penobscot River is relevant to this legal issue.  The Court declines to accept Mr. Wyman's qualified response.

from the Orrington Plant.[3]  DSMF ¶ 11; PRDSMF ¶ 11.  The Court also found that one witness' injury included disruptions of her plans to harvest blue mussels to supplement her income and diet.[4]  DSMF ¶ 12; PRDSMF ¶ 12.

In November of 2003, the Court appointed a study panel (Study Panel) to conduct the Penobscot River Mercury Study (PRMS), a two-phase study of mercury in the Penobscot River.  DSMF ¶ 13; PRDSMF ¶ 13; PSAMF ¶ 1; DRPSAMF ¶ 1.  The Study Panel's original charge included investigation into whether it was feasible to remediate the harm caused by mercury contamination in the Penobscot River and Bay system south of the Orrington Plant.  DSMF ¶ 14; PRDSMF ¶ 14.  In January of 2008, the Court ordered the Study Panel to proceed to its second phase (Phase II Study) to address whether it was necessary and feasible to ameliorate mercury and the methylation of mercury in the Penobscot River by means that would likely exceed the benefits of allowing the natural attenuation processes of the river to continue and, if so, what reasonable human processes would accomplish that end.  DSMF ¶ 15; PRDSMF ¶ 15.  However, at the conclusion of the Phase II Study, the feasibility of ameliorating mercury contamination in the Penobscot River and Bay remained an open question and the Court ordered that an engineering firm be appointed to investigate the feasibility of potential remedies to the mercury contamination.  DSMF ¶¶ 16-17; PRDSMF ¶¶ 16-17.

---

[3]    In attempting to qualify paragraph 11 of Mallinckrodt's statement of material facts, Mr. Wyman refers to his qualification of Mallinckrodt's paragraph 10.  PRDSMF ¶ 11.  The Court disregards this qualification for the reasons expressed in footnote 2, supra.

[4]    In attempting to qualify Mallinckrodt's paragraph 12, Mr. Wyman refers to his qualification of paragraph 10 of Mallinckrodt's statement of material facts.  PRDSMF ¶ 12.  The Court disregards this qualification for the reasons expressed in footnote 2, supra.

### C.     The Maine Department of Marine Resources' Closure Orders

Upon receiving the Phase II Study, the Maine Department of Marine Resources (Maine DMR) reviewed the data concerning mercury levels in lobsters and crabs, which indicated that these levels might be above the Maine Center for Disease Control's (Maine CDC) advisory Fish Tissue Action Levels (FTALs), warranting a consumption advisory for sensitive populations.[5]  PSAMF ¶ 2; DRPSAMF ¶ 2.  The Maine DMR then requested analysis of this data by the state toxicologist.  PSAMF ¶ 3; DRPSAMF ¶ 3; PSMF ¶ 74; DRPSMF ¶ 74.  Based on this analysis, the Maine DMR closed the area from Wilson Point to the Fort Point Lighthouse on Cape Jellison to lobster and crab fishing to protect the public health due to the risk of mercury contamination in lobsters and crabs.[6]  PSAMF ¶ 4; DRPSAMF ¶ 4; PSMF ¶ 75;

---

[5]     Paragraph 2 of Mr. Wyman's statement of additional material facts reads:
        Upon receipt of the [Penobscot River Mercury Study], the Maine [DMR] reviewed the data concerning mercury levels in lobsters and crabs indicating that they may have levels that exceed the Maine [CDC] Fish Tissue Action Levels warranting a consumption advisory for sensitive populations.
PSAMF ¶ 2.
        Mallinckrodt qualifies its response to this paragraph, pointing out that the Maine DMR only found a consumption advisory warranted for the most sensitive populations and that the FTAL is only "a guide and does not automatically trigger a consumption advisory or other action."  DRPSAMF ¶ 2; DRPSMF ¶ 73.  The Court reviewed Mallinckrodt's qualification about sensitive populations and rejects it because additional paragraph two states that the Maine DMR action warranted "a consumption advisory for sensitive populations."  PSAMF ¶ 2.  This language is consistent with the Maine Bureau of Health, Derivation of Action Levels for Setting Consumption Fish Consumption (updated 2/20/01), which Mr. Wyman cites in support of his assertion.  The Court does, however, add the word "advisory" in its description of the FTAL in response to Mallinckrodt's qualification.
        Mallinckrodt also objected, asserting numerous additional facts.  DRPSAMF ¶ 2.  The Court regards the remainder of this qualification as argument outside the scope of the facts asserted in the statement and disregards it for the reasons expressed in footnote 2, supra.
[6]     Mallinckrodt attempts to qualify additional paragraph 4, asserting that protection of public health was only one of Maine DMR's reasons for closing this area and denying that consumption of lobster or crab from the closed area posed an actual public health risk.  DRPSAMF ¶ 4; DRPSMF ¶ 75.  The Maine DMR's Basis Statement reads: "The Commissioner adopts this emergency rulemaking in order to protect public health due to the risk of mercury contamination in lobsters and crabs found in the mouth of the Penobscot River . . .."  PSAMF ¶ 4; PSMF ¶ 75; *Ex. 19*, Attach. 9, *Ex. 28: Notice of Rulemaking Adoption for the First Closure, Dated Feb. 22, 2014 (Emergency Rule)* at 6 (*Maine DMR Basis Statement*).  This language supports paragraph 75 of Mr. Wyman's statement of material facts

DRPSMF ¶ 75.  This closure first occurred on February 22, 2014, and the Maine DMR

made the closure permanent on May 19, 2014.  PSAMF ¶ 4; DRPSMF ¶ 4.

### D.     The Closure Orders and Kenneth F. Wyman, Jr.

After this closure, the Maine DMR sent a letter to Mr. Wyman as a lobster

license holder due to his proximity to the closed area which stated that the closure

would have "a significant impact to the fishermen who fished this area" and that

"their sacrifice would benefit the entire fishery by protecting the brand of Maine

lobster."[7]  PSAMF ¶ 5; DRPSMF ¶ 5; PSMF ¶ 81; DRPSMF ¶ 81; *Ex. 31: Letter from*

*MDMR Commissioner Keliher Dated March 4, 2014* at 3 (ECF No. 59) (*Keliher Letter*).

Additionally, the Maine DMR and Maine CDC initiated a two-year independent

sampling study to confirm the results of the Phase II Study; one year of the results

from this study are contained in the 2014 Sampling Report.[8]  PSAMF ¶ 6; DRPSAMF

---

and paragraph 4 of his statement of additional material facts and the Court rejects Mallinckrodt's
qualified response.

The Court regards Mallinckrodt's denial of an actual public health risk qualification as
argument outside the scope of the facts asserted in the statement and disregards it for the reasons
expressed in footnote 2, supra.

[7]     Paragraph 5 of Mr. Wyman's statement of additional material facts reads:

After the first closure, MDMR sent a letter, dated March 4, 2014, to Plaintiff Kenneth
Wyman acknowledging that the closure would have a "significant impact" on him
because of his harvesting in the closed area, that he would likely suffer harm from the
closure and that his "sacrifice" would benefit the entire fishery.

PSAMF ¶ 5 (citing PSMF ¶ 81).

Mallinckrodt interposed a qualified response to additional paragraph 5, contending that the
letter Mr. Wyman references made no conclusions about him individually and was sent to him only
because of his proximity to the closed area.  DRPSMF ¶ 5.  Additionally, Mallinckrodt points out that
the letter does not state that fishermen would likely suffer from the closure.  DRPSMF ¶ 81.

The Court reviewed the cited portions of the record and agrees in part with Mallinckrodt.  The
Court alters additional paragraph 5 to accurately reflect the content of the Keliher Letter.

The Court regards Mallinckrodt's denial that the letter provides a complete and accurate
statement of the reasons for the closure as argument outside the scope of the facts asserted in the
statement and disregards it for the reasons expressed in footnote 2, supra.

[8]     Mallinckrodt attempts to qualify additional paragraph 6, arguing that the 2014 Sampling
Report contains only one year of results, and denying any meaning that the word "independent" was

¶ 6; PSMF ¶ 82; DRPSMF ¶ 82.  Based on the 2014 Sampling Report, the Maine DMR

expanded the closure to include the fishing grounds Mr. Wyman used to harvest

lobster and crabs (the 2016 Closed Area), first on an emergency basis on June 21,

2016, and then on a permanent basis on November 15, 2016.[9]  PSAMF ¶ 7; DRPSAMF

¶ 7.  Mr. Wyman has suffered special injury as a result of the two closures.[10]  PSAMF

¶ 8; DRPSAMF ¶ 8.  Prior to the two fishing ground closures by the Maine DMR, the

mercury contamination in the Penobscot estuary did not affect Mr. Wyman's business

in any way.[11]  PSAMF ¶ 9; DRPSAMF ¶ 9.  From 1987 until the first closure in 2014,

---

meant to convey in Mr. Wyman's statement other than that the 2014 Sampling Study was separate from the Study Panel.  DRPSMF ¶ 6.

     Regarding the first qualified response in which Mallinckrodt asserts that the Maine DMR and CDC studies were only for one year, the Court agrees with Mallinckrodt that although the Maine DMR and CDC commissioned a two-year study, the May 2, 2016, report attached as Exhibit 33 analyzes data only from the first year of the study.  The Court clarifies this point.

     The Court views the term "independent" as referring to the state of Maine's decision to conduct its own separate study outside this ongoing litigation, thus in this context independent means state generated and administered.  The Court overrules Mallinckrodt's qualification to the term "independent."

[9]    Mallinckrodt attempts to qualify paragraph 7 of Mr. Wyman's statement of additional material facts by pointing out that the sole reason for the expanded closure was not the 2014 Sampling Report. DRPSAMF ¶ 7; DRPSMF ¶ 84.  The Court reviewed the Maine DMR "Basis Statement" for its June 21, 2016, rulemaking in which it expanded the closure area.  *Ex. 31*, Attach. 4, *Ex. 35*, *Notice of Rulemaking for the Second Closure, Dated June 21, 2016 (Emergency Rule)* at 6 (ECF No. 59).  The Maine DMR writes: "The justification for the expanded boundary of the closed area is based on recent data collected by the Department that shows lobsters in this area may have mercury levels above the Maine Center for Disease Control and Prevention (MECDC) action level."  *Id.*  Mallinckrodt's objection may seem obvious, namely that the Maine DMR took into account more than just its own study. However, as the Maine DMR itself described the recent data as the basis for its rulemaking, the Court rejects Mallinckrodt's qualified response.  If Mallinckrodt wished to place additional facts before the Court on this issue, it was free to do so in its statements of fact.

[10]    Mallinckrodt denies additional paragraph 8.  DRPSAMF ¶ 8; DRPSMF ¶¶ 90-102.  The Court reviewed the cited portions of the record and, for the purposes of resolving this partial summary judgment motion in which Mr. Wyman is the non-movant, disregards Mallinckrodt's denial.  Mr. Wyman has set forth ways in which he believes he has suffered special injury, and these instances of special injury—though they may or may not affect the statute of limitations inquiry—have record support.  PSMF ¶¶ 90-102.  In the context of Mallinckrodt's motion for summary judgment, the Court must view disputed facts in the light most favorable to Mr. Wyman.

[11]    Mallinckrodt denies additional paragraph 9.  DRPSAMF ¶ 9; DRPSMF ¶ 89.  The Court reviewed the cited portions of the record and finds paragraph 9 is consistent with the cited record support.  For the purposes of resolving this partial summary judgment motion in which Mr. Wyman is the non-movant, the Court disregards Mallinckrodt's denial.

Mr. Wyman never had any concern about contamination of lobster or crab he harvested, and none of his retail or wholesale customers ever expressed such a concern to him.[12]  PSAMF ¶ 10; DRPSAMF ¶ 10.  Similarly, no retail customer ever declined to purchase crab or lobster from Mr. Wyman because of concerns about mercury contamination in the Penobscot River estuary, and no wholesaler or other commercial purchaser ever declined to purchase or lowered the price for purchase of Mr. Wyman's harvest because of such mercury contamination.[13]  PSAMF ¶¶ 11-12; DRPSAMF ¶¶ 11-12.  There has never been a single lobster or crab Mr. Wyman harvested that he could not sell because of concerns related to mercury contamination.[14]  PSAMF ¶ 13, DRPSAMF ¶ 13.

### E.    The AMEC Report and Recommendations

In January of 2016, the Court selected Amec Foster Wheeler Environment & Infrastructure, Inc. (Amec) to perform an evaluation of potential active remedies to speed the recovery of the Penobscot River estuary from its state of mercury contamination.  DSMF ¶ 18; PRDSMF ¶ 18.  In September of 2018, Amec submitted

---

[12]    Mallinckrodt attempts to qualify paragraph 10 of Mr. Wyman's statement of additional material facts by stating that it is irrelevant, misleading, and prejudicial.  DRPSAMF ¶ 10.  The Court regards Mallinckrodt's qualification as argument outside the scope of the facts asserted in the statement and disregards it for the reasons expressed in footnote 2, supra.

[13]    Mallinckrodt attempts to qualify paragraphs 11 and 12 of Mr. Wyman's statement of additional material facts by stating that they are irrelevant, misleading, and prejudicial.  DRPSAMF ¶¶ 11-12.  The Court regards Mallinckrodt's qualification as argument outside the scope of the facts asserted in the statement and disregards it for the reasons expressed in footnote 2, supra.

As a note, there is no paragraph 12 in Mr. Wyman's statement of additional material facts. The Court adjusts the last two numbers in Mr. Wyman's statement of additional material facts from 13 and 14 to 12 and 13 to be sequential and match those in Mallinckrodt's response to Mr. Wyman's statement of additional material facts.

[14]    Mallinckrodt attempts to qualify paragraph 14 of Mr. Wyman's statement of additional material facts by stating that it is irrelevant, misleading, and prejudicial.  DRPSAMF ¶ 13.  The Court regards Mallinckrodt's qualification as argument outside the scope of the facts asserted in the statement and disregards it for the reasons expressed in footnote 2, supra.

its Phase III Engineering Study Report (the Phase III Report), which contained the conclusions of its evaluation.  DSMF ¶ 19; PRDSMF ¶ 19.

In its Phase III Report, Amec did not recommend system-wide dredging because it would take decades to implement, would destroy habitat, had the potential for increased mercury uptake in biota during and after dredging, and would be particularly expensive, costing approximately $5,544,190,000.[15]   DSMF ¶¶ 22-23; PRDSMF ¶¶ 22-23.

Additionally, Amec did not recommend enhanced monitored natural attenuation to a sediment concentration of 300 nanograms per gram because of "uncertainty as to how this remedial alternative would be applied system-wide and the potential for negative effects from its application."  DSMF ¶ 24 (quoting *Phase III Report* at 8-4); PRDSMF ¶ 24.  Enhanced monitored natural attenuation is innovative and has not been demonstrated on field scale for open systems such as estuaries, and therefore system-wide application of this alternative would require extensive pre-

---

[15]     Paragraph 20 of Mallinckrodt's statement of material facts reads: "Amec concluded that even the most aggressive remedial alternatives evaluated would not lower mercury concentrations in lobster tissue in the 2016 Closed Area below the Maine Center for Disease Control and Prevention's (Maine CDC) Fish Tissue Action Level (FTAL)."  DSMF ¶ 20.  Paragraph 21 reads: "The alternatives which Amec concluded would get closest to this level were system-wide dredging to a system-wide sediment mercury concentration goal [of] 300 nanograms per gram and enhanced monitored natural attenuation to a system-wide sediment mercury concentration goal of 300 nanograms per gram." DSMF ¶ 21.  In support of both paragraphs, Mallinckrodt cites page 6-4 of the Phase III Report.  DSMF ¶ 21 (citing *Phase III Engineering Study Report* at 6-4, *Me. People's Alliance v. Holtrachem Mfg. Co.* (No. 1:00-cv-00069-JAW), ECF No. 972 (*Phase III Report*)).  Mr. Wyman denies paragraph 20, arguing that the "referenced portion of the Phase III Report does not support the asserted fact."  PRDSMF ¶ 20.

Mallinckrodt's proposed paragraphs 20 and 21 are extrapolations from the Phase III Report. This is an exceedingly complex area and although it may turn out that Mallinckrodt is correct, the Court is required to view contested facts in the light most favorable to Mr. Wyman and therefore declines to include Mallinckrodt's paragraphs 20 and 21 in the statement of uncontested material facts.

design modeling to determine the implementation strategy.  DSMF ¶ 24; PRDSMF ¶ 24.  Furthermore, there is the concern that added material might deposit in unintended areas such as in shipping channels, adversely impacting navigation.  DSMF ¶ 24; PRDSMF ¶ 24.  Also, permits for this alternative could be difficult to obtain due to the increased turbidity and particulate load that would result from material additions which could affect biota.  DSMF ¶ 24; PRDSMF ¶ 24.

Amec concluded that remediation at or below background mercury concentrations "would be technically impractical."  DSMF ¶ 25 (quoting *Phase III Study* at 6-3); PRDSMF ¶ 25.  Amec further found that the concentration of particulate mercury from samples at the former Veazie Dam averaged 217.5 nanograms per gram.[16]  DSMF ¶ 26; PRDSMF ¶ 26.  Stacy Ladner, a former head of the Maine Department of Environmental Protection's licensing unit for the hazardous waste program, testified that background mercury concentration in the Penobscot River is approximately 290 nanograms per gram.[17]  DSMF ¶ 27; PRDSMF ¶ 27.

In its Phase III Report, Amec recommended a combination of remedial alternatives which it estimated would cost between $246,068,000 and $333,376,000

---

[16]    Mr. Wyman denies paragraph 26 of Mallinckrodt's statement of material facts because "[t]he referenced table does not contain averages."  PRDSMF ¶ 26.  The Court reviewed the cited portion of the record and rejects Mr. Wyman's denial.  Though the cited table of the 2017 Sediment and Water Quality Monitoring Report does not contain an average, the average is easily calculable based on the information on that page.  *2017 Sediment and Water Quality Monitoring Report* at Table 3-3, *Me. People's All. v. Holtrachem Mfg. Co.* (No. 1:00-cv-00069-JAW), ECF No. 976.

[17]    Mr. Wyman attempts to qualify paragraph 27 of Mallinckrodt's statement of material facts, pointing out that Ms. Ladner "testified to what she 'believe[d]' to be the 'right number,' or 'something like that.'"  PRDSMF ¶ 27 (quoting DSMF, Attach. 2 at 34:06-12).  The Court reviewed the cited portion of the record and alters paragraph 27 to reflect that Ms. Ladner testified to an approximation.

to implement.  DSMF ¶ 28; PRDSMF ¶ 28.  Amec anticipated that system-wide recovery to a surface-weighted average concentration of 500 nanograms per gram in sediment would take an additional twenty-five years after completion of remedial work.  DSMF ¶ 29; PRDSMF ¶ 29.  Ecological recovery would take an unknown longer period after sediments reached their target concentrations.  DSMF ¶ 30; PRDSMF ¶ 30.

## III.   THE PARTIES' POSITIONS

### A.   Mallinckrodt's Cross-Motion for Partial Summary Judgment

Mallinckrodt asserts that the applicable statutes of limitations for Mr. Wyman's public nuisance and strict liability claims is Maine's general six-year statute of limitations for civil actions, 14 M.R.S. § 752, and states that "[s]tatutes of limitation . . . should be construed strictly in favor of the bar which it was intended to create . . .." *Defs.' Mot.* at 4-5 (quoting *Harkness v. Fitzgerald*, 1997 ME 207, ¶ 5, 701 A.2d 370).  Mallinckrodt outlines the legal standard for accrual in Maine and states that "[a] defendant should not be held liable in perpetuity for conditions that cannot reasonably be abated."  *Id.* at 5.  Mallinckrodt then argues that the statutes of limitation expired on Mr. Wyman's public nuisance and strict liability claims.

### 1.   The Statute of Limitations for Kenneth F. Wyman, Jr.'s Public Nuisance Claim Has Expired

Mallinckrodt details the Maine Supreme Judicial Court's (the Law Court) holding in *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504 (Me. 1996), a case in which "the plaintiffs claimed that contaminants dumped by the defendants' predecessors constituted a public nuisance," despite that dumping having ceased in 1978.  *Defs.'*

14

*Mot.* at 6.  Mallinckrodt contends that "[t]he Law Court held that, unless the plaintiffs could prove that the alleged nuisance was *continuing*, as opposed to *permanent*, the statute of limitations ran from the date the dumping ended and had expired." *Id.* (emphasis in original) (citing *Jacques*, 676 A.2d at 506).  Mallinckrodt further states that the Law Court "held that a continuing nuisance is one in which 'the thing that constitutes the nuisance is not of such a permanent nature that it cannot readily be removed and thus abated.'" *Id.* (quoting *Jacques*, 676 A.2d at 507).

Mallinckrodt cites caselaw from other states for the proposition that "Maine is far from alone in holding that a cause of action for permanent public nuisance accrues when the nuisance is created." *Id.* at 6-7.  Mallinckrodt argues that while "Maine's abatability test is more forgiving to plaintiffs than other jurisdictions which hold that the statute of limitations always begins to run at the last act of nuisance or trespass, irrespective of abatability," "where a nuisance is found to be permanent . . . the accrual inquiry in Maine does focus on the timing of Defendants' acts since the cause of action accrues when the nuisance arose." *Id.* at 7.  Therefore, in Mallinckrodt's view, Mr. Wyman's "public nuisance cause of action accrued in 1982—the date of [Mallinckrodt's P]redecessors' last mercury discharge—unless [Mr. Wyman] can prove that the nuisance can readily be removed and thus abated," and "[t]here is no genuine issue of material fact . . . that the nuisance cannot be readily removed and thus abated." *Id.* at 7-8.

Proving that the nuisance can be readily removed and thus abated is Mr. Wyman's burden, and "mere technological feasibility does not prove abatability." *Id.*

at 8.   According to Mallinckrodt, "[w]hile it arguably remains an open question whether the nuisance can be mitigated at extreme hardship and enormous expense, it is a matter of judicial record that it cannot be *readily* removed and that whatever happens mercury will remain in the system." *Id.* (emphasis in original).   Mallinckrodt then outlines some of the Study Panel's results which it says supports this conclusion. *Id.* at 8-9.

Mallinckrodt argues in the alternative that "[e]ven if the Court were to hold that accrual for a permanent nuisance occurs at the time it should reasonably have been discovered, as some courts have held, [Mr. Wyman's] claims are time-barred" because "[m]ercury contamination on the Penobscot has been a matter of public record since at least 1970, when the United States sued [Mallinckrodt's P]redecessors for mercury discharges from" the Orrington Plant, and therefore "[n]o reasonable finder of fact could conclude that Mr. Wyman should not reasonably have discovered mercury contamination until 2014." *Id.* at 10.   Additionally, "[e]ven if the Court were to hold that accrual for a permanent nuisance occurs at the time of the first injury, and not at the time the nuisance is completed, the statute of limitations would still have expired," as Judge Carter "found in 2002 that certain individuals had ceased eating fish or shellfish from the Penobscot River and Bay because they were concerned that the fish had dangerous  levels of mercury" and "[m]ere ignorance of a cause of action does not prevent the statute of limitations from running." *Id.* at 10-11 (quoting *Dugan v. Martel*, 588 A.2d 744, 746 (Me. 1991)).

### 2.   The Statute of Limitations for Kenneth F. Wyman, Jr.'s Strict Liability Claim Has Expired

Mallinckrodt avers that "[u]nder Maine law, strict liability causes of action accrue upon occurrence of the allegedly dangerous activity." *Id.* at 11 (citing *City of Bangor v. Citizen Commc'ns Co.*, No. Civ. 02-183-B-S, 2004 WL 1572612, at *8 (D. Me. Jul. 6, 2004), *recommended decision adopted by* 2004 WL 2823211 (D. Me. Oct. 14, 2004)).   Mallinckrodt describes the Magistrate Judge's thinking in *Citizen Communications*, stating that she "reasoned that strict liability differs from nuisance, in which the statute of limitations may be suspended if the nuisance could readily be removed but is not," though she "recognized that a conflicting line of authority applied the above-described abatability analysis to statute of limitations defenses to strict liability claims."   *Id.* at 12.   Mallinckrodt argues that "[t]his apparent conflict is immaterial here" as "the alleged nuisance is indisputably permanent," and so "the statute of limitations for the strict liability claims has expired . . .." *Id.*

### B.   Kenneth F. Wyman, Jr.'s Opposition

Mr. Wyman argues that his causes of action for nuisance and strict liability "did not accrue until [he] suffered 'special injury' and the earliest [he] suffered 'special injury' was the first closure in February 2014." *Pls.' Opp'n* at 1.  "Prior to that special injury," Mr. Wyman asserts, he "had no standing, no right or opportunity to bring the claims [he] now pursue[s]."   *Id.* at 1-2.   Additionally, Mr. Wyman argues that the feasibility of abating the mercury contamination in the Penobscot River is still an open question and until that "question is resolved, the statute of limitations should not run on claims of [Mr. Wyman] that sound in a continuing tort," *id.* at 2, and that

"the issue of abat[]ability is currently being litigated in the federal RCRA case, the outcome of which will resolve the nature of the continuing torts alleged in this case, rendering [Mallinckrodt's] call for dismissal premature." *Id.*

> ### 1. The Statute of Limitations on Kenneth F. Wyman, Jr.'s Nuisance and Strict Liability Claims Did Not Commence Running Until He Suffered Special Injury

Mr. Wyman states that "[t]he general test for determining when a cause of action accrues [for purposes of the Maine statute of limitations] is when the plaintiff received a judicially recognizable injury," *id.* at 4 (quoting *McLaughlin v. Superintending Sch. Comm. of Lincolnville*, 2003 ME 114 ¶ 22, 832 A.2d 782, 788), which he says means that "a statute of limitations does not commence against a party before they have standing to sue." *Id.* at 5. For Mr. Wyman "to have standing to bring a cause of action for public nuisance or strict liability [he] must have 'special injury.'" *Id.* at 6. Mr. Wyman says that Mallinckrodt concedes that special injury is an element of both causes of action, and therefore Mallinckrodt's arguments raise the question how Mallinckrodt "can possibly claim that [Mr. Wyman's] cause of action 'accrued' before [he] suffered special injury when that special injury is an essential element of the claim." *Id.* at 7.

Mr. Wyman argues that he does "have a special interest, apart from the public generally, to harvest lobsters and clams from the coastal waters of the State of Maine, embodied in [his] commercial fishing license," and that "[t]he two closures by [the Maine] DMR in 2014 and 2016 caused by Mallinckrodt's contamination of the Penobscot River estuary constituted a direct interference with that right . . .." *Id.*

Mr. Wyman says these closures are what provided him with standing, and therefore, in his view, the statute of limitations cannot have begun running until the closures occurred. *Id.* at 8.

Mr. Wyman contends Mallinckrodt's assertion "that the standard for determining when the statute of limitations commences for nuisance and strict liability claims 'differ[s] from the general tort principle that a cause of action accrues at the time a judicially cognizable injury is sustained' . . . is simply wrong and is not remotely supported by the cases" Mallinckrodt cites. *Id.* (quoting *Defs.' Mot.* at 5). Rather, Mr. Wyman says "[t]he 'general tort principle' [he] ask[s] the Court to apply is grounded in the specific language of 14 M.R.S.A. 752," and "[n]o court, state or federal, has the right to apply a different standard." *Id.* at 9.

### 2. Kenneth F. Wyman, Jr.'s Nuisance and Strict Liability Claims Are Not Time-Barred Because They Are Continuing Torts

Mr. Wyman states that "[u]nder the continuing tort doctrine, 'a new cause of action accrues each day the hazardous materials remain,'" *id.* (quoting *Jacques*, 676 A.2d at 506), and "[t]he focus of the continuing tort doctrine, as applied in Maine, is on the *effects* of the conduct of the tortfeasor, not the conduct itself, which may have ceased decades ago." *Id.* (emphasis in original). Mr. Wyman says he agrees with Mallinckrodt "that when a tortfeasor creates conditions that cannot be abated, the tort becomes permanent and the statute of limitations begins to run," but differs with Mallinckrodt on "the measure of how the issue of abat[]ability is determined." *Id.* at 10.

Mr. Wyman asserts that "[w]hether a condition is abatable is a question of fact." *Id.* (citing *Jacques*, 676 A.2d at 508).  He contends Mallinckrodt's argument "that the [Phase III Report] concludes that the mercury contamination cannot be 'reasonably abatable' and, therefore, the condition of the Penobscot River estuary should be considered permanent as of the time that" Mallinckrodt's mercury discharges ceased, *id.* (citing *Defs.' Mot.* at 8-11), "completely overlooks the fact that the issue of whether the mercury contamination can be abated and the extent of the abatement that is feasible and reasonable is subject to ongoing proceedings in the federal RCRA case . . .."  *Id.*  Therefore, in Mr. Wyman's view, "even under [Mallinckrodt's] standard, it would be premature for this Court to dismiss this case based on one piece of evidence in the federal RCRA case proceedings . . .."  *Id.* at 10-11.  Because of this, Mr. Wyman contends that "at a minimum, the Court should defer ruling on the statute of limitations argument . . . until the Phase III proceedings [in the Federal RCRA Case] are completed."  *Id.* at 11.

Additionally, Mr. Wyman says, "this Court does not need to wait to reject [Mallinckrodt's] abat[]ability argument" because "[h]ow the determination of a[bat]ability is made is a critical issue."  *Id.*  Mr. Wyman argues that he should have the ability to elect to treat the nuisance here as permanent or not.  *Id.* (citing *Spaulding v. Cameron*, 239 P.2d 625, 628 (Cal. 1952)).  Furthermore, Mr. Wyman says that "[t]he Law Court has not expressly decided 'what level of proof is necessary . . . to successfully argue that [conditions constituting a nuisance] are in fact abatable.'"  *Id.* at 12 (alterations in original) (quoting *Jacques*, 676 A.2d at 508 n.3).

20

Mr. Wyman contends that an order of remediation in the Federal RCRA Case leaves open the feasibility of abating the mercury contamination in the Penobscot River. *Id.* at 12-13. Mr. Wyman says that the standard adopted in Maryland, New Jersey, South Dakota, and Montana allows a claim for permanent nuisance to accrue on the date when the permanency of the condition giving rise to the nuisance would become clear to a reasonable person, and that the Law Court is likely to adopt this standard because it cites all of these cases in *Jacques* and because the standard "conforms to the core principle . . . that a plaintiff should have a reasonable time in which to vindicate his claim." *Id.*

### C. Mallinckrodt's Reply

Mallinckrodt asserts that Mr. Wyman's "Opposition . . . vacillates between acceptance of the inescapable conclusion that permanent nuisance claims accrue upon creation of the nuisance and urging the unsupported position that a public nuisance claim does not accrue until a plaintiff suffers special injury." *Defs.' Reply* at 1. In Mallinckrodt's view, "[n]ot a single Maine case supports the latter proposition, and it is directly at odds with authority from the Maine Supreme Judicial Court and this Court." *Id.* However, Mallinckrodt continues, even if Mr. Wyman is correct that his "nuisance and strict liability causes of action accrued when [he] suffered special injury, there is no genuine issue of material fact that [he] suffered such injury more than six years before [he] filed this action," and so the statute of limitations on his permanent public nuisance and strict liability claims have run. *Id.* According to Mallinckrodt, this leaves only Mr. Wyman's continuing nuisance and strict liability

claims, "which should be dismissed because there is no genuine issue of material fact that the alleged nuisance cannot be readily removed and thus abated." *Id.*

### 1.   Kenneth F. Wyman, Jr. Seems to Acknowledge that his Permanent Public Nuisance and Strict Liability Claims Accrued in 1982 at Latest

Mallinckrodt points out that "[a]fter arguing for five pages that there are no exceptions to the 'general' rule that tort accrual periods begin to run upon injury to the plaintiff, [Mr. Wyman] acknowledge[s] 'that when a tortfeasor creates conditions that cannot be abated, the tort becomes permanent and the statute of limitations begins to run." *Id.* at 2 (quoting *Pls.' Opp'n* at 10). Therefore, Mr. Wyman "apparently agree[s] with the central legal point in [Mallinckrodt's] cross-motion for summary judgment—that actions for permanent nuisance accrue when the tortfeasor creates the conditions complained of." *Id.* Mallinckrodt argues that in *Jacques*, the Law Court stated this directly. *Id.* (citing *Jacques*, 676 A.2d at 506).

Mallinckrodt states that Mr. Wyman "halfheartedly suggest[s] that the accrual period for public nuisance might be different than that for private nuisance," but that this view is erroneous because of *Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, (Cal. 1996), and *In re MTBE Products Liability Litigation*, 824 F. Supp. 2d 524 (S.D.N.Y. 2011), in which Mallinckrodt's proffered accrual theory was used in public nuisance cases, as well as *Jacques*, in which the Law Court did not specify whether it was dealing with a public or private nuisance but which involved contamination which the Maine Department of Environmental Protection "had described as 'dangerous to public health and in need of remediation.'" *Id.* at 2-3 (quoting *Jacques*,

676 A.2d at 506).  In Mallinckrodt's view, Mr. Wyman "do[es] not cite a single case holding that a claim for public nuisance does not accrue until the plaintiff suffers special injury."  *Id.* at 3.

Mallinckrodt characterizes Mr. Wyman as arguing "the mistaken position that the 'general' test for accrual of tort causes of action applies to permanent nuisances," contradicting his "apparent[]" concession at page ten of his opposition.  *Id.* at 4 (citing *Pls.' Opp'n* at 4-9).  Mallinckrodt says that Mr. Wyman's claims "are time-barred even if this general test applied to permanent nuisance claims," but it does not.  *Id.* Mallinckrodt points to Mr. Wyman's statement that "[t]he 'general tort principle' [he] ask[s] the Court to apply is grounded in the specific language of 14 M.R.S.A. 752," *id.* (quoting *Pls.' Opp'n* at 9), and states that Section 752 "neither states nor implies anything about when a cause of action accrues."  *Id.*  Rather, "the time of accrual depends on the cause of action being alleged."  *Id.* at 4-5 (quoting *Burke v. Hamilton Beach Div.*, 424 A.2d 145, 149 (Me. 1981), *overruled on other grounds by Adams v. Buffalo Forge Co.*, 443 A.2d 932 (Me. 1982)).  Mallinckrodt also states that Mr. Wyman "ignore[s] myriad circumstances under which the accrual analysis turns on the defendant's conduct, as opposed to the plaintiff's injury," including *Citizens Communications.  Id.* at 5-7 (citing 2004 WL 157212, at *8).

Additionally, Mallinckrodt discusses Mr. Wyman's application of the discovery rule to his case.  Mallinckrodt says that not all the cases Mr. Wyman cites as having adopted a discovery rule for public nuisance claims "stand for what [Mr. Wyman] say[s] they do" and that contrary to Mr. Wyman's assertions, *Jacques* did not cite all

these case and did not cite any of them for propositions related to the discovery rule. *Id.* at 7. Mallinckrodt argues that application of the discovery rule here is also "at odds with established Maine law . . .." *Id.* at 7-8. Furthermore, "the discovery rule would not save [Mr. Wyman's] claims" because he "should have known of the mercury contamination well before the 2014 closure," an argument which Mallinckrodt says Mr. Wyman did not rebut in his opposition. *Id.* at 8. Lastly, Mallinckrodt argues that the Court "should reject [Mr. Wyman's] argument that [his] claims are not stale" because of the ongoing effects of the mercury contamination on the Penobscot River because "[t]he duration of a tort's effects has no bearing on the running of the statute of limitations." *Id.*

### 2. The Statute of Limitations Has Run on Kenneth F. Wyman, Jr.'s Causes of Action Even If They Accrued upon the Occurrence of a Judicially Cognizable Injury[18]

Mallinckrodt argues that even if the Court were to conclude that Mr. Wyman's cause of action accrued upon his injury, his argument "fails because [he] suffered a judicially cognizable injury long before the first fishery closure in 2014." *Id.* at 9. It is "[t]he violation of a party's legal rights [that] constitutes judicially cognizable injury[,] even if certain other types of money damages or other harm have not yet occurred." *Id.* Therefore, in Mallinckrodt's view, Mr. Wyman "suffered a judicially cognizable injury no later than 1987, when [he] became licensed to fish in a

---

[18] Mallinckrodt makes clear that it makes this argument "in the alternative to [its] position that causes of action for permanent nuisance and strict liability caused by [Mallinckrodt's P]redecessors' mercury contamination accrued in 1982 and expired six years later." *Id.* at 10 n.3. Mallinckrodt states that "[w]hile this position may seem harsh, its alternative is absurd and even harsher," as if Mr. Wyman is correct that "a cause of action for permanent nuisance accrues each time plaintiffs first suffer special injury, [Mallinckrodt] would never have repose," despite the fact that "[a] defining characteristic of a permanent nuisance is that it cannot reasonably be abated." *Id.*

contaminated area" and "he suffered actual injury no later than 2002, when [the Court] issued findings regarding the diminished reputation of Penobscot seafood in the eyes of the public." *Id.* Mallinckrodt says that Mr. Wyman "seem[s] 'to confuse the concept of what constitutes an injury for purposes of the accrual of a cause of action with what constitutes damages resulting from that injury.'" *Id.* at 10 (quoting *Descoteau v. Analogic Corp.*, 696 F. Supp. 2d 138, 141 (D. Me. 2010)). "Once Mr. Wyman became a commercial fisherman, the mercury contamination itself constituted a violation of his rights for which at least nominal damage was implied and a cause of action accrued." *Id.* That Mr. Wyman's harm "might have been greater or more easily proven at a later time did not toll the statute of limitations," as "[a]n action in permanent nuisance or permanent strict liability would have entitled [him] to recover all prospective damages [he] could prove." *Id.* at 11.

Additionally, Mallinckrodt says, "[e]ven if the law did not recognize a judicially cognizable injury upon violation of a plaintiff's rights, the indisputable evidence establishes damage to the reputation of the Penobscot fishery well more than six years before [Mr. Wyman] brought [his] claim[s]." *Id.* at 12. "[T]he undisputed record evidence," in Mallinckrodt's view, shows that "the mercury contamination at issue had tarnished the reputation of seafood harvested in the Penobscot estuary by 2002 at the latest." *Id.* Despite Mr. Wyman's testimony that "he would not have fished the Penobscot River had he been aware of the mercury contamination," Mallinckrodt argues that "[t]he happenstance that Mr. Wyman did not become aware of the contamination until nearly 30 years after he began fishing the area does not control

25

the timing of accrual" because well-established Maine law makes clear that "judicially cognizable injury occurs as soon as a plaintiff's rights have been violated, regardless of whether he is aware of his injury or has suffered actual damages." *Id.* at 12-13.

### 3. There Is No Genuine Issue of Material Fact that the Alleged Nuisance Cannot Be Readily Removed and Thus Abated

Mallinckrodt asserts that Mr. Wyman's "continuing tort claim fails because there is no genuine issue of material fact that the alleged nuisance cannot be readily removed and thus abated." *Id.* at 13. In Mallinckrodt's view, Mr. Wyman "conflate[s] the abatability inquiry with the feasibility question at issue in the federal RCRA case," despite the fact that "these are distinct standards." *Id.* Mallinckrodt affirms that "[s]ince at least 1929, the Law Court's standard for designating a nuisance as continuing is that it can '*readily* be removed and thus abated.'" *Id.* (emphasis in original) (quoting *Caron v. Margolin*, 128 Me. 339, 147 A. 419, 420 (1929)). Mallinckrodt notes that "the word 'readily' appears nowhere in the Opposition," which instead focuses on "whether abatement of the alleged nuisance is *feasible*." *Id.* (citing *Pls.' Opp'n* at 2, 10, 12) (emphasis in original).

Mallinckrodt outlines caselaw from other states in which those courts "have held as a matter of law that pollution-related nuisances are permanent even though remediation is feasible or remains an open question." *Id.* at 13-14. Mallinckrodt contends that the Court should do the same here, as the fact that "feasibility of remediation remains an open question after more than 15 years of study and litigation establishes indisputably that the alleged nuisance cannot *readily* be

26

removed." *Id.* at 14 (emphasis in original).  Mallinckrodt adds, "[a]s a practical matter, [Mallinckrodt has] no discretion to abate the alleged nuisance" because the decision whether and how to remediate "is in the hands of the federal court and has been for nearly 20 years." *Id.* at 15.  Such remediation "would also be subject to extensive state or federal permitting requirements . . .." *Id.*  Therefore, "[w]hether 'readily' is interpreted to mean quickly and efficiently, on the one hand, or willingly, on the other, the alleged nuisance cannot be readily removed." *Id.*

### 4. Kenneth F. Wyman, Jr. May Not Elect Between Continuing and Permanent Tort When the Statute of Limitations on the Permanent Tort Claims Has Already Expired

Mallinckrodt frames Mr. Wyman's argument that he should be able to elect whether to pursue a continuing or permanent tort as an attempt "to make an end-run around [his] statute of limitations problem . . .." *Id.*  However, Mallinckrodt says, such an election "is appropriate only in cases where the continuing/permanent distinction is one of damages, not when it determines the statute of limitations." *Id.* at 15-16.  Mallinckrodt states that "[w]hile [Mr. Wyman] may plead permanent and continuing nuisance . . . that does not relieve [him] of the legal implications of the respective alternatives: if permanent, the statute of limitations began to run when the condition was created, and if continuing, [Mr. Wyman] must prove that the nuisance is abatable." *Id.* at 17.

### 5. At a Minimum, the Court Should Grant Summary Judgment on Kenneth F. Wyman, Jr.'s Permanent Nuisance and Strict Liability Claims

Mallinckrodt argues that even if the Court were to conclude "that there is a genuine issue of material fact as to whether the alleged nuisance can readily be removed and thus abated, there is no genuine issue of material fact that the statute of limitations has run on any claim for *permanent* nuisance." *Id.* (emphasis in original). Mallinckrodt states that Mr. Wyman "seem[s] to acknowledge this." *Id.* (citing *Pls.' Opp'n* at 10, 12-13). Therefore, "[a]t the very least, the Court should grant summary judgment to the extent [Mr. Wyman] claim[s] a permanent nuisance." *Id.*

## IV.   LEGAL STANDARD

A grant of summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

Once the moving party "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must show "'enough competent evidence' to enable a factfinder

to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), while disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation."  *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54).

When determining an issue of state law in the absence of controlling authority from that state's highest court, the Court "must make an 'informed prophecy' as to how the state's highest court . . . would rule if faced with the issue." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *Sanders v. Phoenix Ins. Co.*, 843 F.3d 37, 42 (1st Cir. 2016)).  In order to do so, the Court "may look to 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the [state's highest court] would decide the issue at hand.'"  *Id.* (quoting *N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 38 (1st Cir. 2001)).

## V.    DISCUSSION

Mr. Wyman is proceeding against Mallinckrodt on seven counts: (1) continuing public nuisance, (2) permanent public nuisance, (3) continuing tort-strict liability, (4) permanent strict liability, (5) continuing tort-negligence, (6) permanent negligence, and (7) punitive damages.[19]   *First Am. Compl.* ¶¶ 47-81.   Mallinckrodt seeks

---

[19]     Although not raised by Mallinckrodt, Count VII, the punitive damages count, is subject to dismissal because punitive damages "are not a separate cause of action but, rather, an element of

summary judgment on four of these counts: (1) the continuing public nuisance claim, (2) the permanent public nuisance claim, (3) the continuing tort-strict liability claim, and (4) the permanent strict liability claim. *Defs.' Mot.* at 1. The parties agree that the appropriate statute of limitations for these claims is 14 M.R.S. § 752. *See id.* at 5 (citing *Jacques*, 676 A.2d at 506; *Citizen Commc'ns*, 2004 WL 1572612, at *8); *Pls.' Opp'n* at 1. Section 752 states:

> All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards, except actions on a judgment or decree of any court of record of the United States, or of any state, or of a justice of the peace in this State, and except as otherwise specially provided.

14 M.R.S. § 752. Based on this language, the relevant questions are: (1) when claims for permanent nuisance and strict liability accrue; (2) whether there is a genuine dispute of material fact as to whether the mercury contamination of the 2016 Closed Area is readily abatable such that it constitutes a continuing nuisance; and (3) whether the continuing tort theory may be applied to common law or statutory strict liability claims and, if so, when  such claims accrue.

---

damages in, and thus wholly derivative of, [another underlying claim]." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007); *see also Redmond v. Yachting Sols., LLC*, No. 2:17-cv-292-GZS, 2018 U.S. Dist. LEXIS 31470, at *5 (D. Me. Feb. 27, 2018) ("It is well established that punitive damages 'do not constitute a separate cause of action, but instead form a *remedy* available for some tortious or otherwise lawful acts'") (quoting *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*. 234 F.3d 58, 64 (1st Cir. 2000)) (emphasis in *South Port*).

The Court raised this issue with counsel for Mr. Wyman at oral argument on February 19, 2020 and suggested that he might wish to dismiss the separate punitive damages count. *Tr. of Proceedings*, *Oral Argument* at 7:15-8:12 (ECF No. 95) (*Oral Arg. Tr.*). Since oral argument, the Court has received no dismissal of the punitive damages count and no reassertion of the claim for punitive damages as part of the damages claims in the other counts. The Court will refrain from dismissing Count VII for the time being, but ultimately, as the Court informed Mr. Wyman's counsel, Court VII as a standalone count is subject to dismissal.

### A.    Statutes of Limitations: An Overview

The courts of the state of Maine have long enforced statutes of limitations.  In 1897, the Maine Supreme Judicial Court wrote:

> After much and varying judicial exposition, statutes of limitation are now almost universally held to be statutes of repose, to be interpreted and applied to effect that purpose.  Any act or declaration interposed to defeat or postpone that effect is to be closely scrutinized.

*Johnston v. Hussey*, 89 Me. 488, 36 A. 993, 993 (1897); *see also Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 13, 765 A.2d 566 ("The purpose of the statute [of limitations], in general, is to provide eventual repose for potential defendants and to avoid the necessity of defending stale claims").  In enacting a statute of limitations, the Maine Legislature (Legislature) has sought "to reconcile the injured party's interest in compensation with the liable party's interest in a terminal date to litigation." *Pino v. Maplewood Packing Co.*, 375 A.2d 534, 537 (Me. 1977).  In *Myrick v. James*, 444 A.2d 987 (Me. 1982), the Law Court explained:

> First, parties injured by the actions of others must be afforded an opportunity to pursue their meritorious claims and seek relief in the courts.  On the other hand, potential defendants are entitled to eventual repose and to protection from being required to meet claims which could have been addressed more effectively if asserted more promptly.  Difficulties in defending stale claims are caused by faded memories, dead or otherwise unavailable witnesses, and lost or destroyed evidence.  Additionally, several courts have attributed to statutes of limitations the function of filtering out those claims which are spurious, inconsequential, and unfounded, because meritorious claims "are not usually allowed to remain neglected."  The intended effect, then, of statutes of limitations is to stimulate activity and to punish negligence and slumber.

*Id.* at 994 (internal citations omitted) (quoting *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1868)), *superseded by statute on other grounds by* P.L. 1985, ch. 804,

§§ 13, 22 (effective Aug. 1, 1988) (codified at 24 M.R.S. § 2902 (2011)), *as recognized in Choroszy v. Tso*, 647 A.2d 803, 807 (Me. 1994) and *Novak v. Mentor Worldwide LLC*, 287 F. Supp. 3d 85, 90 (D. Me. 2018).

The Law Court has stressed that "[i]n interpreting a statute, [the] single goal is to give effect to the Legislature's intent in enacting the statute." *Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 2019 ME 90, ¶ 20, 209 A.3d 116 (internal citation omitted). The Law Court has cautioned that it "construe[s] statutes of limitations narrowly." *Id.* ¶ 19 (quoting *White v. McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A.*, 2002 ME 160, ¶ 8, 809 A.2d 622).

The statutory structure of Maine's law on statutes of limitations starts with a general six-year statute of limitations, 14 M.R.S. § 752, the one typically applicable absent a separate specific provision and the one applicable to Mr. Wyman's claims. The Maine Legislature has altered this general statutory rule to address specific occupations or circumstances. *See*, *e.g*, 14 M.R.S. § 752-A (design professionals: four years from the date of discovery but no more than ten years after contract or services completion); 14 M.R.S. § 752-B (ski areas: two years after the cause of action accrues); 14 M.R.S. § 752-C (sexual acts towards minors: no limitation); 14 M.R.S. § 752-D (land surveyors: within four years after the negligence was discovered, but no more than ten years after contract or services completion); 14 M.R.S. § 753 (assault and battery, false imprisonment, and slander and libel: two years after the cause of action accrues); 14 M.R.S. § 753-B (attorneys: accrual from the date of malpractice, not the date of discovery, except for title opinions and the drafting of wills); 14 M.R.S. § 859

32

(fraud or fraudulent concealment: six years from discovery of cause of action); 24 M.R.S. § 2902 (health care providers and practitioners: three years from the date of malpractice, except for "foreign object" cases where the cause of action accrues at the date the patient discovers or reasonably should have discovered the harm). These statutory exceptions demonstrate that the Maine Legislature is aware of the impact of statutes of limitations on certain industries and professions and on certain potential plaintiffs and has tailored both the time within which claims must be brought and when claims accrue to fit circumstances not subject to the general rule.

In general, the Maine Supreme Judicial Court has resisted placing a judicial gloss on section 752 that would undercut the legislative judgment reflected in the statutory language. The First Circuit has written that "[d]epartures from Maine's date-of-injury rule are rare. They have involved careful balancing between competing interests of fairness and repose, and the opinions have not always been unanimous." *Erlich v. Ouellette, Labonte, Roberge & Allen, P.A.*, 637 F.3d 32, 37 (1st Cir. 2011). However, the Legislature and the Law Court have cracked open the limitations door and allowed some specific claims to commence from the date of discovery. In addition to a narrow set of statutory exceptions, the common law discovery rule is limited to "three discrete areas: legal malpractice, foreign object and negligent diagnosis medical malpractice, and asbestosis," *Novak*, 287 F. Supp. 3d at 90 (quoting *Johnston v. Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996)), as well as "circumstances where there is both (1) a fiduciary relationship between plaintiff and defendant and (2) the tort is virtually undiscoverable by the plaintiff, in the absence of an

independent investigation that would be destructive of the fiduciary relationship."
*Verizon New England, Inc. v. Fleet Elec. Servs., Inc.*, No. CV-04-646, 2006 WL
1990819, at *1 (Me. Super. Ct. June 2, 2006) (citing *Bangor Water Dist. v. Malcolm
Pirnie Eng'rs*, 534 A.2d 1326, 1328 (Me. 1988)); *see also In re George Parsons 1907
Tr.*, 2017 ME 188, ¶ 23, 170 A.3d 215 (same); *Erlich*, 637 F.3d at 36 (same) (citing
*Nevin*, 1999 ME 47, ¶ 25).

Mr. Wyman has not explicitly argued that the "discovery rule" should be
applied to his claims but did state his belief that Maine was likely to adopt a rule that
"a claim for permanent nuisance must be brought within the number of years
specified in the statute of limitation of the date when the permanency of the
conditions giving rise to a nuisance becomes manifest to a reasonably prudent
person." *Pls.' Opp'n* at 12-13 (alterations omitted) (quoting *Litz v. Md. Dep't of the
Env't*, 76 A.3d 1076, 1087 (Md. Ct. App. 2013)).  The Court regards this argument as
akin to seeking application of the discovery rule.

Mr. Wyman filed his lawsuit on March 5, 2018, *Compl.*, and Mallinckrodt's
Predecessor's last discharge from the Orrington Plant took place in April of 1982.
DSMF ¶ 4; PRDSMF ¶ 4.  Mr. Wyman therefore filed his lawsuit nearly thirty-six
years after Mallinckrodt's last discharge.  To avoid the six-year statute of limitations,
Mr. Wyman argues that his claims of nuisance and strict liability against
Mallinckrodt had not "accrued" until he "suffered 'special injury' and the earliest [he]
suffered 'special injury' was the first closure in February 2014." *Pls.' Opp'n* at 1.

Before February of 2014, Mr. Wyman says, he had "no standing, no right or opportunity to bring the claims [he] now pursue[s]." *Id.* at 1-2.

Section 752 does not define "accrues" and, in fact, the Maine Legislature has "never defined when a cause of action accrues under this statute but has left that determination to the Judicial Department." *Anderson v. Neal*, 428 A.2d 1189, 1190 (Me. 1981). "Maine courts generally consider an action accrued 'when a plaintiff received a judicially recognizable injury.'" *Erlich*, 637 F.3d at 35 (quoting *McLaughlin*, 2003 ME 114, ¶ 22). "In other words, it accrues at 'the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication.'" *McLaughlin*, 2003 ME 114, ¶ 22 (quoting *Williams v. Ford Motor Co.*, 342 A.2d 712, 714 (Me. 1981)). In *Burke*, the Law Court further explained that the "time of accrual depends on the precise substantive elements of each cause of action." 424 A.2d at 149. For a contract action, for example, "a cause of action accrues at the time of breach." *Id.* For a breach of warranty action, "the time of sale or delivery of the defective goods" is the date the statute of limitations begins to run. *Id.*

With this background, the Court turns to the date of accrual for the public nuisance and strict liability counts in this case.

## B.    Permanent Nuisance and Strict Liability

The first question—when the permanent nuisance and strict liability claims accrue—has the most clear-cut answer.   Consistent with the Law Court's directive in *Burke*, the analysis begins with "the precise substantive elements of" the

permanent nuisance and strict liability claims. *Burke*, 424 A.2d at 149. Addressing the nuisance claim first, it is important that Mr. Wyman is not claiming that Mallinckrodt has caused a private nuisance. *First Am. Compl.* ¶¶ 47-60 (Count I – Continuing Public Nuisance; Count II – Permanent Public Nuisance). Instead, Mr. Wyman is proceeding with the claim that Mallinckrodt created a public nuisance. *Id.*

In 1859, Justice Appleton of the Law Court discussed the concept of a public nuisance in *Brown v. Watson*, 47 Me. 161 (1859). In *Brown*, the "defendant obstructed the public highway, over which the plaintiff was passing, by felling trees across the same, so as to render it impassable. He thus caused a nuisance. . .." *Id.* at 162. Justice Appleton wrote:

> The law is well settled, that no person can maintain an action for a common nuisance, unless he has suffered therefrom some special and peculiar damages other and greater than those sustained by the public generally. Those, who have no occasion of business or pleasure to pass over a road thus obstructed, and who have not attempted it, cannot maintain an action for the obstruction thereon.

*Id.*; *see also* JACK H. SIMMONS, DONALD N. ZILLMAN & ROBERT H. FURBISH, MAINE TORT LAW § 14.03 (2018 ed.) ("Justice Appleton . . . got it just exactly right"). Thus, to maintain a claim of public nuisance, a plaintiff must demonstrate that the nuisance caused "special damages to him, not common to others . . .." *Cole v. Sprowl*, 35 Me. 161, 169 (1852).

With this concept in mind, the Court turns to the nub of the issue: when Mr. Wyman's permanent nuisance claim based on Mallinckrodt's discharge of mercury into the Penobscot River accrued or—more precisely in the context of this motion— whether there is a genuine issue of material fact as to when Mr. Wyman's claim of

permanent nuisance as a result of Mallinckrodt's discharge accrued.  On this issue, there is little, if any, disagreement on the facts.

The Law Court has ruled that the six-year statute of limitations of 14 M.R.S. § 752 applies to nuisance actions.  *See Perkins v. Town of Searsport*, 2001 ME 118, ¶ 1, n.1, 776 A.2d 1221 ("[T]he statute of limitations for . . . nuisance is six years" (quoting *Jacques*, 676 A.2d at 506)).  Applying the six-year statute of limitations, Mr. Wyman must demonstrate that his claim of permanent nuisance first accrued sometime after March 5, 2012.  Mr. Wyman points to the February 22, 2014, Maine DMR closure on his lobster-fishing grounds north of a line from Wilson Point to Fort Point Lighthouse, a closure that took place within the six-year statute of limitations. PSAMF ¶ 4; DRPSAMF ¶ 4.  Mr. Wyman also points out that he had fished for and sold lobster in the now closed area from 1987 until the first closure in 2014 without any concern about the lobsters or crabs being contaminated with mercury or any loss of business from the contamination.  PSAMF ¶¶ 9-13; DRPSAMF ¶¶ 9-13.  Yet, although not explicitly postulated by Mallinckrodt, the Court infers that the lobster and crab in the now-closed area were in fact contaminated with some degree of mercury from at least 1982 onward.[20]  *See* PSAMF ¶¶ 4, 9.  The facts establish that, even though Mr. Wyman (and others, including the Maine DMR) did not know that lobster and crab north of Wilson Point to Fort Point Lighthouse line had elevated levels of mercury, the lobsters and crabs did in fact have such elevated levels for the

---

[20]      At oral argument, Mallinckrodt agreed with the proposition that "at least from around 1982 onward the lobsters and crabs of the now closed area had some degree of elevated mercury due to the Mallinckrodt discharge," and Mr. Wyman stated that he did not "have any grounds to disagree with it . . .." *Oral Arg. Tr.* at 10:12-11:02 (ECF No. 95).

period from at least 1987 onward.  As a fisherman for lobster and crab with elevated mercury levels, Mr. Wyman had sustained special damage beyond what members of the general public had sustained in 1987 when he began fishing in that area.  *See Burgess v. M/V Tamano*, 370 F. Supp. 247, 250 (D. Me. 1973) (stating that the injury complained of by "commercial fishermen and clam diggers" had "resulted from defendants' alleged interference with their direct exercise of the public right to fish and to dig clams" (emphasis omitted)).  He just did not know it.

In this sense, Mr. Wyman's special damage is like the injury to the patients in the *Tantish v. Szendey*, 158 Me. 228, 182 A.2d 660 (1962), and *Myrick v. James* cases. These cases involved surgical procedures where a surgeon negligently left a foreign object in a patient's body during the surgery and the patient could not discover the existence of the foreign object until the statute of limitations had run.  The historical development of these Law Court cases is instructive.  Until 1982, the Maine courts held that the statute of limitations began running for foreign object cases at the time of the surgery.  Thus, when Marjorie Tantish filed suit in 1960 against her surgeon for leaving a tubing in her back during a 1956 surgery, the Maine Supreme Judicial Court held that her claim was barred by the two-year statute of limitations even though she was not aware of the foreign object until 1958.  *Tantish*, 158 Me. at 228-30.  Like Mr. Wyman, Ms. Tantish suffered an injury she was unaware of until she discovered it, but the statute of limitations barred her claim.

The Law Court judicially changed the accrual rule two decades later in *Myrick* to redefine the accrual date for foreign object plaintiffs from the date of the surgery

to the date the patient discovered the foreign object.  444 A.2d at 995-97.  But, as then-Justice Gene Carter explained, it did so because the "patient must repose great confidence and trust in her surgeon."  *Id.* at 997.  Thus, following its 1981 decision in *Anderson v. Neal*, where the Law Court applied the discovery rule to a claim of legal malpractice in which the attorney's negligence could not have been discovered at the time of the real estate transaction, the Maine Supreme Judicial Court recast the accrual date as the date of discovery for a limited set of claims involving a fiduciary-like relationship.[21]  But Mr. Wyman has not alleged nor could he allege that he enjoyed a fiduciary-like relationship with Mallinckrodt's Predecessors.  Thus, he cannot fit within the narrow band of cases where the Maine Supreme Judicial Court has adopted the discovery rule for purposes of the running of the statute of limitations.  Mr. Wyman, like Marjorie Tantish, sustained an injury but did not know it until the Maine statute of limitations had run.[22]

Moreover, Mr. Wyman conflates the "special damages" analysis—relevant to standing to sue on a public nuisance—with the altogether different legal question of claim accrual.  Mr. Wyman's argument is that an individual plaintiff's claim of permanent public nuisance does not accrue until that plaintiff suffers special

---

[21]    Effective in 1988, the Maine Legislature adopted the discovery rule announced in *Myrick* for foreign object medical malpractice cases.  *See* AN ACT RELATING TO MEDICAL AND LEGAL PROFESSIONAL LIABILITY, 1985 ME. LAWS 4273, § 13 (effective Aug. 1, 1988) (codified at 24 M.R.S. § 2902 (2011)).

[22]    For the discovery rule cases, the legal standard of the plaintiff's knowledge is high.  In *Anderson*, the Law Court stressed the client's "lack of means for discovery" of the existence of the unrevealed right of way, 428 A.2d at 1192, and in *Myrick*, the Law Court described the existence of the foreign object as "*unknown* and *unknowable*."  444 A.2d at 995 (emphasis in original).  In *Myrick*, the Maine Supreme Judicial Court established that the standard for knowledge on the part of the plaintiff in such cases is "when the plaintiff discovers, or in the exercise of reasonable care and diligence, should discover" the negligence.  444 A.2d at 996.  Whether Mr. Wyman could meet this standard in the facts of this case is another matter.

damages. *Pls.' Opp'n* at 6. However, in *Jacques*, a land purchaser of Lot B brought a lawsuit based on a nuisance theory against the prior owner when the purchaser discovered that the owner had dumped hazardous chemicals on the land. 676 A.2d at 505-06. The prior owner stopped all dumping as of 1978 and the purchaser bought the land in 1980. *Id.* Significantly, the *Jacques* Court wrote:

> Because it is undisputed that no dumping has occurred since 1978, the plaintiffs' claim may be maintained only if the materials on lot B constitute a continuing nuisance.

*Id.* at 506. This statement, although a dictum, strongly suggests that the Maine Supreme Judicial Court views the date of the last tortious act as the date of accrual for nuisance claims under 14 M.R.S. § 752. Otherwise, the plaintiffs' claim could have been maintained if they had demonstrated that they first suffered damages when they discovered the nuisance, not when it was created. If Mr. Wyman were correct that his cause of action did not accrue until he suffered special injury, the Law Court in *Jacques* would not have referenced 1978 in determining that a cause of action for permanent nuisance could not lie, 676 A.2d at 506, but rather 1980, when the plaintiffs in that case purchased the property, or some later date, when they sustained "special injury" by attempting to improve or sell the property and were unable to do so. Indeed, it is not clear even if Mr. Wyman disagrees with this proposition. *See Opp'n* at 10 (stating that "when a tortfeasor creates conditions that cannot be abated, the tort becomes permanent and the statute of limitations begins to run").

Mr. Wyman's accrual theory is also contradicted by *Dunelawn Owners' Association v. Gendreau*, 2000 ME 94, 750 A.2d 591.  In *Dunelawn*, the defendants built a condominium in the early 1980s and created an owners' association at the close of construction in 1984.  *Id.* ¶ 2.  Two of the plaintiffs purchased one unit of the condominium in 1985.  *Id.* ¶ 3.  In 1995, the plaintiff-owners of the unit suffered a fire due to allegedly negligently installed wiring in their home.  *Id.* ¶¶ 3-4.  The plaintiff-owners and the condominium's owners' association brought an insurance subrogation claim against the condominium's builder, alleging claims including negligence and strict liability.  *Id.* ¶ 4.  The *Dunelawn* Court ruled that the plaintiffs' common law and strict liability claims accrued at the time construction was completed in 1984 for the owners' association and at the time of purchase in 1985 in the case of the plaintiff-owners.  *Id.* ¶ 12.  *Dunelawn* was not a nuisance case; however, it is instructive here because it suggests that the accrual of a tort claim does not depend on the harm suffered by the plaintiff, but the timing of the defendant's breach of duty.  *See id.* (reasoning that the claims accrued at the time the defendant "breached a duty").

Assuming that a special damages-centered accrual regime applies to permanent nuisance claims, rather than the less forgiving regime implied by *Jacques*, *Dunelawn* would suggest that Mr. Wyman's permanent nuisance claim accrued at latest in 1987 when he began lobstering in the Penobscot Bay area that was closed to fishing by the Maine DMR in 2014 and his claim would still be foreclosed by the statute of limitations.  In fact, however, *Dunelawn* more likely suggests that Mr.

Wyman's claim for permanent nuisance accrued in 1982 when the mercury dumping ceased, not in 1987 when Mr. Wyman got a commercial fishing license and began fishing in the now-closed area. Mr. Wyman does not suggest that Mallinckrodt or its predecessors ever breached a duty to him specifically; the duty, if there was one, ran to the public or to lobster and crab fishermen as a group, *First Am. Compl.* ¶¶ 72-73, and so *Dunelawn* would suggest that any claims based on breach of that duty accrued at the time of last disposal.[23]

---

[23]    At oral argument, counsel for Mr. Wyman attempted to differentiate *Jacques* and *Dunelawn* by stating that in those cases, "the cause of action was held to exist at the time the conduct occurred." *Oral Arg. Tr.* at 12:16-13:08, 14:10-11. But as the Court pointed out, that is also true here. As Mr. Wyman agreed, *see* footnote 20, supra, the lobsters in the areas he was fishing were contaminated with mercury from at least 1982. Therefore, in 1987, when he began his career as a commercial fisherman, he had suffered an interference with his special interest in the fishery. Just as with the plaintiff in *Jacques*, the full impact of Mr. Wyman's damages may not have occurred until the closures, but that does not mean that the claim had not already accrued.

Mr. Wyman also attempts to differentiate *Jacques* on the grounds that that case deals with a private nuisance and the accrual regime is different for public nuisances. *Oral Arg. Tr.* at 14:16-25. But *Jacques* refers to "nuisance" generically in its discussion of the applicability of the statute of limitations, 676 A.2d at 506, and Mr. Wyman points to no public nuisance caselaw suggesting there is such a distinction. Rather, he points to *O'Brien v. Deutsche Bank National Trust Co.*, 948 F.3d 31 (1st Cir. 2020), a First Circuit case dealing with unfair and deceptive practices, for the proposition that "a cause of action accrues when 'the plaintiff can file suit and obtain relief.'" *Id.* at 32, 35 (quoting *Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 203 (1st Cir. 2015)). Mr. Wyman himself stated that he "wouldn't put much particular weight" on this case, which just states "the general rule . . .." *Oral Arg. Tr* at 15:19-16:04. He also cites *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), for the proposition that the Law Court has "said there is generally no cause of action in tort until a plaintiff has suffered an identifiable, compensable injury." *Tr. of Proceedings* at 16:18-21. However, the Law Court "has declined to extend the holding in *Bernier* beyond the asbestos realm," *Descoteau*, 696 F. Supp. 2d at 141, and so the Court is unable to do so here. Lastly, Mr. Wyman cites *Williams v. Ford Motor Company* for the proposition that accrual of a tort cause of action occurs at "[t]he point at which [a] wrongful act produces an injury for which [a] potential plaintiff is entitled to seek judicial [vindication]." *Oral Arg. Tr.* at 18:02-04, 19:07-09 (quoting *Williams*, 342 A.2d at 714). The Court does not regard *Williams* as inconsistent with its understanding of *Jacques* (which in any event is a later-decided case): Here, Mallinckrodt's disposal of mercury contaminated the Penobscot River estuary by 1982, and at that time, a potential plaintiff, such as a fisherman, *see Burgess*, 370 F. Supp. at 250, was entitled to seek a judicial remedy.

Mr. Wyman further argues that under Maine law, a plaintiff seeking to vindicate his or her public nuisance injury must "produce evidence that they have suffered a pecuniary loss injury to the person or property for which there are quantifiable damages." *Oral Arg. Tr.* at 19:23-20:06. Notwithstanding that the Court is holding that a cause of action for public nuisance may accrue before a particular plaintiff has suffered special damages, Mr. Wyman's contention leaves aside the fact that

Put simply, the problem for Mr. Wyman is this:  Even if he had not begun fishing in contaminated waters until March 6, 2012, his claim for permanent nuisance against Mallinckrodt would still have accrued in 1982 because that is when Mallinckrodt ceased having liability for mercury dumping.   The special injury requirement is divorced from the statute of limitations inquiry.  In a public nuisance, any breach of duty is to the public; because of this, the date of accrual for a public nuisance is not tied to the injury of any individual plaintiff, but rather to that of the public at large.

Mr. Wyman would be able to avoid the six-year statute of limitations if the discovery rule applied to his public nuisance claim.  But unfortunately for Mr. Wyman, neither the Legislature nor the Law Court has extended the discovery rule to the law of public nuisance.  There is no statutory discovery rule exception to the six-year statute of limitations for public nuisances and, although the Maine Supreme Judicial Court has not directly ruled on this question in the context of a public nuisance, to the extent the Law Court has addressed this issue in *Jacques*, it has not extended the discovery rule to nuisance claims.

Mr. Wyman's argument that he did not suffer the requisite special damages until the Maine DMR closed his fishing grounds in 2014 is, in the Court's view, another way of framing the discovery rule.  Once again, as a factual matter, the lobsters and crabs that Mr. Wyman caught from 1987 to 2014 in the area that the Maine DMR closed in 2014 would have contained elevated levels of mercury caused

---

a plaintiff may recover nominal damages in nuisance.  *See, e.g.*, *Dalphonse v. St. Laurent & Son, Inc.*, 2007 ME 53, ¶ 13, 922 A.2d 1200; *Brown*, 47 Me. at 162.

by Mallinckrodt's mercury dumping.  In other words, as a fisherman for contaminated lobster and crabs during the period from 1987 to 2014, Mr. Wyman had sustained special injury but did not know it as of 1987.  The Court concludes the discovery rule is not applicable in Maine in public nuisance cases.

Mr. Wyman also argues for application of the discovery rule to his permanent nuisance claim by stating that the Law Court is likely to follow the lead of authorities in Maryland, New Jersey, South Dakota, and Montana who have all held that "[a] claim for permanent nuisance must be brought within [the number of years specified in the statute of limitation] of the date when the permanency of the conditions [giving rise to a nuisance] bec[omes] manifest to a reasonably prudent person," because the Law Court cited all these authorities in *Jacques*.  *Pls.' Opp'n* at 12-13 (quoting *Litz*, 76 A.3d at 1087, 294 (Md. 1980)).  Mr. Wyman also cites Professor Dan B. Dobbs' Handbook on the Law of Remedies for the same proposition.  *Id.* at 12.

First, as Mallinckrodt correctly notes, "*Jacques* cited only two of the six authorities [Mr. Wyman] reference[d]," *Defs.' Reply* at 7, and those it did cite, it cited "for propositions totally unrelated to the discovery rule."  *Id.; see also Jacques*, 676 A.2d at 507-08 (citing *City of Sioux Falls v. Miller*, 492 N.W.2d 116, 119 (S.D. 1992) for the proposition that "periodic flooding from storm sewer system permanent nuisance because unlikely to be enjoined due in part to value to community" and DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 5.4 (1973) for factors used in determining whether something is a permanent or continuing nuisance).

Second, the Court has a strong indication from *Dunelawn's* discussion of the discovery rule, *Dunelawn*, 2000 ME 94, ¶ 14 ("Although the facts of this case present a difficult to discover breach, the absence of a fiduciary relationship in these facts prevents the application of the discovery rule"), and *Jacques'* brief reference to the accrual date for  permanent nuisance claims that the Law Court would not apply the discovery rule to permanent nuisance.

The same logic applies to Mr. Wyman's permanent strict liability claim.  In *Dunelawn*, the plaintiff asserted a strict liability claim along with other claims.  2000 ME 94, ¶ 10 ("Dunelawn next contends that their claims for negligence, strict liability, and breach of warranty of habitability survive application of the general statute of limitations . . . because they did not accrue until the date of the fire" (internal footnote omitted)).  The Law Court treated the strict liability claim just as it treated the negligence and breach of warranty claims and concluded that all claims were barred by the six-year statute of limitations, even though the fire caused by defective construction in the early 1980s did not occur until 1995. *Id.* ¶¶ 2-3, 10 n.11. *Dunelawn* stands for the position that a claim for strict liability that is not a continuing tort accrues at the time of a defendant's breach, not at the time of a plaintiff's injury, *id.* ¶ 12, and clarifies that the discovery rule does not apply to strict liability claims.  *Id.* ¶ 14; *see also Penobscot Energy Recovery Co. v. Bos-Hatten, Inc.*, 111 F. Supp. 2d 55, 57 (D. Me. 2000).  The Court is bound by the Law Court's determination of these issues.

Finally, if accepted, Mr. Wyman's expansive view of the accrual date for public nuisance claims would have significant public policy implications.   Mr. Wyman presses the argument that it is illogical to hold that his public nuisance cause of action accrued before he suffered the particular injury—the closures—for which he now seeks redress.  *Oral Arg. Tr.* at 13:19-21 ("Under the analysis that [the Court] just went through, Mr. Wyman would be precluded from bringing a lawsuit before he even had his license").  But a statute of limitations bars all stale claims, meritorious or not, because in the judgment of the Legislature, there must be an endpoint to liability.

The obverse is that for claims of public nuisance, under Mr. Wyman's theory, the statute of limitations begins again for each potential plaintiff whenever a new claimant can assert the recent onset of special damage.  Thus, under Mr. Wyman's theory, if the tree in *Brown v. Watson* were still obstructing the public highway in Somerset County, a passerby, even today, could assert she sustained special damage and sue Jonathan Watson (or his estate) more than one hundred and seventy years after he created the public nuisance because even though the nuisance existed for decades, her cause of action had not accrued until she personally sustained special damages.  The Court cannot square Mr. Wyman's proposition with the Law Court's language in *Jacques*, 676 A.2d at 506, or with its statement that "[t]he purpose of the statute [of limitations], in general, is to provide repose for potential defendants and to avoid the necessity of defending stale claims."  *Stromberg-Carlson Corp.*, 2001 ME 11, ¶ 13.

## C.     Continuing Nuisance

If a nuisance is continuing rather than permanent, then "a new cause of action accrues each day the hazardous materials remain . . .." *Jacques*, 676 A.2d at 506.  A nuisance is continuing when "the thing that constitutes the nuisance 'is not of such a permanent nature that it can not readily be removed and thus abated.'"[24]  *Id.* at 507 (quoting *Caron*, 128 Me. at 343).   Because the Court finds that Mallinckrodt has successfully raised the statute of limitations defense as to Mr. Wyman's permanent nuisance claim, it is Mr. Wyman's burden to "make a prima facie showing of facts that would support the tolling of the statute of limitations."  *Halliday v. Henry*, 2015 ME 61, ¶ 9, 116 A.3d 1270 (alterations omitted) (quoting *Angell v. Hallee*, 2012 ME 10, ¶ 11, 36 A.3d 922).  Whether a nuisance is readily abatable is a question of fact. *See Jacques*, 676 A.2d at 508 ("The abatability of the materials currently on lot B is a question of fact").   In *Jacques*, the plaintiffs raised such an issue of fact "by

---

[24]     At oral argument, Mr. Wyman raised the Montana case of *Burley v. Burlington Northern & Santa Fe Railway Co.*, 364 Mont. 77, 273 P.3d 825 (2012), for the proposition that the Law Court's "readily abatable" language is better understood as "feasibly abatable."  *Oral Arg. Tr.* at 31:11-32:17. In *Burley*, the Montana Supreme Court stated that "Montana cases that have discussed readily or easily abatable nuisances used that language more to describe the facts of those cases than to establish a standard," and thus "adopt[ed] the reasonably abatable standard for continuing torts as announced in RESTATEMENT (SECOND) OF TORTS § 839."  364 Mont. 77, ¶¶ 80, 89.  It may be the case that Mr. Wyman is correct, and if faced with this issue, the Law Court would retreat from the "readily abatable standard" and apply a lower bar to the determination of whether a nuisance is continuing.  But the Court must take the law as the Law Court has expressed it, and on this issue, the last clear pronouncement from the Law Court appears to be that a nuisance is continuing when it "is not of such a permanent nature that it can not readily be removed and thus abated."  *Jacques*, 676 A.2d at 507 (quoting *Caron*, 128 Me. at 343).
       Mr. Wyman also argues that *Jacques* does not create a "readily abatable" standard because footnote three of that case negates that language.  *Oral Arg. Tr.* at 33:05-17.  Footnote three states: "The issue is not before us and thus we do not decide what level of proof is necessary for the Jacques to successfully argue that the materials that are on lot B are in fact abatable."  *Jacques*, 676 A.2d at 508 n.3.  The Court does not see this language as negating the Law Court's "readily abatable" standard. Rather, this language suggests that the Law Court did not wish to weigh in on what level of proof is necessary to establish that a nuisance is indeed readily abatable before that issue was properly presented.

producing a 1992 DEP compliance order requiring the responsible parties to submit a remediation feasibility study.  As part of that study the responsible parties [had to] include at least the option of the removal of all wastes and contaminated soils from the site." *Id.*

Mr. Wyman argues that "the issue of whether the mercury contamination can be abated and the extent of the abatement that is feasible and reasonable is subject to ongoing proceedings" in the Federal RCRA Case, and it would therefore be "premature for this Court to dismiss this case based on one piece of evidence in the federal RCRA case proceedings in which all the evidence will be considered and a judgment will be issued."  *Pls.' Opp'n* at 10-11.  Mallinckrodt counters that Mr. Wyman's "focus on whether abatement of the alleged nuisance is *feasible*. . . . read[s] the word 'readily' out of the standard articulated by the Law Court."  *Defs.' Reply* at 13 (emphasis in original).  To Mallinckrodt, "[w]hile feasibility of a potential mercury remediation project remains an open question, the question of whether the alleged nuisance can 'readily be removed' is not."  *Id.*  In Mallinckrodt's view, the very fact "[t]hat feasibility of remediation remains an open question after more than 15 years of study and litigation establishes indisputably that the alleged nuisance cannot *readily* be removed."  *Id.* at 14 (emphasis in original).

The Court agrees with Mr. Wyman that the abatability of mercury contamination of lobster and crabs in the Maine DMR closed area remains a factual issue not determinable by summary judgment.  Mr. Wyman and Mallinckrodt cite Amec's Phase III Report filed in *Maine People's Alliance v. Mallinckrodt*, 1:00-cv-

00069-JAW.  However, the parties in the Federal RCRA Case have requested a month of trial time to assess the Amec Phase III Report and to plumb Amec's findings and recommendations and that case remains subject to trial.[25]  *See Notice of Hr'g*, *Maine People's All. v. HoltraChem Mf'g*, No. 1:00-cv-00069-JAW (D. Me. Mar. 6, 2020), ECF No. 1061.

The Court is aware, having presided over Phase II of *Maine People's Alliance*, that the scientific issues Amec addressed in its Phase III Report are extraordinarily dense, nuanced, and complex and involve professional judgments.  On its face, the fact that the parties in *Maine People's Alliance*, including Mallinckrodt, have requested a month of trial time for the Court to hear evidence on Amec's Phase III Report must mean that there are unresolved factual issues in this case—especially since both Mr. Wyman and Mallinckrodt are relying on the Amec Phase III Report to support their differing positions here.  Furthermore, the Law Court in *Jacques* did not "decide what level of proof is necessary for [plaintiffs] to successfully argue that the [alleged nuisance was] in fact abatable." *Jacques*, 676 A.2d at 508 n.3.[26]  In short,

---

[25]    More recently, the parties in *Maine People's Alliance* have engaged in discussions that they believe may lead to a resolution of that case, avoiding the need for a lengthy trial.  The Court has accommodated the parties and continued the trial with the hope that they will be able to amicably resolve this longstanding case.  To date, however, the parties have not informed the Court that they have arrived at a resolution and, if they were to do so, the Court would require that the parties demonstrate that the resolution, including any plan for abatement, satisfy the public interest.  In other words, the status of the *Maine People's Alliance* case does not allow a finding that the elevated mercury levels in lobsters and crabs in the closure area would or would not be readily abatable.

[26]    As Mallinckrodt notes, *Defs.' Mot.* at 8, the Law Court in *Jacques*, in dicta, cited *Moy v. Bell*, 46 Md. App. 364, 416 A.2d 289, 294 (Md. Ct. Spec. App. 1980), for the proposition that "more than likely any nuisance created can be abated, and therefore more appropriate inquiry is not possibility of abatement but the likelihood of the abatement." *Jacques*, 676 A.2d at 508 n.3.  At the same time, the Maine Supreme Judicial Court, as just noted, declined to decide what level of proof is necessary, leaving the standard of proof on abatability an open question in Maine.  *Id.*

the Court does not view this case as susceptible to summary judgment on the abatability issue.

### D.     Continuing Strict Liability

Neither party has presented the Court with a case in which the Maine Supreme Judicial Court has extended the continuing tort theory to claims for strict liability—either common law or statutory—and the Court could not find such a case. This raises two questions:  first, would the Law Court recognize a continuing tort theory for strict liability, and second, if so, when would such a claim accrue.

### 1.     Continuing Tort Doctrine

The Law Court "has not applied the common law continuing tort doctrine outside the realm of trespass and nuisance law," *Murphy v. Maine*, No. CV-06-62-B-W, 2006 WL 2514012, at *4 (D. Me. Aug. 29, 2006), and negligence in medical malpractice cases, *Baker v. Farrand*, 2011 ME 91, ¶ 29, 26 A.3d 806, though it has stated in dicta that "[t]he common law continuing tort doctrine may be applied when no single incident in a chain of tortuous activity can 'fairly or realistically be identified as the cause of significant harm.'" *McLaughlin*, 2003 ME 114, ¶ 23 n.6 (quoting *Fowkes v. Pa. R.R. Co.*, 264 F.2d 397, 399 (3d Cir. 1959)).  The Law Court in *McLaughlin* went on to say that "[i]n such cases, the breach of duty is regarded as a single continuing wrong that terminates when the exposure to the harm terminates." *Id.*

Despite this dictum in *McLaughlin*, the Law Court has been notably careful about extending the continuing tort doctrine beyond a few, narrow areas.  In *Dickey*

*v. Vermette*, the Law Court rejected application of the continuing course of treatment doctrine by which the limitations period in a medical malpractice case would not begin to run until the end of the doctor-patient relationship, finding that the Legislature's definition of when a cause of action accrued under the Health Security Act foreclosed application of the doctrine. *Dickey v. Vermette*, 2008 ME 179, ¶¶ 1, 7, 960 A.2d 1178.  In *Baker v. Farrand*, the Law Court expanded the continuing tort doctrine to cases involving a continuing course of negligent treatment, basing its analysis "on the language and authority of the Health Security Act and not the common law," and finding that "in cases involving a continuing course of negligent treatment, the Act allows for the possibility that two or more negligent acts or omissions might combine to proximately cause a patient's injury."  2011 ME 91, ¶¶ 25, 30.  In *Packgen, Inc.* 2019 ME 90, the Law Court declined to extend the continuing tort doctrine to legal malpractice claims, stating that "[w]ithout similar authorizing language [to that discussed in *Baker*] on which to draw, we are unable to conclude that the continuing negligence doctrine is applicable to claims for legal malpractice." 2019 ME 90, ¶¶ 34-35.  With this background, the Court turns to the Law Court's language in *McLaughlin*.

In *McLaughlin*, the Law Court did not consider whether a cause of action sounding in negligence and brought under the Maine Tort Claims Act constituted a continuing tort, as the theory was not alleged in the plaintiff's complaint and the doctrine had "never [been] applied in th[at] context."  2003 ME 114, ¶ 23 n.6.  The Court quoted a Third Circuit case for its formulation of the continuing tort doctrine

but stated only that the doctrine "may" be applied in such circumstances. *Id.* This delimiting word, "may," suggests that the Maine Supreme Judicial Court did not intend *McLaughlin* to open the floodgates of continuing torts to all common law tort causes of action. Rather, given the subsequent history of the continuing tort doctrine in the Law Court, it is likely that the Law Court was merely indicating a general receptivity to future arguments about its applicability. This interpretation is supported by the fact that in over sixteen years since the *McLaughlin* decision, the Law Court has not expanded the continuing tort doctrine to any common law cause of action—despite opportunities to do so in *Dickey*, *Baker*, and *Packgen*—and has only expanded it to statutory causes of action in the presence of supportive language from the legislature. The Court sees no indication that this hesitancy to impose continuing tort liability in the absence of legislative authorization would not extend to common law claims for strict liability.

Mr. Wyman also brings his strict liability claim under 38 M.R.S. § 1319-U(5). *First. Am. Compl.* ¶¶ 63-64. Section 1319-U(5) states:

> A person who disposes of or treats hazardous waste, when that disposal or treatment, in fact, endangers the health, safety or welfare of another, is liable in a civil suit for all resulting damages. It is not necessary to prove negligence.

> For the purposes of this section, damages are limited to damages to real estate or personal property or loss of income directly or indirectly as a result of a disposal or treatment of hazardous wastes. Damages awarded may be mitigated if the disposal or treatment is the result of an act of war or an act of God.

> Nothing in this section shall preclude any action for damages which may be maintained under the common law or the laws of this State.

38 M.R.S. § 1319-U(5).

Two portions of this section merit analysis. The first is "[a] person who disposes of or treats hazardous waste, when that disposal or treatment, in fact, endangers the health, safety or welfare of another, is liable in a civil suit for all resulting damages." *Id.* At first blush, use of the word "disposes" is ambiguous as to whether it refers to a single discrete act of disposal or multiple disposals. The later phrase "when that disposal or treatment," however, indicates that the Legislature is referring to a discrete act, rather than a continuing course of conduct. This becomes clearer when one considers the language in the second portion of this section that "damages are limited to damages to real estate or personal property or loss of income directly or indirectly as a result of a disposal or treatment." This language is similar to the language of the statute at issue in *Packgen*, 14 M.R.S. § 753-B, which refers to a singular "act or omission," interpreted by the Law Court as foreclosing application of the continuing tort doctrine, 2019 ME 90, ¶ 35, and unlike the language at issue in *Baker*, which spoke of "acts or omissions" and was interpreted as allowing a single cause of action to lie where multiple acts proximately caused the complained-of injury. 2011 ME 91, ¶¶ 23-24. The use of adjectives like "a" and "that" to modify "disposal" and "treatment" brings this statute more in line with the one in *Packgen*, and indicates that the Legislature did not intend that "a single cause of action . . . arise from multiple" acts of disposal.[27] *Baker*, 2011 ME 91, ¶ 24.

---

[27] At oral argument, Mr. Wyman argued that the phrase "that disposal" refers to "a person who disposes" rather than a single act of disposal. *Oral Arg. Tr.* at 54:11-13. The Court disagrees with this interpretation. The statute refers both to "[a] person" and "a disposal." 38 M.R.S. § 1319-U(5). Both the act and the actor are singular.

However, with regard to both the statutory and common-law strict liability claims, the Court is reluctant, "[a]s a federal court sitting in diversity . . . to expand Maine law," *Douglas v. York Cty.*, 433 F.3d 143, 149 (1st Cir. 2005), particularly where, as here, the issue of abatability is going to be factually resolved and may render resolution of the state law issues unnecessary. The Court leaves the question of whether the Law Court would hold that strict liability may be a continuing tort for another day.

### 2.    Accrual of Claim

Even if the Law Court were to recognize a continuing tort of strict liability, the question remains whether the statute of limitations on Mr. Wyman's strict liability claim would still have run prior to his bringing this action. In *Fowkes*, the case quoted by the Law Court in *McLaughlin*, 2003 ME 114, ¶ 23 n.6, the plaintiff's job required him to use a large air hammer which, due to an accumulation of water in the air lines leading to the hammer, would occasionally stop suddenly, causing the plaintiff a severe jolt. *Fowkes*, 264 F.2d at 398. The plaintiff experienced these jolts until he "successfully bid for lighter work involving the use of a smaller air hammer . . .." *Id.* He later became aware that he had developed an arthritic condition in his shoulder and back. *Id.* Because there was "no evidence that plaintiff ever suffered a single seriously injurious jolt," the Third Circuit stated that "no one incident was or could

---

In addition, Mr. Wyman made a policy argument that proving damages from discrete acts or periods of disposal is complicated, and thus the statute should be interpreted as implying a continuing tort. *Oral Arg. Tr.* at 55:12-56:07. But in the face of plain statutory language referring to discrete acts, the Court cannot read continuing tort liability into the Legislature's words, particularly in light of the Law Court's admonition that continuing liability is not available under a statute without clear "authorizing language . . .." *Packgen*, 2019 ME 90, ¶ 35.

fairly or realistically be identified as the cause of significant harm" and found that "the [three year] statute of limitations did not begin to run on the . . . claim before the plaintiff was relieved of jolting work with the heavy hammer," and therefore the plaintiff's claim—filed within three years of being relieved of duties related to the heavy hammer—was timely. *Id.* at 399. The critical factor in *Fowkes*, in other words, was that at least one tortious act in the chain of continuing activity occurred within the limitations period.

The logic in *Fowkes* lines up with the Law Court's dictum in *Packgen*. In *Packgen*, the Law Court stated that "[u]nder a continuing negligence theory, the statute of limitations period does 'not begin to run until the date of the last act of negligence'—the date of last injury." 2019 ME 90, ¶ 2 n.4. Even if the Law Court were to recognize a continuing tort theory of strict liability, there must be an act within the limitations period for the claim to not be time-barred.

The question thus becomes what constitutes an "act" for the purpose of a strict liability claim premised on disposal of hazardous waste. Is it the act of disposal, or like with nuisance, is it the act of leaving the hazardous waste to continue causing harm, even though the hazardous waste is readily abatable? If the former, Mr. Wyman's strict liability claim would have accrued, even under a continuing tort theory, in 1982. If the latter, then, as discussed above, a jury question remains as to whether the mercury contamination caused by Mallinckrodt's predecessors is readily abatable.

Two District of Maine cases have discussed the accrual of strict liability claims and reached opposite conclusions: *Lefebvre v. Central Maine Power Co.*, 7 F. Supp. 2d 64 (D. Me. 1998), and *Citizens Communications*, 2004 WL 1572612.  In *Lefebvre*, the defendant owned a piece of property from 1919 until 1949 on which it "generated and disposed of hazardous waste."  7 F. Supp. 2d at 66.  The plaintiff ultimately purchased the property more than thirty-five years later, in 1985, though he was unaware of the contamination at the time of purchase.  *Id.* at 67.  The plaintiff sued, alleging various claims including a common law strict liability claim.  *Id.* at 66.  The district court concluded that this claim was not barred by the statute of limitations because the allegations of "continuing harm caused by [the d]efendant's disposal" made "the Maine Law Court's analysis in *Jacques* persuasive in the context" of the plaintiff's strict liability claim.  *Id.* at 72.

In *Citizens Communications*, the plaintiff purchased "a parcel of land fronting on Dunnett's Cove in the Penobscot River" which was contaminated with tar slick due to activities by the defendant that had ceased at least forty years prior to the case, being decided.  2004 WL 1572612, at *1-2, *8.  While the Court allowed the public nuisance claim to go forward, it found that the strict liability claim was barred by the statute of limitations because "[u]nlike continuing trespass and nuisance theories, in which a claimant's injury stems from the ongoing existence of a harmful condition that could be removed, strict liability theory is premised on the abnormally dangerous nature of the defendant's *acts*, not the conditions created by those acts."  *Id.* at *8 (emphasis in original).  Thus in the *Citizens Communications* Court's view, "the

56

rationale of *Jacques* . . . does not logically extend to the [plaintiff's] strict liability claim," though it noted this point of disagreement with *Lefebvre*. *Id.*

Once again, with regard to the common law strict liability claim, the Court does not see any efficiency gains to be made by resolving this question of state law prior to the resolution of the abatability question, which may render such an analysis moot. The Court therefore denies Mallinckrodt summary judgment on the question of when a common law continuing tort strict liability claim accrues. However, the Court regards the language of 38 M.R.S. § 1319-U(5) as very clear: Such a cause of action accrues when someone "disposes of or treats hazardous waste" in such a way that the disposal or treatment "endangers the health, safety or welfare of another . . .." The statute does not speak of a failure to abate or give any indication that such a failure would be relevant to the accrual analysis for such a claim. Rather, liability is predicated on acts of "dispos[al] or treat[ment] . . .." *Id.* In the absence of such an act within the limitations period, as discussed above, the Court concludes that Mr. Wyman's statutory continuing strict liability claim is time-barred.[28]

---

[28]     The Court does not regard this reasoning as incompatible with *Lefebvre*, which is silent as to whether 38 M.R.S. § 1319-U(5) is implicated. In fact, it is unlikely that a statutory strict liability claim could have been brought in that case. In *Lefebvre*, the last act of disposal of hazardous waste by the defendant took place in 1949. 7 F. Supp. 2d at 66. Section 1319-U was not enacted until 1981 and was not effective until September of that year. AN ACT TO AMEND THE HAZARDOUS WASTE STATUTE TO MEET CERTAIN REQUIREMENTS FOR DELEGATION OF THE FEDERAL PROGRAM AND TO PROVIDE INTERNAL CONSISTENCY, 1981 ME. LAWS 693. In Maine, "all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used." *Morrill v. Me. Tpk. Auth.*, 2009 ME 116, ¶ 5, 983 A.2d 1065, 1067 (quoting *Terry v. St. Regis Paper Co.*, 459 A.2d 1106, 1109 (Me. 1983)). In *Lefebvre*, there were no acts of disposal for more than thirty years prior to the effective date of the statute, so even under a continuing tort theory, liability could not have attached under the statute.

## VI.   CONCLUSION

The Court GRANTS in part and DENIES in part Mallinckrodt's Cross-Motion for Partial Summary Judgment (ECF No. 64).   The Court GRANTS summary judgment in favor of Mallinckrodt on Counts II and IV, as well as Count III insofar as Count III alleges a statutory claim of strict liability.   The Court DENIES Mallinckrodt summary judgment on Count I and on Count III insofar as Count III alleges a common law claim of strict liability.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of April, 2020